No. 24-12289

In the

# United States Court of Appeals
## for the Eleventh Circuit

Barred Business, et al.,

*Plaintiff-Appellees*,

v.

Brian Kemp, Governor of Georgia, et al.,

*Defendant-Appellants*.

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:24-cv-02744 — Victoria M. Calvert, *Judge*

## BRIEF OF DEFENDANT-APPELLANTS GOVERNOR KEMP AND ATTORNEY GENERAL CARR

Beth Burton
  *Deputy Attorney General*
Elizabeth Crowder
  *Senior Ass't Attorney General*

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Elijah J. O'Kelley
  *Assistant Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Defendant-Appellants Kemp and Carr*

Barred Business v. Governor of Georgia, No. 24-12289

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

ACLU Foundation of Georgia, Counsel for Plaintiff-Appellees

American Civil Liberties Union of Georgia, Counsel for Plaintiff-Appellees

Athens-Clarke County Attorney's Office, Counsel for Defendant Will Fleenor

Barred Business, Plaintiff-Appellees

Bhattacharyya, Rupa, Counsel for Plaintiff-Appellees

Burton, Beth, Deputy Attorney General, Counsel for Defendant-Appellants Governor Brian Kemp and Attorney General Christopher M. Carr

Calambokidis, Shelby, Counsel for Plaintiff-Appellees

Calvert, Victoria M., United States District Court Judge, Northern District of Georgia

Carr, Christopher M., Attorney General, Defendant-Appellant

Crowder, Elizabeth McRary, Senior Assistant Attorney General, Counsel for Defendant-Appellants Governor Brian Kemp and Attorney General Christopher M. Carr

Fleenor, Will, Solicitor General for Athens-Clarke County, Defendant

Freidlin, Akiva, Counsel for Plaintiff-Appellees

Barred Business v. Governor of Georgia, No. 24-12289

Gammage, Keith E., Solicitor General for Fulton County,
Defendant

Georgetown University Law Center

Hines, Sherrie Lynn Hines, Counsel for Defendant Will Fleenor

Hawkins, John Matthew, Counsel for Defendant Will Fleenor

Institute for Constitutional Advocacy and Protection, Counsel for
Plaintiff-Appellees

Isaacson, Cory, Counsel for Plaintiff-Appellees

Kemp, Brian, Governor, Defendant-Appellant

Lichtenstein, Alexandra, Counsel for Plaintiff-Appellees

Lopez-Delgado, Andres Martin, Counsel for Plaintiff-Appellees

Mead, Joseph, Counsel for Plaintiff-Appellees

Oconee Street United Methodist Church

Office of the Fulton County Attorney, Counsel for Defendant Keith
E. Gammage

O'Kelley, Elijah J., Assistant Solicitor General, Counsel for
Defendant-Appellants Governor Brian Kemp and Attorney
General Christopher M. Carr

Petrany, Stephen J., Solicitor General, Counsel for Defendant-
Appellants Governor Brian Kemp and Attorney General
Christopher M. Carr

Piper, Tina M., Former Senior Assistant Attorney General,
Former Counsel for Defendant-Appellants Governor Brian
Kemp and Attorney General Christopher M. Carr

Barred Business v. Governor of Georgia, No. 24-12289

Plott, Mathew Eli, Counsel for Defendant Keith E. Gammage

Powell, William, Counsel for Plaintiff-Appellees

Simonson, Jocelyn, Professor of Law and Associate Dean for Research and Scholarship at Brooklyn Law School

Simpson, Bridgett, Executive Director of Barred Business

Vodicka, John Cole, Plaintiff-Appellee

Williams, Steven, Plaintiff-Appellee

No publicly traded company or corporation has an interest in the outcome of this appeal.

/s/ *Stephen J. Petrany*
Stephen J. Petrany
*Counsel for Defendant-Appellants Kemp and Carr*

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellants request oral argument in this case. The district court preliminarily enjoined Georgia's modest limits on the practice of charitable bail funds, and it did so on the basis of deeply erroneous vagueness and First Amendment theories. The decisional process would be aided by oral argument.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ............................................... i

Table of Authorities ................................................................. iv

Jurisdiction ............................................................................ x

Statement of Issues ................................................................. 1

Introduction ........................................................................... 2

Statement of the Case ............................................................... 6

    A.  Statutory Background ........................................................ 6

        1.  Cash Bond Limit ........................................................ 10

        2.  Surety Requirement ................................................... 11

    B.  Factual Background ......................................................... 11

    C.  Proceedings Below .......................................................... 12

    D.  Standard of Review ......................................................... 15

Summary of Argument .............................................................. 15

Argument ............................................................................... 22

    I.  Plaintiffs are not likely to succeed on the merits of their
        claims. ....................................................................... 22

        A.  The Cash Bond Limit is not vague ................................. 23

        B.  The Cash Bond Limit does not implicate the First
            Amendment, much less violate it. .................................. 31

            1.  The Cash Bond Limit does not trigger First
                Amendment scrutiny because it regulates conduct
                (the payment of bail), not speech. ........................... 32

# TABLE OF CONTENTS
## (continued)

Page

2.  Even if the Cash Bond Limit regulates expressive conduct, it satisfies intermediate scrutiny. ............. 46

C.  The Surety Requirement does not implicate the First Amendment, much less violate it. ................................. 48

1.  The Surety Requirement is a licensing scheme that regulates conduct, not speech. ................................ 49

2.  Even if the Surety Requirement regulates speech, it does not violate the First Amendment. ................... 54

II. The equities weigh against a preliminary injunction. ....... 58

Conclusion ....................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adderley v. Florida*,
   385 U.S. 39 (1966) ...................................................................... 44

*Ala. Educ. Ass'n v. State Superintendent of Educ.*,
   746 F.3d 1135 (11th Cir. 2014) .....................................17, 25, 27

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir. 2015) ...................................................... 28

*Ayotte v. Planned Parenthood of N. New England*,
   546 U.S. 320 (2006) ................................................................... 53

*Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*,
   76 F.4th 569 (7th Cir. 2023)
   ........................................ 18, 20, 33, 34, 35, 36, 40, 41, 45, 46, 57

*Bowen v. Roy*,
   476 U.S. 693 (1986) .............................................................37, 38

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ................................................................... 53

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
   596 U.S. 61 (2022) ...............................................................54, 55

*City of Dallas v. Stanglin*,
   490 U.S. 19 (1989) ..................................................................... 32

*Clark v. Cmty. For Creative Non-Violence*,
   468 U.S. 288 (1984) ................................................................... 33

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971) ................................................................... 23

iv

*Curling v. Raffensperger*,
   50 F.4th 1114 (11th Cir. 2022) ................................................. 15

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
   26 F.4th 1214 (11th Cir. 2022) ........................................5, 21, 51

*Doe v. Valencia Coll.*,
   903 F.3d 1220 (11th Cir. 2018) ................................................. 25

*Fort Lauderdale Food Not Bombs v. City of Fort
   Lauderdale*,
   11 F.4th 1266 (11th Cir. 2021) (*Food Not Bombs II*)
   ......................................................................................42, 46, 47

*Fort Lauderdale Food Not Bombs v. City of Fort
   Lauderdale*,
   901 F.3d 1235 (11th Cir. 2018) (*Food Not Bombs I*)
   ................................................... 18, 19, 32, 33, 39, 41, 43, 44, 45

*Frazier v. Winn*,
   535 F.3d 1279 (11th Cir. 2008) ................................................. 54

*In re Gateway Radiology Consultants, P.A.*,
   983 F.3d 1239 (11th Cir. 2020) ................................................. 30

*Harrison v. Wigington*,
   269 Ga. 388 (1998) ................................................................... 53

*Heyman v. Cooper*,
   31 F.4th 1315 (11th Cir. 2022) ............................................24, 29

*High Ol' Times, Inc. v. Busbee*,
   673 F.2d 1225 (11th Cir. 1982) ............................................24, 29

*Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ........................................ 4, 16, 17, 24, 25, 27

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ..................................................................... 27

v

*KH Outdoor, LLC v. City of Trussville,*
  458 F.3d 1261 (11th Cir. 2006) ................................................. 58

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of*
  *State,*
  66 F.4th 905 (11th Cir. 2023)..........................................4, 16, 25

*Lichtenstein v. Hargett,*
  83 F.4th 575 (6th Cir. 2023)....................................................... 33

*Locke v. Shore,*
  634 F.3d 1185 (11th Cir. 2011) ................................................. 50

*Lowery v. Euverard,*
  497 F.3d 584 (6th Cir. 2007) ................................................36, 39

*Martin v. Lloyd,*
  700 F.3d 132 (4th Cir. 2012) .................................................... 24

*Maryland v. King,*
  567 U.S. 1301 (2012) ................................................................ 60

*Minn. Voters All. v. Mansky,*
  585 U.S. 1 (2018) ...............................................................36, 37

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
  585 U.S. 755 (2018) .................................................................. 50

*New Ga. Project, Inc. v. Att'y Gen., State of Ga.,*
  106 F.4th 1237 (11th Cir. 2024)......................................2, 27, 40

*Otto v. City of Boca Raton,*
  981 F.3d 854 (11th Cir. 2020) .................................................. 55

*Pryor Org. v. Stewart,*
  274 Ga. 487 (2001)..........................................2, 8, 9, 21, 47, 57

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006)
  ................................................. 4, 5, 19, 20, 32, 38, 40, 41, 48, 50

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ............................................................19, 38

*Schultz v. Alabama*,
  42 F.4th 1298 (11th Cir. 2022)
  ............................................ 3, 7, 20, 21, 37, 39, 47, 56

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) (en banc)
  ................................................................15, 22, 58, 59

*SisterSong Women of Color Reprod. Just. Collective v.
  Governor of Ga.*,
  40 F.4th 1320 (11th Cir. 2022)..................................3, 18, 24, 31

*Spence v. Washington*,
  418 U.S. 405 (1974) ................................................................ 33

*Stardust, 3007 LLC v. City of Brookhaven*,
  899 F.3d 1164 (11th Cir. 2018) ................................................ 24

*Texas v. Johnson*,
  491 U.S. 397 (1989) ................................................................ 34

*Turner Broad. Sys. v. FCC*,
  520 U.S. 180 (1997) ................................................................ 57

*United States v. Bronstein*,
  849 F.3d 1101 (D.C. Cir. 2017)................................................ 24

*United States v. Kokinda*,
  497 U.S. 720 (1990) ................................................................ 36

*United States v. O'Brien*,
  391 U.S. 367 (1968) ................................................................ 32

*United States v. Patterson*,
  431 F.3d 832 (5th Cir. 2005) ................................................... 28

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) ............................................................. 25

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................. 25

*United States v. Williams,*
    553 U.S. 285 (2008) .............................................................23, 24

*Walker v. City of Calhoun, Ga.,*
    901 F.3d 1245 (11th Cir. 2018) ....................................19, 37, 39

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ................................................................. 38

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ................................................................. 56

*Wollschlaeger v. Governor, Fla.,*
    848 F.3d 1293 (11th Cir. 2017) (en banc) ............................... 51

*Wreal, LLC v. Amazon.com,*
    840 F.3d 1244 (11th Cir. 2016) ............................................... 59

**Statutes & Constitutional Provisions**

O.C.G.A. § 17-6-1 .......................................................... 6, 9

O.C.G.A. § 17-6-4 ............................................................. 7

O.C.G.A. § 17-6-12 ........................................................... 7

O.C.G.A. §17-6-12 ............................................................ 7

O.C.G.A. § 17-6-15
    ..................................... 1, 2, 7, 8, 9, 10, 11, 26, 30, 49, 50, 51, 55

O.C.G.A. § 17-6-30 ............................................................ 8

O.C.G.A. § 17-6-50 .......................................................8, 11, 50, 52

O.C.G.A. § 18-4-1 ................................................................ 52

O.C.G.A. § 43-15-2 .............................................................. 52

U.S. Const. amend. I ............................................................. 32

**Other Authorities**

Eugene Volokh, *Symbolic Expression and the Original Meaning of the First Amendment*, 97 Geo. L.J. 1057 (2009) .................................................................. 34

Rob Kuznia & Yahya Abou-Ghazala, *Bailed out, arrested again: These charities boomed after the murder of George Floyd. They're under fire for bailing out violent offenders*, CNN (Mar. 21, 2023), https://www.cnn.com/2023/03/21/us/bail-reform-bail-charities-invs/index.html ............................................ 57

Senate Bill 63, 157th Gen. Assemb., Reg. Sess. (Ga. 2024) ..................................................................... 9

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellees sued the Defendant-Appellants under 42 U.S.C. § 1983.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court granted a preliminary injunction prohibiting enforcement of O.C.G.A. § 17-6-15-(b)(4)–(6).

This appeal is timely because the district court granted the preliminary injunction on July 12, 2024, Doc. 38, and Defendant-Appellants filed a notice of appeal on July 16, 2024, Doc. 41.

x

# STATEMENT OF ISSUES

1.    Georgia's cash bail reform law provides that "[n]o more than three cash bonds may be posted per year by any individual, corporation, organization, charity, nonprofit corporation, or group in any jurisdiction."  O.C.G.A. § 17-6-15(b)(4).  The question is whether the district court erred when it enjoined that rule on the basis that the term "group" is supposedly facially unconstitutionally vague, even where there is no dispute that the statute applies to Plaintiff-Appellees' conduct.

2.    Whether the district court erred in ruling that the act of paying someone else's cash bail is inherently expressive conduct such that Georgia cannot regulate it without triggering First Amendment scrutiny.

3.    Whether the district court erred in facially enjoining Georgia from requiring individuals and entities who "purport" to be charitable bail funds to submit to licensing requirements even though this Court has sustained substantively identical statutory language against First Amendment challenges.

## INTRODUCTION

Laws are not facially unconstitutionally vague just because hypothetical edge cases require statutory interpretation.  Nor does regulation of conduct (like the payment of cash bail) implicate First Amendment scrutiny just because certain plaintiffs engage in expression *outside* of the regulated conduct.  Yet here, the district court enjoined Georgia's modest bail reform law on the basis of these and other errors.  Had the district court actually "engaged" with the controlling law, *New Ga. Project, Inc. v. Att'y Gen., State of Ga.*, 106 F.4th 1237, 1244 (11th Cir. 2024), it would have easily rejected the motion for a preliminary injunction. This Court should reverse.

Georgia recently enacted reforms to its criminal bail system that (1) limit the number of times per year that third parties can pay cash bail for someone else and (2) impose licensing requirements on charitable bail funds, similar to the requirements for professional bond companies.  O.C.G.A. § 17-6-15(b)(4).  The purpose of these reforms is plain: charitable bail funds, which raise money to release detainees via cash bail, were previously unregulated, and greater oversight limits the opportunities for "unscrupulous" actors to "seriously interfere with the fair and proper administration of the criminal laws." *Pryor Org. v.*

*Stewart*, 274 Ga. 487, 488–89 (2001) (quoting *Jackson v. Beavers*, 156 Ga. 71, 75 (1923)).

Well-meaning people can disagree on the wisdom of these reforms, but there is no question that they sit well within the power of the State to enforce.  A bail system with pretrial release is a "government benefit."  *Schultz v. Alabama*, 42 F.4th 1298, 1323 (11th Cir. 2022).  And third parties have no right to pay someone else's cash bail *at all*.  Indeed, Georgia, or any state, could simply ban charitable bail funds from paying for bail across the board.

The district court, nevertheless, preliminarily enjoined the Georgia law at the behest of Plaintiff-Appellees: individuals and a charitable bail fund that raise money to pay cash bail.  Plaintiffs argued that the law was vague and infringed their right to free expression.  The district court agreed, holding that a statute with "competing, but reasonable interpretations" is somehow vague, Doc 38 at 22, and that the act of paying bail is somehow inherently expressive, *id.* at 34.

The district court's analysis is riddled with errors from top to bottom.  Take vagueness, to start.  To be vague, a law must have no discernible "core meaning."  *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327

3

(11th Cir. 2022) (quotation omitted).  To be *facially* vague, a law must have no meaning in any of its applications.  *Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982); *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 946 (11th Cir. 2023).  That can't possibly be the case here, where the district court itself acknowledged that the law "[p]lainly" applies to Plaintiffs.  Doc. 38 at 17.  The district court nevertheless held that the law is facially vague because it applies to any "individual, corporation, organization, charity, nonprofit corporation, or group," and the district court fretted that it was not entirely clear what certain applications of the word "group" might mean.  *Id.* at 17–19, 23.  Likewise, the court was worried that certain interpretations might involve substantive constitutional problems, *id.* at 21–22—a mistaken concern, but in any event an irrelevant one.  Edge cases and perceived substantive constitutional concerns do not make a statute vague.

Similarly, the district court invented its own First Amendment standard.  The First Amendment does not protect conduct, *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006), so it does not apply to a regulation of the payment of cash bail, which is plainly conduct.  The district court held that paying bail is expressive conduct but failed to consider whether paying cash bail is

4

*inherently* expressive.  Instead, the district court created a First Amendment interest by pointing to all the unregulated, irrelevant expressive conduct Plaintiffs engage in, including cheering or protesting outside of jails, wearing t-shirts, informing others of their mission, and the like.  Doc. 38 at 34.  The district court's reliance on this unregulated activity got things exactly backwards: "The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive." *Rumsfeld*, 547 U.S. at 66

The court also wrongly held that Georgia could not impose licensing requirements on charitable bail funds because the statute identifies the regulated parties as those who "purport" to be a charitable bail fund.  Doc. 38 at 46–48.  In the district court's view, "purporting" to be a charitable bail fund is protected speech. *Id.*  But even if that is true, the statute does not *regulate* that speech.  This Court has held that licensure requirements are not subject to First Amendment scrutiny simply because they identify the regulated parties by reference to what the parties "hold[] themselves out to be." *See Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1217, 1220 (11th Cir. 2022).

On top of everything else, these Plaintiffs are particularly unsuited for the relief of a preliminary injunction.  They delayed

filing their lawsuit until the eve of the law's effective date, which discredits claims of imminent harm. And Plaintiffs are not detainees, nor are they at any urgent risk of losing some right or suffering some harm. They merely want to participate in a government program on their own terms and without having to follow the requirements that everyone else must. That does not entitle them to the extraordinary relief of a preliminary injunction.

This Court should reverse.

## STATEMENT OF THE CASE

Georgia amended its criminal bail system to limit the number of times individuals or entities can pay someone else's cash bail per year and require charitable bail funds to satisfy the same licensing and other requirements as professional bond companies. Plaintiffs filed a lawsuit challenging those provisions as unconstitutional and moved to preliminarily enjoin them. The district court granted the preliminary injunction.

### A. Statutory Background

Like every State and the federal government, Georgia law authorizes judges to release pretrial detainees in certain circumstances. *See* O.C.G.A. § 17-6-1. The release can sometimes

be "unsecured," where the pretrial detainee is released on his own recognizance. *See id.* § 17-6-12. Other times, the release must be "secured" by bail in an amount the judge sets, based on certain considerations such as flight risk or dangerousness. *See, e.g.*, *id.* §§ 17-6-1(e), 17-6-12(d), 17-6-15(b)(3).

Bail systems serve obvious and important interests. They benefit detainees by allowing many of them pretrial release. Bail systems also benefit the State by reducing its costs of incarceration. And they are generally designed to mitigate the risks that detainees will abuse their release by failing to show up to court or committing crimes while released. *See Schultz*, 42 F.4th at 1306 (purpose of bail is "getting defendants to appear for court proceedings and ensuring public safety").

Relevant here, bail can be posted by cash or surety bond. To post bail by cash, the detainee (or someone on his behalf) must "deposit[] cash in the amount of the bond so required with the appropriate person, official, or other depository." O.C.G.A. § 17-6-4(a). To post bail by surety, the detainee typically uses the services of a professional bond company or bondsman that the county sheriff has accepted as an acceptable surety. *Id.* § 17-6-15(b)(1). The detainee typically pays the professional a percentage of the bail amount, and the professional then posts bond on the

detainee's behalf, effectively assuming the responsibility for the detainee's future presence in court.  *See id.* § 17-6-30.

Georgia's bail system regulates professional bond companies and professional bondsmen, who are defined as those who "hold themselves out as signers or sureties of bonds for compensation." O.C.G.A. § 17-6-50(a).  They are subject to several licensing and oversight safeguards.  They must, among other things, have complete documentation of their composition and employees; be at least a yearlong resident of Georgia and have a business license in the jurisdiction where they write bonds; have clean criminal records as to felonies and crimes of moral turpitude; be in good standing with respect to all applicable laws; be of good moral character; maintain up to date contact information with the clerk of courts; and be approved by the sheriff in the county where they write bonds.  *Id.* §§ 17-6-15(b)(1), 17-6-50(b).

Those requirements help to safeguard the State's bail and penal systems against possible abuse.  The "business of professional bondsmen … affords peculiar opportunity for fraud and imposition upon the persons whom they serve." *Pryor Org.*, 274 Ga. at 488 (quoting *Jackson*, 156 Ga. at 75).  Equally concerning, "[s]uch business may be so conducted as to seriously interfere with the fair and proper administration of the criminal

laws" because the "unscrupulous may devise means and methods for the escape of violators of the penal statutes" and they "may use improper and illegal means to secure the acquittal of their clients." *Id.* at 488–89.

Unlike the regulation of professional bond companies, Georgia previously had no regulation or oversight of the practice of outright paying someone else's cash bail.  The Georgia General Assembly changed that with Senate Bill 63 in 2024.  *See* S.B. 63, 157th Gen. Assemb., Reg. Sess. (Ga. 2024).  The bill made numerous reforms to the bail system, including, for instance, barring the unsecured release of a person until that person has appeared before a judge.  *See* O.C.G.A. § 17-6-1(f)(1).

Relevant here, Section 4 of Senate Bill 63, codified at O.C.G.A. § 17-6-15(b)(4)–(6), addresses the practice of paying people's cash bail and charitable bail funds.  In relevant part, it provides:

> No more than three cash bonds may be posted per year by any individual, corporation, organization, charity, nonprofit corporation, or group in any jurisdiction.  Every individual, corporation, organization, charity, nonprofit corporation, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons shall be required to submit to the same requirements as any professional surety company, including, without limitation, the

> requirements set forth in paragraph (1) of this subsection
> and Code Sections 17-6-50, 17-6-50.1, and 17-6-51.
> *Id.* § 17-6-15(b)(4).

Violations of subsection (b)(4) are a misdemeanor offense. *Id.*
§ 17-6-15(b)(6).

The first sentence of that subsection is the "Cash Bond
Limit." The second sentence is the "Surety Requirement."

## 1. Cash Bond Limit

The Cash Bond Limit precludes anyone from posting a cash
bond (as opposed to a surety bond) for someone else more than
three times in a particular jurisdiction in a year. By applying to
"any individual, corporation, organization, charity, nonprofit
corporation, or group," *id.* § 17-6-15(b)(4), the Cash Bond Limit
applies to everyone. Thus, professional bondsmen, charitable
organizations, and solo charitable individuals are all subject to the
three-cash-bond limit. So is any "group" of two or more
individuals or entities that have coordinated to post someone's
cash bond.

The Cash Bond Limit has a bounded temporal and
jurisdictional reach, applying to the posting of three cash bonds
within a single county within a single year. The text applies to
cash bonds "posted … in any jurisdiction." *Id.* And the
"jurisdiction" in which a bond is "posted" is the county where the

transaction happens.  *Id.* § 17-6-15(b)(1) (establishing prerequisites for the "sheriff of the *county*" to accept a professional bond company as surety (emphasis added)).  The limit applies only "per year."  *Id.* § 17-6-15(b)(4).  The upshot is that individuals or entities can post cash bonds for others up to three times per year in each jurisdiction in Georgia.

### 2.  Surety Requirement

The Surety Requirement provides that "charitable bail fund[s]" must satisfy the same requirements as professional bond companies and professional bondsmen.  *See, e.g.*, *id.* § 17-6-15(b)(1) (requirements for "a professional bonding company"); *id.* § 17-6-50 (requirements for a "professional bondsman").  A "charitable bail fund" is defined as any individual or entity that "purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons."  *Id.* § 17-6-15(b)(4).  Thus, when an individual or entity pays bail with money that was raised for that purpose, that individual or entity is subject to the licensing and other requirements that apply to all professional bondsmen.

### B.  Factual Background

Plaintiffs are John Cole Vodicka, Steven Williams, and nonprofit organization Barred Business.  Vodicka and Williams, in

connection with their church service and with a charitable bail fund administered by their church, pay people's bail. *See* Doc. 36-2 at 1; Doc 1 at 12. Barred Business is a nonprofit that solicits donations for use in its efforts to bail people out of jail. Doc. 5-1 at 2; Doc 36-1 at 15.

When Plaintiffs post cash bail, they also engage in a variety of other conduct that is not regulated by Georgia's bail laws. Vodicka, for example, will sign into the jail noting his church affiliation, and he will have conversations with jail staff to inform them that he is there in connection with his church's charitable bail fund. Doc. 36-2 at 2. He will also offer the releasee a car ride or money for a meal. *Id.* Barred Business will sometimes gather volunteers wearing matching t-shirts and holding signs to wait in the parking lot of the jail to greet the releasee. *See* Doc. 36-1 at 1–2. They are also "often joined by family members" of the releasee. *Id.*

### C. Proceedings Below

The Georgia General Assembly enacted Senate Bill 63 on April 2, 2024, and Governor Kemp signed it into law on May 1, 2024, with the law's effective date set as July 1, 2024. On June 21, 2024—six business days before SB 63's effective date—Plaintiffs filed a complaint seeking declaratory and injunctive

relief barring the enforcement of Section 4 of SB 63. Doc. 1 at 48. Plaintiffs named as defendants the Governor and Attorney General, along with the Solicitors General of Fulton County and Athens-Clarke County. *Id.* at 1.

The day after filing their complaint, on June 22, 2024, Plaintiffs moved for a temporary restraining order and expedited preliminary injunction. Doc. 2. They asserted that Section 4 of SB 63 violates their First Amendment free expression, free exercise, and free association rights, and that the law was unconstitutionally vague in violation of the Due Process Clause. *Id.* The district court ordered a hearing on the motion to take place on June 28, 2024; it also ordered the defendants to file any response to Plaintiffs' motion by noon on June 27, 2024. Doc. 10.

At the hearing, the district court ruled from the bench that it would grant a temporary restraining order because, in the court's view, the Cash Bond Limit was likely unconstitutionally vague and the Surety Requirement likely violated Plaintiffs' free expression rights. *See* Doc. 37 at 40–42; *see also* Doc. 34 (text order). The court also stated that it did not believe Plaintiffs had made an evidentiary showing supporting their First Amendment free expression claim as to the Cash Bond Limit, but that it would

allow Plaintiffs to submit supplemental evidentiary declarations on that issue.  Doc 37 at 43–44.

Plaintiffs filed supplemental declarations from Barred Business, Vodicka, and law professor Jocelyn Simonson.  Doc 36. Those declarations included additional detail about the non-bail-paying activity that Plaintiffs engage in, such as information about Barred Business's gatherings outside of jails, their social media posts, parties and brunches they host, and their fundraising efforts.  *See, e.g.*, Doc. 36-1.

The district court then preliminarily enjoined the enforcement of all of Section 4 of SB 63.  Doc. 38.  As to the Cash Bond Limit, the court ruled that it was likely facially unconstitutionally vague, even though no one contested that it applies to *Plaintiffs*' activities.  *Id.* at 14–24.

The court also ruled that, as applied, the Cash Bond Limit likely violates Plaintiffs' free expression rights because it regulates their expressive conduct and fails intermediate scrutiny. *Id.* at 31–41.  Although seemingly acknowledging that the bare act of paying cash bail for another is not inherently expressive, the district court declared that examining only the act actually regulated was "too narrow" a lens.  *Id.* at 36.  The district court instead relied on the various activities Plaintiffs engage in other

14

than posting bail, such as wearing message t-shirts and cheering outside of the jail.  *Id.* at 34.

As to the Surety Requirement, the court concluded that it likely facially violates the First Amendment because it imposes a content-based restriction on free expression: it applies to entities that "purport to be … charitable bail fund[s]," which the court took to be a targeting of speech.  *Id.* at 46–50 (quotation omitted and alteration adopted).

Finally, the court summarily decided that the other preliminary injunction factors weigh in Plaintiffs' favor, excusing Plaintiffs' 2-month delay in filing a lawsuit because "it is unreasonable" to expect them to have found counsel sooner.  *Id.* at 50–51.

## D.  Standard of Review

This Court reviews the grant of a preliminary injunction for abuse of discretion but reviews any underlying legal questions *de novo*.  *Curling v. Raffensperger*, 50 F.4th 1114, 1120–21 (11th Cir. 2022).

## SUMMARY OF ARGUMENT

A preliminary injunction is an "extraordinary and drastic remedy," *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en

banc) (quotation omitted), and Plaintiffs are not entitled to one here. Plaintiffs have no likelihood of success on the merits, as the act is not vague and does not regulate expression. Beyond the merits, the equities weigh against a preliminary injunction because Plaintiffs face no imminent harm, delayed for no reason, and merely want to voluntarily participate in a government program free from the government's rules and oversight. This Court should reverse, and it should do so quickly.

**I.** The district court was wrong on the merits across the board. The statute is not vague, and it regulates the non-expressive *act* of paying bail. Regulating non-expressive conduct does not even implicate the First Amendment, and the district court's contrary conclusion was based on an array of errors.

**A.** To start, the Cash Bond Limit is not vague, and it is not a close question. The statute limits groups or individuals to three cash bail payments per year in a single jurisdiction. There is nothing unclear about that, and at the very least, it is not *facially* vague, i.e., unconstitutional in all applications. *Hoffman Ests.*, 455 U.S. at 494–95; *League of Women Voters*, 66 F.4th at 946.

The district court erroneously held otherwise. The court held that it was unclear what constitutes a "group." Doc. 38 at 19, 23. And the court wondered whether paying bail for oneself or a

16

family member counted toward the three-cash-bail-payment limit. *Id.* at 17–21. But rather than conduct an actual vagueness analysis, the court declared that there were "two competing, but reasonable interpretations" of the Act and it was therefore vague. *Id.* at 22–23.

Even under the district court's own deeply mistaken analysis, the law is not *facially* vague because it plainly covers Plaintiffs' conduct. "Where an enactment clearly covers some conduct in which a plaintiff engages, that plaintiff cannot complain of the vagueness of the law." *Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1139–40 (11th Cir. 2014). The district court's digressions into questions about the scope of the term "group" and whether the law limits payments for family members or oneself are irrelevant. Plaintiffs here are definitively "individuals" and a "nonprofit corporation" covered by the law, and they are not paying bail for themselves. That is enough to end the analysis. And even if some applications to some of Plaintiffs' conduct could be unclear, that would not change the outcome because it is improper to declare a law "void for vagueness because it is unclear in *some* of its applications to the conduct of [the plaintiffs]." *Hoffman Ests.*, 455 U.S. at 495.

On top of everything else, the district court never correctly analyzed whether the law is vague in *any* application. A statute is not unconstitutionally vague because it requires interpretation. Statutes can be complex and confusing and require canons of construction, deep textual analysis, and all manner of interpretation, and yet they are not vague unless they are "utterly devoid of a standard of conduct so that [they] simply [have] no core and cannot be validly applied to any conduct." *SisterSong*, 40 F.4th at 1327. The Cash Bond Limit is nowhere close to that level of indeterminacy.

**B.** The Cash Bond Limit does not implicate the First Amendment because it does not regulate speech. Conduct is protected by the First Amendment only when it is *inherently* expressive, meaning that a "reasonable observer" would view it "as conveying some sort of message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1242 (11th Cir. 2018) (*Food Not Bombs I*). But paying cash bail is no more than the transfer of money to a bail clerk, and "a reasonable person witnessing [Plaintiffs] paying cash bail would not detect *any* message from the act itself." *Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 577 (7th Cir. 2023). That is especially true because, as Plaintiffs themselves admit, they engage in

18

expression to explain why they are posting bail.  *See* Doc. 36-2 at 2.  But if conduct requires explanation, that means it is *not* inherently expressive.  *Rumsfeld*, 547 U.S. at 66.

That should end the inquiry, but here the question is even easier because the payment of bail is participation in a government program.  Non-detainees like Plaintiffs have no right to pay other people's bail in the first place, and because the State is entitled to wide latitude in fashioning procedures for setting bail, *see Walker v. City of Calhoun, Ga.*, 901 F.3d 1245, 1268 (11th Cir. 2018), it can surely establish the parameters for how non-detainees may participate in Georgia's bail system.  Plaintiffs cannot use their voluntary participation in a government program to then force the State to let them participate in whatever way they please.  *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 194, 199 & n.5 (1991).

The district court held otherwise only by again ignoring the actual legal standards at issue.  The district court did not even examine whether the payment of cash bail is, by itself, "inherently expressive." *Food Not Bombs I*, 901 F.3d at 1240 (quotation omitted).  Instead, the court focused on all the activity that Plaintiffs engage in—gathering outside jails, holding signs, and wearing matching t-shirts, Doc. 38 at 34—*other* than paying bail.

But not only is that legally erroneous, the necessity of explanatory speech cuts against the notion that paying bail is inherently expressive. *See, e.g.*, *Rumsfeld*, 547 U.S. at 66; *Bail Project*, 76 F.4th at 577. So does the fact that paying bail happens inside a jail—a place that is not, and never has been, a forum for speech.

Regardless, even if the Cash Bond Limit does somehow regulate speech, it satisfies intermediate scrutiny. The State has a "compelling interest in assuring the presence at trial of persons charged with crime." *Schultz*, 42 F.4th at 1323 (quotation omitted). Even assuming the Cash Bond Limit affects speech, it barely does, and is thus narrowly tailored to advance the State's compelling interest.

**C.** Lastly, the district court incorrectly ruled that the Surety Requirement regulates speech because it applies to an individual or entity that "purports to be a charitable bail fund." Doc. 38 at 47. In the district court's view, "purporting" to be a charitable bail fund is expressive, so the statute's imposition of limitations on those who do so is a content-based limitation on speech. *Id.* at 46–47. But this licensing requirement does not target speech: it simply identifies charitable bail funds and imposes licensing requirements on that group of entities. This Court has held licensing requirements do not trigger First Amendment scrutiny

20

at all even when they apply to someone who "hold[s] himself or herself out" as something. *See, e.g.*, *Del Castillo*, 26 F.4th at 1217, 1219. And that makes sense. The Surety Requirement does not regulate what anyone can say, whether anyone can "purport" to be anything, or how anyone can engage in the purporting. It is just a routine statutory definition that correctly identifies who the statute applies to without incorrectly sweeping in other actors.

Even if the Surety Requirement did regulate speech, it would warrant only intermediate scrutiny, which it would satisfy. By giving the State oversight capability, the Surety Requirement advances the State's substantial interest in overseeing the potentially "unscrupulous" actors whose practice is to pay other people's bail. *Pryor Org.*, 274 Ga. at 488–89. It also advances the State's "compelling interest in assuring the presence at trial of persons charged with crime." *Schultz*, 42 F.4th at 1323 (quotation omitted). And it is narrowly tailored because it does not burden more speech than necessary.

**II.** The equities also strongly weigh against an injunction. Plaintiffs delayed in bringing this suit, as there is no imminent harm or irreparable injury. And in any event, Plaintiffs merely want to engage in certain voluntary behavior, utilizing a government program, that they have no right to engage in at all.

21

A detainee might, in certain circumstances, have a right to post bail, but third parties do not. The State, on the other hand, does face the significant harm of being unable to enforce its laws and protect its bail system from manipulation.

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy." *Siegel*, 234 F.3d at 1176. It is warranted only if the movants establish each of four prerequisites: (1) substantial likelihood of success on the merits; (2) that withholding an injunction will cause irreparable harm; (3) that the potential injury to the movants outweighs the harm the injunction would inflict on the opposing parties; and (4) that the injunction is in the public's best interest. *Id.* Plaintiffs have made none of those showings, and the district court wrongly ruled otherwise.

## I.    Plaintiffs are not likely to succeed on the merits of their claims.

The district court got the merits entirely wrong. The Cash Bond Limit is not facially unconstitutionally vague. The Cash Bond Limit also does not even trigger First Amendment scrutiny, much less violate the First Amendment, because the act of paying cash bail is not inherently expressive conduct. And the Surety Requirement does not trigger First Amendment scrutiny, either,

22

as it is an ordinary licensing requirement regulating conduct, not expression.

### A.    The Cash Bond Limit is not vague.

Despite reasoning that the Cash Bond Limit has "plain language," Doc. 38 at 21, that there were "two competing, but reasonable interpretations" of the language, *id.* at 22, and that the Cash Bond Limit "[p]lainly" applies to Plaintiffs, *id.* at 17, the district court still ruled that it is facially unconstitutionally vague, *id.* at 23.  To put it charitably, that conclusion does not follow from those premises, and the Cash Bond Limit is nowhere close to being facially unconstitutionally vague.  Indeed, it is hard to think of any circumstances in which it would be vague.

A law is unconstitutionally vague when it lacks any meaningful interpretations whatsoever.  *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 305–06 (2008).  There is no unconstitutional vagueness where a law requires a person "to conform his conduct to an imprecise but comprehensible normative standard"—only when "no standard of conduct is specified at all."  *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).  So, for example, a statute prohibiting "annoying" conduct is unconstitutionally vague because it presents "an unascertainable standard."  *Id.* at 614–15.  But the "Constitution

23

does not require perfect clarity in the language of statutes and ordinances," *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018), and statutory ambiguity does not equal unconstitutional vagueness, *see, e.g.*, *Hoffman Ests.*, 455 U.S. at 502–03; *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1231 (11th Cir. 1982). Likewise, the "mere fact that close cases can be envisioned [does not] render[] a statute vague." *Williams*, 553 U.S. at 305–06. It is enough for a statute to have a discernible "core meaning." *SisterSong*, 40 F.4th at 1327 (quotation omitted).

A statute also is not vague merely because it requires the use of interpretive tools. *See, e.g.*, *United States v. Bronstein*, 849 F.3d 1101, 1106–08 (D.C. Cir. 2017). Instead, "a court may cure a law's vagueness by statutory interpretation." *High Ol' Times, Inc.*, 673 F.2d at 1229. Accordingly, the "first step in a vagueness inquiry is to examine the plain language of the statute," *Heyman v. Cooper*, 31 F.4th 1315, 1323 (11th Cir. 2022) (quotation omitted), including through use of all the tools for textual analysis that are "part and parcel of the process of statutory construction," *Martin v. Lloyd*, 700 F.3d 132, 137 (4th Cir. 2012).

Additionally, when a plaintiff asserts a facial vagueness challenge, a court "should uphold the challenge only if the

enactment is impermissibly vague in all of its applications." *Hoffman Ests.*, 455 U.S. at 494–95; *League of Women Voters*, 66 F.4th at 946.  Hypothetical unconstitutional applications are irrelevant if there are constitutional applications.  *See, e.g.*, *United States v. Rahimi*, 144 S. Ct. 1889, 1903 & n.2 (2024).  Naturally, a facial challenge is "the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

**1.** Plaintiffs' vagueness claim fails at the outset because the Cash Bond Limit clearly covers their conduct.  That is fatal to Plaintiffs' vagueness claim because "[w]here an enactment clearly covers some conduct in which a plaintiff engages, that plaintiff cannot complain of the vagueness of the law," *Ala. Educ. Ass'n*, 746 F.3d at 1139–40, whether in an as-applied challenge or a facial challenge, *Doe v. Valencia Coll.*, 903 F.3d 1220, 1233 (11th Cir. 2018).

Plaintiffs asserted—and the district court accepted—that the law was facially vague because the Cash Bond Limit does not define the word "group" and it could potentially include "any like-minded individuals who pay charitable bail in tandem."  Doc. 2-1 at 25; *see also* Doc. 38 at 19.  The district court reasoned that a prosecutor might "bring charges against two members of the same group who collectively but unwittingly violated" the Cash Bond

Limit and that "any legal person posting cash bond could be unknowingly swept into the [Cash] Bond Limit's reach by the term 'group.'"  Doc. 38 at 19, 23.

But whatever confusion there might be about edge cases (and there should not be much), it makes no difference because there is no dispute that each *Plaintiff* engages in conduct that is covered by the Cash Bond Limit.  Each is either an "individual, corporation, organization, charity, nonprofit corporation, or group" that posts cash bonds for other people.  O.C.G.A. § 17-6-15(b)(4).  The district court recognized that the Cash Bond Limit's "plain language … applies … to any individual or entity regardless of the [charitable] purpose of posting the bond."  Doc. 38 at 21.

That "plain language" necessarily includes Plaintiffs.  Plaintiff Barred Business is a "nonprofit corporation," *see* Doc. 5-1 at 1, that "typically bails out more than three people each year in Fulton County alone," Doc. 36-1 at 18.  Plaintiff Vodicka is an individual, and he testified that the Cash Bond Limit "restrict[s] the payment of cash bail," which "would make it more difficult for" him to pay people's cash bail as often as he wants.  Doc. 36-2 at 5.  Plaintiff Williams is also an individual who "volunteers alongside Plaintiff Vodicka," "regularly bails out people," and "has already bailed out more than three people in 2024, and normally would

26

continue to bail people out throughout the year." Doc. 1 at 11–12. Plaintiffs' law professor declarant understands that the Cash Bond Limit applies to Plaintiffs; she stated that the "bail out efforts conducted by Plaintiffs here" are "restricted by Senate Bill 63." Doc. 36-3 at 8. Everyone seems to acknowledge that the Cash Bond Limit covers Plaintiffs' conduct.

That resolves the vagueness issue because where "[s]ome of [Plaintiffs'] conduct indisputably falls within the [Cash Bond Limit], … the challengers cannot bring a facial challenge arguing the [Cash Bond Limit] is vague based on other applications." *Ala. Educ. Ass'n*, 746 F.3d at 1140. The Supreme Court has specifically held that a court errs when it "determine[s] that [an] ordinance is void for vagueness because it is unclear in *some* of its applications to the conduct of [the plaintiffs] and of other hypothetical parties." *Hoffman Ests.*, 455 U.S. at 495. Simply, Plaintiffs "cannot seek refuge in imaginary cases." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 22 (2010).

**2.** The district court, in erroneously holding otherwise, "engaged in only the most cursory treatment of these considerations." *New Ga. Project*, 106 F.4th at 1244. The district court instead did precisely what the Supreme Court says is improper. For instance, despite reasoning that the word "group"

27

has a "plain meaning" that would include Plaintiffs, the court concluded that the Cash Bond Limit "poses vagueness problems" because imagined hypothetical applications could raise constitutional concerns. Doc. 38 at 17. Likewise, the district court reasoned that the Cash Bond Limit is unclear as to whether it applies to a person paying his *own* bail—even though that is not the situation for any plaintiff in this case. *Id.* at 22.

There is another fundamental mistake in the district court's consideration of hypothetical future cases. Its analysis *of* those hypotheticals was wrong. For example, the district court suggested there might be "constitutional issues" and "due process concerns" if the Cash Bond Limit restricted a person's ability to pay his own cash bail. Doc. 38 at 20–22. That isn't correct, but it also has nothing to do with whether the statute is *vague*. That a law might have constitutionally questionable edge cases has literally nothing to do with vagueness; vagueness and substantive challenges are separate. *See, e.g.*, *Arce v. Douglas*, 793 F.3d 968, 989 n.13 (9th Cir. 2015); *United States v. Patterson*, 431 F.3d 832, 835–36 (5th Cir. 2005). Indeed, to hold that a law violates a substantive provision of the Constitution would require it *not* to be vague, because a vague law has no meaning at all.

The district court's errors do not stop there. Never did the district court actually show that any part of the statute, in any application, is "vague." At most, the district court showed that there were competing plausible interpretations, and that just proves there is no vagueness because "a court may cure a law's vagueness by statutory interpretation." *High Ol' Times, Inc.*, 673 F.2d at 1229. This Court has had no concern with engaging in detailed statutory analysis, choosing from competing interpretations, and then quickly dispensing with a vagueness challenge merely by reference to the preceding textual analysis. *See, e.g.*, *Heyman*, 31 F.4th at 1323.

Contrary to the district court's view, the word "group" is not vague. The statute uses it to mean two or more individuals or entities coordinating to post someone's cash bond. The district court resisted that conclusion, reasoning that the word "group" could apply to multiple community members who "unwittingly" showed up to post people's bond at the same time, even without coordinated action (again, a pure hypothetical). Doc. 38 at 19. That interpretation ignores the very definitions the district court recited: a group is "a number of individuals *bound together by a community* of … *purpose, or function.*" Doc. 38 at 17 (emphasis added) (quoting *Group*, Merriam-Webster's Unabridged

29

Dictionary, https://unabridged.merriam-webster.com/unabridged/group (last visited Aug. 20, 2024)).  But just suppose for the moment that there are "two competing, but reasonable interpretations" of the statute (which the district court itself held).  Doc. 38 at 22.  That proves it is not vague.  There are competing, plausible interpretations of nearly every statute.  Courts interpret them through the ordinary application of statutory interpretation principles.  They do not throw their hands up and declare vagueness the moment they need to do the job of statutory interpretation.

Similarly, the district court's apprehensions about whether the statute covers a detainee paying his own bail, *id.* at 21–22, (again, purely a hypothetical question) have nothing to do with vagueness.  The best reading of the statute is that it does not apply to a detainee paying his own bail.  In statutory interpretation, "context is king."  *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1260 (11th Cir. 2020).  The Cash Bond Limit applies to individuals, corporations, organizations, charities, nonprofits, and groups.  O.C.G.A. § 17-6-15(b)(4).  Almost none of those entities could be detainees at all, and the Cash Bond Limit was also placed in the same subsection as the Surety Requirement, which addresses the practice of paying *other*

30

people's bail. But suppose that interpretation is wrong and the statute does reach detainees paying their own bail. So what? That doesn't make the statute vague. Determining to whom a statute applies is ordinary statutory interpretation, and the statute is far from being "utterly devoid of a standard of conduct so that it simply has no core and cannot be validly applied to any conduct." *SisterSong*, 40 F.4th at 1327.

The Cash Bond Limit is not vague as applied to Plaintiffs, it is not vague in all its applications, it is not vague at all. This Court should reverse.

### B. The Cash Bond Limit does not implicate the First Amendment, much less violate it.

The district court ruled that the Cash Bond Limit regulates inherently expressive conduct. But it could reach that conclusion only by focusing on everything *other* than what the Cash Bond Limit actually regulates: the payment of bail. No reasonable observer would perceive the bare act of paying cash bail as inherently expressive, so the First Amendment does not apply. Regardless, the Cash Bond Limit would satisfy intermediate scrutiny.

31

### 1. The Cash Bond Limit does not trigger First Amendment scrutiny because it regulates conduct (the payment of bail), not speech.

The First Amendment protects the "freedom of speech," not the freedom of conduct.  U.S. Const. amend. I.  Conduct cannot be labeled "speech" simply because the person engaging in the conduct intends to express an idea.  *United States v. O'Brien*, 391 U.S. 367, 376 (1968).  And because it "is possible to find some kernel of expression in almost every activity a person undertakes," *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989), the First Amendment applies to conduct only in circumscribed situations where the conduct is "inherently expressive," *Rumsfeld*, 547 U.S. at 66.

Conduct is inherently expressive only if there is "an intent to covey a particularized message" and where "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it."  *Food Not Bombs I*, 901 F.3d at 1240 (quotation omitted).  The conduct's context is relevant, *id.* at 1241, but when "explanatory speech is necessary" to convey the message, that strongly suggests that conduct is not inherently expressive, *Rumsfeld*, 547 U.S. at 66.  And it is Plaintiffs' burden to prove that their regulated conduct is inherently expressive.

*Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

**1.** Plaintiffs cannot prove their conduct is inherently expressive because the Cash Bond Limit does not regulate conduct that a "reasonable observer" would view as conveying a message. *Food Not Bombs I*, 901 F.3d at 1242. The statute regulates only the payment of cash bail—that is, the transferring of money to a bail clerk. As the only other circuit to address the question has held, a "reasonable observer would not understand [the] payment of cash bail at the clerk's office as an expression of any message about the bail system." *Bail Project*, 76 F.4th at 577. Without some form of explanatory speech, a reasonable observer would not know whether the person pays bail "to secure a loved one's freedom pending trial," or to perform a "purely charitable act to help an indigent defendant," or for any number of other reasons. *Id.*

Conduct typically must be symbolic to be protected under the First Amendment, *see, e.g.*, *Lichtenstein v. Hargett*, 83 F.4th 575, 583 (6th Cir. 2023), but paying bail is not a symbolic act. Courts have, for example, recognized symbolic conduct involving flying a flag covered with a peace symbol, *Spence v. Washington*, 418 U.S. 405, 410 (1974), or burning an American flag at an anti-

government protest, *Texas v. Johnson*, 491 U.S. 397, 404–06
(1989).  And around the time of the Founding, free expression was
understood to include symbolic conduct such as burning the King's
effigy.  *See* Eugene Volokh, *Symbolic Expression and the Original
Meaning of the First Amendment*, 97 Geo. L.J. 1057, 1060–61 &
n.20, 1081–84 (2009).  Those activities are *inherently* symbolic;
even without explanation, a reasonable observer would
understand that someone burning an effigy or a country's flag is
trying to say something.  But paying cash bail is nothing like
burning an effigy or a country's flag.  It does not inherently
express opposition against, support for, or any other message
about bail or any other topic.  *See, e.g.*, *Bail Project*, 76 F.4th at
577.

For conduct to be *inherently* expressive, a reasonable observer
must perceive it as conveying a message regardless of who is doing
it, because "courts do not assume that an observer has
foreknowledge of an actor's intentions" or is "aware of [the actor]
and knows its mission."  *Id.*  A reasonable observer, for example,
need not have any idea who is burning a country's flag or an effigy
because the act alone says something.  But that is not the case
with paying bail.  Bail is often paid by a family member "to secure
a loved one's freedom pending trial."  *Id.*  It is also often posted by

34

professional bondsmen.  A detainee can post his *own* bail.  A reasonable observer would not think those people are trying to convey any message when they post someone's bond; he or she would perceive only a financial transaction that allows a detainee to walk out of a jail.

The Seventh Circuit reached that conclusion when addressing the precise issue raised in this case.  *See id.*  It considered a free expression challenge raised by the national charitable bail fund The Bail Project against a law that required charitable bail funds to be licensed and that prohibited them from paying bail for people charged with certain crimes.  *Id.* at 572.  The Bail Project sued, asserting that it engaged in expressive conduct because "a reasonable observer would understand its payment [of bail] as communicative."  *Id.* at 576–77.  The Seventh Circuit held that, "[o]n its own, paying bail for a pretrial defendant does not communicate even the most general version of The Bail Project's message."  *Id.* at 577.  Instead, explanatory speech would be necessary, whether that explanatory speech came through "knowledge of The Bail Project's mission and repeat-player status" or through The Bail Project's "other speech explaining its efforts."  *Id.*  The Seventh Circuit concluded that, although "The Bail Project's speech makes clear that its payment of bail is meant as

an act of protest," the "payment of bail itself … does not communicate a message of protest." *Id.*  The analysis should be identical here.

**2.** Plaintiffs' free speech theory runs headlong into another fundamental problem: they cannot impose their expression onto a government program.  Paying bail is part of the State's own system of detention and criminal justice, it takes place in jails (which are not forums for speech), and no one has a right to pay someone else's bail.

 "There is a crucial distinction between the government regulating the citizenry in its sovereign capacity, and managing programs that citizens participate in voluntarily." *Lowery v. Euverard*, 497 F.3d 584, 597 (6th Cir. 2007).  And generally there is a "lower level of First Amendment scrutiny" as to how the government "manage[s] its internal operations." *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (lead op.) (quotation omitted and alterations adopted).

When the government is regulating its own nonpublic forum property, for example, it has broad "flexibility to craft rules limiting speech" that happens on it. *See, e.g.*, *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018).  "Nothing in the Constitution requires the Government freely to grant access to all who wish to

exercise their right to free speech on every type of Government property." *Id.* at 12 (quotation omitted).  In the same way that a citizen cannot prevent the government from assigning social security numbers (an internal government program) because of a purported religious objection, *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986), a citizen cannot demand to engage in supposedly expressive activity by hijacking the bail system (itself a government program).  The free speech clause (like the free exercise clause), "does not afford an individual a right to dictate the conduct of the Government's internal procedures."  *Id.* at 700.

A bail system and pretrial release is "a government benefit." *Schultz*, 42 F.4th at 1323.  That benefit stems from the State's program for governing its internal justice system, a program that is not generally open for broad public participation.  Generally, "federal courts should give States wide latitude to fashion procedures for setting bail," *Walker v. City of Calhoun, GA*, 901 F.3d 1245, 1268 (11th Cir. 2018), and that latitude can only be more expansive where the challenged procedures concern *non-detainee* participation.

Georgia does not prohibit any person from voicing any message about the pros or cons of the bail system.  Its procedures address only what Plaintiffs can "*do* … not what they may or may

not *say*." *Rumsfeld*, 547 U.S. at 60. And the procedures have no application to Plaintiffs unless they voluntarily choose to participate in Georgia's program. The First Amendment does not empower Plaintiffs to wield their voluntary participation in a government program as a hammer to force "the Government *itself* to behave in ways that [they] believe[] will further" their speech. *Bowen*, 476 U.S. at 699.

Indeed, if a bail program involved speech (which it does not), it would be analogous to government programs that are expressly permitted to discriminate among speech. *See, e.g.*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). The State can, for example, attach speech restrictions to government funds—especially where participation in the government program is voluntary. *See, e.g.*, *Rust*, 500 U.S. at 194, 199 & n.5. If the State can do that, it can certainly limit a non-detainee's voluntary participation in its bail system. Limiting third-party cash bail payments is several steps less restrictive than the kind of direct speech restrictions allowed under the First Amendment in analogous circumstances.

Driving the point home is that Plaintiffs have no right to pay for others' bail—which is why they attempt to disguise their claim in First Amendment garb. "Pretrial detainees have no

fundamental right to pretrial release." *Schultz*, 42 F.4th at 1332. Indeed, the "Excessive Bail Clause 'says nothing about whether bail shall be available at all,' and it is meant 'merely to provide that bail shall not be excessive in those cases where it is proper to grant bail.'" *Walker*, 901 F.3d at 1258 (quoting *Salerno*, 481 U.S. at 752, 754). If detainees themselves have no fundamental right to bail, Plaintiffs certainly have no right to pay *someone else's* bail.

"Confusing the right to express one's opinion with the right to participate in a voluntary government program on one's own terms would lead to an unworkable legal regime." *Lowery*, 497 F.3d at 600. That is especially true when the program is one where there is no "general constitutional right to participate" in the first place. *Id.* at 588. "[F]ortunately the First Amendment does not require [that]." *Id.* at 600.

**3.** The district court reached the opposite conclusion, but from beginning to end it failed to apply the correct standard. Rather than actually address the legal question—would a reasonable observer take the payment of cash bail to express a message, *Food Not Bombs I*, 901 F.3d at 1242—the district court listed a series of "factors" that informed its decision. Doc. 38 at 27–28. But those "factors" are either irrelevant or prove the opposite conclusion that the district court drew. The district court failed to "engage[]" with

the on-point precedent, *New Ga. Project*, 106 F.4th at 1244, and failed to distinguish cases directly rejecting its holding here.

The district court's most basic error was transforming the payment of cash bail into expressive conduct by focusing on all the expression Plaintiffs engage in *surrounding* their payment of cash bail. The district court's core conclusion was that "a reasonable observer seeing a group of people assembled outside of a jail, wearing matching graphic t-shirts, with or without signs, would naturally assume that some sort of message about incarceration was intended." Doc. 38 at 34. But the Cash Bond Limit does not regulate any of that, and remarkably absent from that description is any mention of what this case is about: the payment of bail. Yet, as already explained, that Plaintiffs need to engage in explanatory expression proves that paying bail is not itself expressive. *Rumsfeld*, 547 U.S. at 66; *Bail Project*, 76 F.4th at 577.

The district court also noted that cash bail is often the subject of "public concern" and debate. Doc. 38 at 33. But being the subject of public debate does not transform the non-expressive into the inherently expressive. Fracking is the subject of a public debate, but that doesn't mean states can't regulate fracking. The "Don't Ask, Don't Tell" policy was publicly debated, yet the

Supreme Court held that conduct protesting it was not inherently expressive. *Rumsfeld*, 547 U.S. at 66. Without explanatory speech or being "aware of [Plaintiffs] and know[ing] [their] mission," *Bail Project*, 76 F.4th at 577, a reasonable observer would have no way of knowing whether someone paying cash bail is taking any stance on any debate about anything.

The district court next pointed to the history of charitable bail funds. Doc 38 at 33–34. But that history means nothing unless paired with explanatory speech. A reasonable observer would have no idea whether someone paying bail represents a charitable bail fund or is a family member or a professional bail bondsman. Again, only an "observer who is aware of [Plaintiffs] and knows [their] mission" would know that they purport to be charitable bail funds. *Bail Project*, 76 F.4th at 577.

The district court also got precedent all wrong. It relied almost exclusively on this Court's decision in *Food Not Bombs I*. *See generally* Doc. 38 at 26–37. In that case, this Court considered an ordinance that required people to obtain a permit before using a particular park for events that involved giving free food to the public. *Food Not Bombs I*, 901 F.3d at 1238–39. The plaintiff sued because it wanted to use that park to hold food sharing events for the homeless, and it claimed its activity was inherently

expressive conduct. *Id.* at 1238. This Court agreed. In doing so, it focused on five points from the record that "would lead the reasonable observer to view the conduct as conveying some sort of message." *Id.* at 1242. The plaintiff set up tables and banners; opened the meals to everyone; held the event in a public park; the city's treatment of the homeless population was "an issue of concern in the community"; and history suggested that food sharing is symbolic. *Id.* at 1242–43. Based on the specific record, the Court concluded that those five record facts—when combined—supported the notion that handing out free meals, in that specific context, was expressive conduct. *Id.*

This case is nothing like *Food Not Bombs I*. To begin, this Court itself acknowledged the extremely fact-specific and limited reach of that decision later in that same case. In *Food Not Bombs II*, this Court explained that its earlier holding was based on only "a close examination of the specific context surrounding the events" and that "most social-service food sharing events will not be expressive." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1292 (11th Cir. 2021) (*Food Not Bombs II*). Two judges concurred for the sole purpose of stressing that *Food Not Bombs I* was "based on a particular and extensive list of factual circumstances." *See id.* at 1298 (Hull, J., joined by

Lagoa, J., concurring).  Attempting to broaden *Food Not Bombs I* into a generally applicable test for whether conduct is inherently expressive—which is exactly what the district court tried to do—is explicitly foreclosed by *Food Not Bombs II*, not to mention other Eleventh Circuit and Supreme Court precedent.

And on its facts*, Food Not Bombs I* comes nowhere near this case.  The ordinance in *Food Not Bombs I* actually regulated the supposedly expressive conduct: hosting the meal in that particular park.  But here, the Cash Bond Limit regulates none of the supposedly expressive conduct the district court pointed to, such as holding signs outside the jail, wearing matching t-shirts, and so on.  Doc. 38 at 34.  And critically, the communal meal in *Food Not Bombs* is not similar to the act of paying cash bail.  The communal meal was at least arguably a symbolic event: sharing food with the homeless in a public park known for homelessness.  *Food Not Bombs I*, 901 F.3d at 1238, 1242.  But paying cash bail itself symbolizes nothing.  *See supra* at 34.

The locations are also dramatically different.  The communal meal took place in a public park—a public forum that was "historically associated with the exercise of First Amendment rights."  *Food Not Bombs I*, 901 F.3d at 1242 (quotation omitted).  The panel believed that the location may have signaled to a

43

reasonable observer that some message was being conveyed because public parks are places that "commonly play an important role in defining the identity that a city projects to its own residents and to the outside world," *id.* (quotation omitted), and because that park in particular had "traditionally been a battleground over the City's attempts to reduce the visibility of homelessness," *id.* at 1238 (quotation omitted). But the inside of a jail is none of that. It is not a public forum. *See, e.g.*, *Adderley v. Florida*, 385 U.S. 39, 47 (1966). It is not a place historically associated with exercising First Amendment rights. And it is not historically "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Food Not Bombs I*, 901 F.3d at 1242 (quotation omitted).

This Court also noted the presence of banners in *Food Not Bombs I*, which it reasoned distinguished the communal meals from "relatives or friends simply eating together in the park." *Id.* at 1242. That reasoning does not transfer to this case. The banners in *Food Not Bombs* were located where the regulated conduct was—in the park and at the meal. The signs Plaintiffs hold in this case are not located where the payment of bail happens, which is inside the jail. And holding signs outside the jail is not regulated by the Cash Bond Limit.

The district court also erroneously rejected the Seventh Circuit's directly applicable and persuasive decision in *Bail Project*. The district court offered three points of distinction, each of which is either irrelevant or flatly incorrect.

The district court rejected *Bail Project* as "distinguishable factually" because in that case, only county clerk employees and incidental by-standers observed the bail payments, whereas here "the general public and members of the criminal justice system observed Plaintiffs' conduct." Doc. 38 at 35; *Bail Project*, 76 F.4th at 574. This is a fundamental error. It is irrelevant who actually observed the conduct because the test is whether a "reasonable observer" would see it as conveying a message. *See, e.g.*, *Food Not Bombs I*, 901 F.3d at 1242–45 (referring repeatedly to "the reasonable observer"). That's why the identity of the observers did not matter to the Seventh Circuit's reasoning. *Bail Project*, 76 F.4th at 577. Moreover, observing Plaintiffs' "conduct" outside the jail is irrelevant, because again, the regulated conduct is the payment of bail *inside* the jail.

The district court also mistakenly reasoned that "the Seventh Circuit's rationale conflicts with the law of this circuit because it considered whether an observer would necessarily infer a specific message, rather than some sort of message." Doc. 38 at 35

45

(quotation omitted).  The Seventh Circuit never required a reasonable observer to perceive a specific message.  It held that a "reasonable person witnessing an employee from The Bail Project paying cash bail would not detect *any message* from the act itself." *Bail Project*, 76 F.4th at 577 (emphasis added).

Finally, repeating the foundational error underlying all its reasoning, the district court rejected *Bail Project* because it thought the Seventh Circuit's "distillation of the posting of bail to the moment that money is passed through a window is too narrow."  Doc. 38 at 36.  The Cash Bond Limit regulates nothing else but that.  Other, unregulated, non-bail-paying conduct happening elsewhere cannot possibly transform the act of paying bail into expressive conduct.  The Seventh Circuit was exactly right, and the district court exactly wrong.

## 2. Even if the Cash Bond Limit regulates expressive conduct, it satisfies intermediate scrutiny.

A "regulation of expressive conduct is content neutral if the justification for the regulation is unrelated to the suppression of free expression." *Food Not Bombs II*, 11 F.4th at 1292.  The justification for the Cash Bond Limit has nothing to do with suppressing free expression, and it applies neutrally regardless of

46

a person's reason for paying someone else's cash bail.  So if the Cash Bond Limit regulated speech (and it does not), it would be "a content-neutral regulation of expressive conduct [that] is subject only to intermediate scrutiny."  *Id.* at 1294.

Intermediate scrutiny requires a regulation to be "narrowly drawn to further a substantial government interest that is unrelated to the suppression of free speech."  *Id.* (quotation omitted).  To be narrowly tailored, a regulation "need not be the least restrictive or least inclusive means of serving the government's interest."  *Id.* at 1295 (quotation omitted).  It is instead enough that the relevant government interest "would be achieved less effectively absent the regulation" and that "the means chosen are not substantially broader than necessary to achieve the government's interest."  *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989)).

The State has a "compelling interest in assuring the presence at trial of persons charged with crime."  *Schultz*, 42 F.4th at 1323 (quotation omitted).  Similarly, it has a substantial interest in safeguarding its bail system against possible abuse by entities that pay other people's bail.  *See Pryor Org.*, 274 Ga. at 488–89.

The Cash Bond Limit is narrowly tailored to those interests. By limiting how often a person can pay someone else's cash bail,

the Cash Bond Limit encourages the practice to be done sparingly and carefully, increasing the likelihood that it will be done only when someone has community ties or at least some meaningful connection with the releasee. That, in turn, limits the likelihood of frequent cash bail payments being made without any concern for whether the released person appears in court. The tailoring here is sufficient because it "suffices that the means chosen by [the State] add to the effectiveness of [its bail system]." *Rumsfeld*, 547 U.S. at 67.

Moreover, no expression is affected here outside of the literal payment of bail. Plaintiffs and others can still wear t-shirts, assemble, protest, and do all the things that they purport to do now. They just can't pay someone else's cash bail more than three times a year in a single jurisdiction. That is not a regulation of expression, but if it were, it would be so minimal an imposition that it would easily satisfy intermediate scrutiny.

## C. The Surety Requirement does not implicate the First Amendment, much less violate it.

The district court concluded that the Surety Requirement regulates speech because it applies when an individual or entity "purports" to be a charitable bail fund. Doc. 38 at 46. But the Surety Requirement doesn't regulate speech of any kind, and this

48

Court has held that a State's licensing requirements do not trigger First Amendment scrutiny merely because regulated parties are identified based on how they hold themselves out to the public. Regardless, even if the Surety Requirement somehow regulates speech, it satisfies intermediate scrutiny because it imposes no more than a minimal burden on the supposed speech interest of "purporting" to be a charitable bail fund.

### 1. The Surety Requirement is a licensing scheme that regulates conduct, not speech.

The Surety Requirement imposes a licensing regime with various requirements, all of which are regulations of conduct, not speech. The district court reached the opposite conclusion only by homing in on a single word in the Surety Requirement's text: "purports." Doc. 38 at 46. Because the Surety Requirement applies to a person that "purports to be a charitable bail fund," the court ruled that it regulates speech. *Id.*; *see also* O.C.G.A. § 17-6-15(b)(4). That is wrong.

As a reminder, the Surety Requirement requires charitable bail funds to satisfy the licensing and other requirements applicable to professional bond companies and bondsmen. *Id.* § 17-6-15(b)(4). To identify to whom it applies, the Surety Requirement defines a "charitable bail fund" as an individual or

49

entity that "purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons." *Id.* This definition mirrors the definition for professional bondsmen: "Bondsmen or persons who hold themselves out as signers or sureties of bonds for compensation are declared to be professional bondsmen." *Id.* § 17-6-50(a).

Defining charitable bails funds (and professional bondsmen) by who "purports" to be one is a common and reasonable definitional drafting choice that does not regulate speech. To be a regulation of speech, a law must actually regulate speech—it must regulate what a person "may or may not *say*" not simply what he "must *do*." *Rumsfeld*, 547 U.S. at 60. Licensing requirements typically do not fall within that category because "States may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018); *see also Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) (similar).

Licensing requirements remain valid even when a statute defines the regulated class based on what an actor holds herself out to be. For instance, this Court rejected a First Amendment challenge to a statute that required licensure for anyone who "hold[s] himself or herself out as a practitioner of dietetics and

50

nutrition practice or nutrition counseling." *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1217 (11th Cir. 2022) (quotation omitted).  That statute also defined "nutrition counseling" by reference to certain speech, such as "advising and assisting individuals or groups" on nutrition.  *Id.*  But as this Court held, the statutory scheme was nothing more than a "professional regulation with a merely incidental effect on protected speech," and it was "constitutional under the First Amendment."  *Id.* at 1226 (quotation omitted).  It triggered no First Amendment scrutiny.  *Id.*

The Surety Requirement is the same and falls squarely within *Del Castillo*'s scope.  It defines to whom it applies by reference to what an entity "purports" to be, O.C.G.A. § 17-6-15(b)(4), which is synonymous with the phrase this Court approved: "hold himself or herself out as," *Del Castillo*, 26 F.4th at 1217 (quotation omitted).  It is dispositive that the Surety Requirement does not "restrict[] what [charitable bail funds] could say on a given topic." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1309 (11th Cir. 2017) (en banc).

And these holdings make perfect sense.  The use of the word "purports" (or similar phraseology) is a way to practically identify regulated conduct—it doesn't target any speech itself.  By way of

51

comparison, if a person *said* that they received a $100,000 gift and the IRS then investigated that person, the IRS would clearly not be regulating that person's speech. The speech would instead indicate certain conduct (receipt of a taxable gift). The Surety Requirement functions the same way. It applies to "charitable bail funds." Naturally, an individual or entity that "purports to be a charitable bail fund" *is* one. Otherwise, the entity doing so would have to lie to its donors about why it is raising the money and what it is using the money for.

Notably, Georgia's definition of "professional bondsman" works the same way. A professional bondsman is "one who holds himself or herself out as a signer or surety of bonds for compensation." § 17-6-50(b). And Georgia's code similarly uses "holds out" language in many other places (as do other state and federal laws). *See, e.g.*, O.C.G.A. § 18-4-1(4) (defining "[f]inancial institution" as including an "organization held out to the public as a place of deposit of funds or medium of savings or collective investment"); *id.* § 43-15-2(10)–(11), (13) (defining professional land surveyors, professional engineers, and structural engineers as any person who "represents or holds himself or herself out" as those things). No one is seriously suggesting that the

requirements for professional bondsmen (or other professions) "target" someone's speech, and for good reason.

On top of everything else, Plaintiffs' free-speech argument also fails because it is again an attempt to impose their desires onto a government program. *See supra* at 36–39. As explained above, the State is entitled to establish the parameters of its *own* bail system. *See id*. The Surety Requirement sets the requirements for those who want to participate in Georgia's bail system. Plaintiffs have no First Amendment right—or any other right—to carve themselves a special exception to those requirements. The "attainment of the status of a professional bondsperson is not itself a civil or political right." *Harrison v. Wigington*, 269 Ga. 388, 388 (1998).

Finally, if the Surety Requirement somehow violated the First Amendment because it applies to those who "purport" to be a charitable bail fund, the proper remedy would be to enjoin the State from enforcing the law based on what someone has purported. An injunction should go no further than to "remove the seeming threat" to speech, *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), and "a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact," *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006)

53

(quotation omitted and ellipsis adopted).  By enjoining only
enforcement based on the act of purporting, the claimed speech
interest would then be entirely unburdened, the threat to speech
removed, and this Court would have "invalidate[d] no more of the
statute than [it] must." *Frazier v. Winn*, 535 F.3d 1279, 1283
(11th Cir. 2008).  But the law would still be enforceable against
those who *are* charitable bail funds and who engage in the conduct
the Surety Requirement regulates.

### 2.    Even if the Surety Requirement regulates speech, it does not violate the First Amendment.

Assuming the Surety Requirement regulates speech at all, it
is content neutral because it does not make facial speech-based
distinctions or single out any particular message.  And it satisfies
intermediate scrutiny because it is narrowly tailored to serve the
State's compelling interests in overseeing entities that pay other
people's bail and in assuring that people released on bail come
back to court.

"A regulation of speech is facially content based under the
First Amendment … if it applies to particular speech because of
the topic discussed or the idea or message expressed."  *City of
Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61,

69 (2022) (quotation omitted).  A regulation that does not "single out any topic or subject matter for differential treatment" is not content based.  *Id.* at 71.  And needing to engage in "some evaluation of the speech" does not necessarily mean a regulation is content based.  *Id.* at 72.

The Surety Requirement is content-neutral.  It does not "appl[y] to particular speech because of the topic discussed or the idea or message expressed," *id.* at 69 (quotation omitted), and it neither "restricts [n]or penalizes speech on the basis of that speech's content," *Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020).  Although the Surety Requirement applies when an entity "purports to be a charitable bail fund," O.C.G.A. § 17-6-15(b)(4), it does not single out any particular topic, idea, or message.  Instead, as explained, it identifies certain conduct and applies regardless of the form or content of the "purporting."

Because the Surety Requirement is content-neutral, intermediate scrutiny applies.  To satisfy intermediate scrutiny, the Surety Requirement "must be narrowly tailored to serve a significant governmental interest."  *City of Austin*, 596 U.S. at 76.  The "essence of narrow tailoring" is "focus[ing] on the source of the evils the [State] seeks to eliminate [without] significantly

restricting a substantial quantity of speech that does not create the same evils." *Ward*, 491 U.S. at 799 n.7.

There can be no dispute that the State has a "compelling interest in assuring the presence at trial of persons charged with crime." *Schultz*, 42 F.4th at 1323 (quotation omitted). As for narrow tailoring, the Surety Requirement advances that interest and does so without "significantly restricting a substantial quantity of speech." *Ward*, 491 U.S. at 799 n.7.

The tailoring is clear. Unlike an individual whose own money or professional livelihood is on the line if a person jumps bail, a charitable bail fund uses fundraised money. *See* Doc. 36-1 at 15. That reduces any inherent incentive for the bail fund to see that the releasee returns to court, and it certainly reduces the releasee's incentive because he has no financial interest at stake. There is also no guarantee that a charitable bail fund will have any community ties, meaningful connection to the releasee, or any other interest in the releasee's appearance in court. It is no surprise that one study found that (contrary to the unsupported claims of charitable bail funds) the people bailed out by charitable bail funds failed to appear in court almost twice as often as people bailed out by professionals. *See* Rob Kuznia & Yahya Abou-Ghazala, *Bailed out, arrested again: These charities boomed after*

*the murder of George Floyd. They're under fire for bailing out violent offenders*, CNN (Mar. 21, 2023), https://www.cnn.com/2023/03/21/us/bail-reform-bail-charities-invs/index.html.

And a charitable bail fund faces no regulations on who may run it, which further leaves the bail system open for the "unscrupulous" to "seriously interfere with the fair and proper administration of the criminal laws." *Pryor Org.*, 274 Ga. at 488–89 (quotation omitted); *see also, e.g.*, Kuznia & Abou-Ghazala, *supra*. The Georgia General Assembly could reasonably "have determined that charitable bail organizations have different incentives, resources, and ties to the community than other bail payors, and therefore, that it was appropriate to treat them differently than bail payors who risk their own money and weigh their own safety to bail out a defendant." *Bail Project*, 76 F.4th at 578.

The Surety Requirement addresses those problems without "burden[ing] substantially more speech than necessary." *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997). The licensing requirements place no burden on Plaintiffs' claimed speech interest: the ability to "purport" to be a charitable bail fund. The district court's own tailoring analysis proves the point. The court

57

reasoned that certain creditworthiness requirements imposed by the Surety Requirement "only make sense" for surety bond companies, not cash bonds.  Doc. 38 at 48–49.  And it reasoned that there are "more straightforward ways to deter" the "conduct" of bail jumping and other pretrial misconduct.  *Id.* at 49–50.  But crucially, the things the district court identified have *nothing* to do with the supposed speech interest in "purport[ing]" to be a charitable bail fund.  The district court's opinion critiqued the wisdom of Georgia's bail system; it did not even assess the Surety Requirement's impact on Plaintiffs' claimed speech interest.  That is not surprising because there is no impact—or at the very most, a *de minimis* one.

## II.  The equities weigh against a preliminary injunction.

The remaining preliminary-injunction factors also work against Plaintiffs.  They cannot show irreparable injury.  Initially, because neither the Cash Bond Limit nor the Surety Requirement impose any restriction on free speech, Plaintiffs cannot claim irreparable injury based on the loss of First Amendment freedoms.  *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  Without that basis, Plaintiffs must show that the asserted irreparable injury is "neither remote nor speculative, but actual and imminent."  *Siegel*, 234 F.3d at 1176 (quotation

58

omitted). But Plaintiffs have no urgent need for relief. They are instead merely individuals and a non-profit organization who want to pay other people's bail either at a higher frequency than the Cash Bond Limit allows or without any of the oversight that the Surety Requirement demands. The "extraordinary and drastic remedy" of a preliminary injunction is entirely out of place when it comes to Plaintiffs. *Id.* (quotation omitted).

Plaintiffs also delayed their filing of this lawsuit, disproving any claim of "imminent" harm. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016). Plaintiffs offered no reason or justification for their delay, which was almost two months from the signing of the bill, three months after passage of the bill, and a matter of days before its effective date. The district court suggested that "it is unreasonable to expect that Plaintiffs would be able to make an informed decision about securing counsel in a shorter period of time," Doc. 38 at 51, but that is risible. No Plaintiff averred that to be the case or otherwise explained their delay.

On the other hand, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people,

it suffers a form of irreparable injury." *Maryland v. King*, 567
U.S. 1301, 1303 (2012). Georgia recognized an area of concern in
its bail laws and enacted a law to ensure that it had proper
oversight over significant actors in its bail system. Disrupting
that reform—and allowing unlimited and unregulated third
parties to pay people's bail without any limitation or incentive to
ensure the person's appearance in court—undermines the State's
bail system and subjects the State to irreparable harm.

## CONCLUSION

For the reasons set out above, this Court should reverse the
judgment of the district court.

Respectfully submitted.

|  | /s/ *Stephen J. Petrany* |
|  | Christopher M. Carr |
| Beth Burton | *Attorney General of Georgia* |
| *Deputy Attorney General* | Stephen J. Petrany |
| Elizabeth Crowder | *Solicitor General* |
| *Senior Ass't Attorney General* | Elijah J. O'Kelley |
|  | *Assistant Solicitor General* |

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Defendant-*
*Appellants Kemp and Carr*

60

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,549 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


*/s/ Stephen J. Petrany*
Stephen J. Petrany