No. 24-12289

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

———————————

BARRED BUSINESS, JOHN COLE VODICKA,
and STEVEN WILLIAMS,

Plaintiffs-Appellees,

v.

BRIAN KEMP, GOVERNOR OF GEORGIA, and CHRISTOPHER M. CARR,
ATTORNEY GENERAL,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division
Case No. 1:24-cv-02744-VMC

———————————

**BRIEF OF PLAINTIFFS-APPELLEES**

———————————

Cory Isaacson
Andrés López-Delgado
Akiva Freidlin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA
P.O. Box 570738
Atlanta, GA 30357
(770) 415-5490
cisaacson@acluga.org

Alexandra Lichtenstein
Rupa Bhattacharyya
Shelby Calambokidis
Joseph Mead
William Powell
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 662-9042
alex.lichtenstein@georgetown.edu

*Attorneys for Plaintiffs-Appellees*

*Barred Business v. Kemp, No. 24-12289*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiffs-Appellees hereby certify that the following have an interest in the outcome of this case:

1. American Civil Liberties Union Foundation of Georgia (Counsel for Plaintiffs-Appellees)

2. Barred Business Foundation (Plaintiff-Appellee)

3. Bhattacharyya, Rupa (Counsel for Plaintiffs-Appellees)

4. Burton, Beth Attaway (Counsel for Defendants-Appellants Brian Kemp and Christopher M. Carr)

5. Calambokidis, Shelby (Counsel for Plaintiffs-Appellees)

6. Calvert, Victoria, United States District Judge, U.S. District Court for the Northern District of Georgia

7. Carr, Christopher M., Attorney General of Georgia (Defendant-Appellant)

8. Crowder, Elizabeth McRary (Counsel for Defendants-Appellants Brian Kemp and Christopher M. Carr)

9. Fleenor, Will, Solicitor General for Athens-Clarke County (Defendant)

10. Freidlin, Akiva (Counsel for Plaintiffs-Appellees)

11. Gammage, Keith E., Solicitor General for Fulton County (Defendant)

12. Georgetown University Law Center

*Barred Business v. Kemp, No. 24-12289*

13. Hawkins, John Matthew (Counsel for Defendant Will Fleenor)

14. Hines, Sherrie Lynn (Counsel for Defendant Will Fleenor)

15. Institute for Constitutional Advocacy and Protection (Counsel for Plaintiffs-Appellees)

16. Isaacson, Cory (Counsel for Plaintiffs-Appellees)

17. Kemp, Brian, Governor of Georgia (Defendant-Appellant)

18. Lichtenstein, Alexandra (Counsel for Plaintiffs-Appellees)

19. López-Delgado, Andrés Martín (Counsel for Plaintiffs-Appellees)

20. Mead, Joseph (Counsel for Plaintiffs-Appellees)

21. Oconee Street United Methodist Church

22. O'Kelley, Elijah J. (Counsel for Defendants-Appellants Brian Kemp and Christopher M. Carr)

23. Petrany, Stephen John (Counsel for Defendants-Appellants Brian Kemp and Christopher M. Carr)

24. Piper, Tina Michelle (Counsel for Defendants-Appellants Brian Kemp and Christopher M. Carr)

25. Plott, Matthew Eli (Counsel for Defendant Keith E. Gammage)

26. Powell, William (Counsel for Plaintiffs-Appellees)

27. Simonson, Jocelyn, Professor of Law and Associate Dean for Research and Scholarship at Brooklyn Law School (Declarant)

28. Simpson, Bridgette, Executive Director of Barred Business (Declarant)

29. Vodicka, John Cole (Plaintiff-Appellee)

30. Williams, Steven (Plaintiff-Appellee)

Plaintiffs-Appellees further certify that no publicly traded company has an interest in this appeal.

s/ *Alexandra Lichtenstein*
Alexandra Lichtenstein

*Attorney for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees do not oppose Defendants-Appellants' request for oral argument in this important case concerning the violation of constitutional rights posed by S.B. 63.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT .............................................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF THE ISSUES ........................................................................... 1

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE CASE .............................................................................. 2

    A.    Statutory Background .................................................................. 2

    B.    Factual Background ..................................................................... 4

            1.    Tradition of Charitable Bail Activity ............................... 5

            2.    Plaintiffs' Charitable Bail Work ..................................... 6

    C.    Procedural History .................................................................... 11

    D.    Standard of Review ................................................................... 12

SUMMARY OF ARGUMENT ............................................................................ 13

ARGUMENT ..................................................................................................... 15

I.    The District Court Correctly Concluded That Plaintiffs Are Likely to
    Succeed on Their Vagueness and Free Speech Challenges. .............................. 15

    A.    The three-cash-bail limit is unconstitutionally vague. ............................... 15

            1.    By criminalizing more than three cash bail payments made
                by any "group," S.B. 63 fails to provide notice on how to
                comply with the law ......................................................... 16

            2.    The court cannot cure the law's vagueness. ................................... 18

B. The three-cash-bail limit violates the First Amendment. ........................ 22

1. The three-cash-bail limit severely restricts Plaintiffs' expressive conduct. .............................................................. 22

2. The three-cash-bail limit is not subject to lesser First Amendment scrutiny as a "government benefit." ........................ 32

3. Defendants fail to carry their burden of showing that the law survives intermediate scrutiny. ................................... 36

C. The surety licensing requirement violates the First Amendment. ........... 39

1. The surety licensing requirement is a content-based restriction on protected speech. ...................................... 40

2. Defendants' defense of the surety licensing requirement ignores the plain language of the statute. ....................... 41

3. The surety licensing requirement fails any level of scrutiny. ........ 44

II. The District Court Did Not Abuse Its Discretion in Weighing the Remaining Preliminary Injunction Factors. ......................................... 49

CONCLUSION ............................................................................. 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.A. Always Open Bail Bonds, Inc. v. DeKalb Cnty.,*
129 F. App'x 522 (11th Cir. 2005) ............................................................. 3, 48

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) ....................................................................................... 33

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) ....................................................................................... 45

*Bondsman, Inc. v. Taylor,*
367 Ga. App. 213, 885 S.E.2d 249 (2023) ..................................................... 48

*Brewer v. City of Albuquerque,*
18 F.4th 1205 (10th Cir. 2021) ...................................................................... 38

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) ....................................................................................... 45

*Brown v. Louisiana,*
383 U.S. 131 (1966) ....................................................................................... 24

*Buehrle v. City of Key West,*
813 F.3d 973 (11th Cir. 2015) ....................................................................... 36

*Burns v. Town of Palm Beach,*
999 F.3d 1317 (11th Cir. 2021) ................................................................ 23, 29

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
596 U.S. 61 (2022) ......................................................................................... 41

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) ....................................................................................... 48

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
   6 F.4th 1247 (11th Cir. 2021) ............................................................ 22

*Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*,
   760 F.3d 427 (5th Cir. 2014) (en banc) ........................................ 35

*FF Cosms. FL, Inc. v. City of Miami Beach*,
   866 F.3d 1290 (11th Cir. 2017) ...................................................... 36

*Flowers v. Comm'r, Soc. Sec. Admin.*,
   97 F.4th 1300 (11th Cir. 2024) ...................................................... 33

*\*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
   11 F.4th 1266 (11th Cir. 2021) ................................... 36, 38, 39, 47

*\*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
   901 F.3d 1235 (11th Cir. 2018) .......... 23, 24, 25, 27, 28, 29, 30, 32

*Gonzalez v. Governor of Ga.*,
   978 F.3d 1266 (11th Cir. 2020) ...................................................... 13

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ................................................................ 16, 21

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ............................................................................ 21

*Holloman ex rel. Holloman v. Harland*,
   370 F.3d 1252 (11th Cir. 2004) (per curiam) ............................... 23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ............................................................ 23, 24, 32

*Hynes v. Mayor & Council of Borough of Oradell*,
   425 U.S. 610 (1976) ...................................................................... 21

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) ...................................................................... 33

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
   585 U.S. 878 (2018) ................................................................. 33

*\*Johnson v. United States*,
   576 U.S. 591 (2015) ............................................................ 15, 20

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ................................................................. 38

*Lowery v. Euverard*,
   497 F.3d 584 (6th Cir. 2007) .................................................. 34

*Lozman v. Riviera Beach*,
   585 U.S. 87 (2018) ................................................................... 26

*Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*,
   594 U.S. 180 (2021) ................................................................. 33

*Matal v. Tam*,
   582 U.S. 218 (2017) ................................................................. 33

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ......................................................38, 39, 47

*NAACP v. Button*,
   371 U.S. 415 (1963) ................................................................. 16

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) ................................................................. 43

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) .............................................43, 44

*Papachristou v. City of Jacksonville*,
   405 U.S. 156 (1972) ................................................................. 19

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ................................................................. 34

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ................................................................. 35

*\*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................... 40, 44

*\*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ........................................................... 40, 44

*Robinson v. Att'y Gen.*,
    957 F.3d 1171 (11th Cir. 2020) ................................................ 50

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ................................................................. 41

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) ........................................................... 29, 30

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ................................................................. 35

*Schneider v. Town of Irvington*,
    308 U.S. 147 (1939) ................................................................. 48

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) ................................................ 50

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ................................................................. 21

*\*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ..................................... 40, 41, 49

*Spence v. Washington*,
    418 U.S. 405 (1974) ........................................... 23, 25, 29, 32

*Staub v. City of Baxley*,
    355 U.S. 313 (1958) ................................................................. 48

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ..................................................................... 18

*Tagami v. City of Chicago*,
  875 F.3d 375 (7th Cir. 2017) ..................................................... 32

*Texas v. Johnson*,
  491 U.S. 397 (1989) ..................................................................... 22

*The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*,
  76 F.4th 569 (7th Cir. 2023) ...........................................24, 31, 32

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002) .............................................................. 43, 44

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ..................................................................... 22

*United States v. O'Brien*,
  391 U.S. 367 (1968) ..................................................................... 22

*United States v. Williams*,
  553 U.S. 285 (2008) .............................................................. 19, 21

*Vill. of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980) ..................................................................... 40

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ..................................................................... 15

*Virginia v. Black*,
  538 U.S. 343 (2003) ..................................................................... 22

*Walker v. City of Calhoun*,
  901 F.3d 1245 (11th Cir. 2018) ................................................. 34

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ..................................................................... 35

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................... 13

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) (en banc) ................................. 43, 44

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016) ...................................................... 49

**Statutes**

O.C.G.A. § 17-6-1 ................................................................................... 2

O.C.G.A. § 17-6-15(b)(1) ................................................................... 3, 4

O.C.G.A. § 17-6-15(b)(1)(D) ......................................................... 3, 46

O.C.G.A. § 17-6-15(b)(1)(E) ......................................................... 3, 46

O.C.G.A. § 17-6-15(b)(1)(F) ............................................................... 3

O.C.G.A. § 17-6-15(b)(1)(H) ............................................................. 3

O.C.G.A. § 17-6-15(b)(2) ................................................................... 48

O.C.G.A. § 17-6-15(b)(4) ......................................................... 4, 16, 39

O.C.G.A. § 17-6-15(b)(4)-(6) ............................................................ 4

O.C.G.A. § 17-6-15(b)(6) ................................................................... 4

O.C.G.A. § 17-6-4(a) ........................................................................... 3

O.C.G.A. § 17-6-50 ............................................................................. 4

O.C.G.A. § 17-6-50(b) ........................................................................ 3

O.C.G.A. § 17-6-50(b)(3) ............................................................ 46, 48

O.C.G.A. § 17-6-50.1 ................................................................. 4

O.C.G.A. § 17-6-51 .................................................................. 4

**Other Authorities**

*Any*, Merriam-Webster Dictionary, https://www.merriam-
    webster.com/dictionary/any (last visited Nov. 7, 2024) ............................................ 18

*Group*, Merriam-Webster Dictionary, https://www.merriam-
    webster.com/dictionary/group (last visited Nov. 7, 2024) ......................................... 19

Jocelyn Simonson, *Bail Nullification*, 115 Mich. L. Rev. 585, 600 (2017).......................... 5

S.B. 63, 157th Gen. Assemb., Reg. Sess. (Ga. 2024)........................................................ 4

## STATEMENT OF THE ISSUES

1.      Did the district court correctly conclude that Plaintiffs are likely to prevail on their claim that Georgia S.B. 63's three-cash-bail limit is unconstitutionally vague?

2.      Did the district court correctly conclude that Plaintiffs are likely to prevail on their claim that the three-cash-bail limit is an unconstitutional restriction on expressive conduct as applied to them?

3.      Did the district court correctly conclude that Plaintiffs are likely to prevail on their claim that S.B. 63's surety licensing requirement is an unconstitutional content-based restriction on speech?

4.      Did the district court abuse its discretion by issuing a preliminary injunction?

## INTRODUCTION

Throughout our history, Americans have engaged in the charitable, expressive, and religious act of pooling resources to pay bail for those in pretrial detention. Georgians continue this tradition today, providing funds through their churches, businesses, synagogues, nonprofits, and individual selfless acts to those who cannot afford to pay bail. These payments are not merely functional: they express messages of religious faith, support for community members in need, and opposition to pretrial detention.

Section 4 of Senate Bill 63 ("S.B. 63") imposes a pair of criminal restrictions with the design and effect of all but ending charitable bail activity in Georgia. First,

1

the law imposes a flat limit of three cash bail payments per year "in any jurisdiction." Second, it requires any person or organization soliciting donations for charitable bail to register as a surety. The registration requirement imposes onerous burdens, including maintenance of a massive cash reserve, with no logical application to charitable bail activity, and also grants complete discretion to the sheriff in each jurisdiction to decide whether to grant a request to operate as a surety.

Plaintiffs—a charitable nonprofit that works with and advocates for people involved with the criminal legal system, and two Methodist volunteers who pay bail as part of their church's bail fund—sought a preliminary injunction against enforcement of these provisions. Defendants did not challenge Plaintiffs' evidence or offer any of their own. Following a hearing, the district court held that, on the record before it, Plaintiffs were likely to succeed on their arguments that the law is unconstitutionally vague and violates the freedom of speech under the First Amendment. This Court should affirm.

## STATEMENT OF THE CASE

### A.    Statutory Background

Under Georgia law, a judge may order a pretrial detainee to be released upon the payment of bail. *See* O.C.G.A. § 17-6-1. Two types of bail are relevant to this case: cash and surety.

Cash bail involves release of the arrestee upon "depositing cash in the amount of the bond so required with the appropriate person, official, or other depository."

O.C.G.A. § 17-6-4(a). Once the entire bail amount is deposited, the government receives it immediately. Prior to the enactment of S.B. 63, there was no limit on who could make a cash bail payment or how many payments could be made by any given person.

Alternatively, an arrestee may secure a surety bond from a for-profit bonding company. *See* O.C.G.A. § 17-6-15(b)(1). A surety bond constitutes a promise to pay the full amount of a bond in the event the court orders it forfeited. Because the government relies on this promise to pay, bond companies must meet demanding requirements. For example, a bondsperson must have resided in Georgia for at least a year, be "a person of good moral character," have no felony convictions, undergo background checks, and "remain[] in good standing" with all applicable laws and rules. O.C.G.A. §§ 17-6-50(b), 17-6-15(b)(1)(D). Bonding companies must also maintain a substantial "cash escrow account or other form of collateral." O.C.G.A. § 17-6-15(b)(1)(E). Each company must have "application, approval, and reporting procedures … deemed appropriate by the sheriff" and meet whatever "[a]dditional criteria and requirements" are "determined at the discretion of the sheriff." *Id.* § 17-6-15(b)(1)(F), (H). Even if an applicant complies with all requirements, "the sheriff has discretion to decide whether a candidate is acceptable." *A.A.A. Always Open Bail Bonds, Inc. v. DeKalb Cnty.*, 129 F. App'x 522, 524 (11th Cir. 2005).

In May 2024, the Governor signed into law S.B. 63, which amended Georgia's statutory scheme governing the payment of bail in several ways. *See generally* S.B. 63,

157th Gen. Assemb., Reg. Sess. (Ga. 2024) (codified at O.C.G.A. § 17-6-15(b)(4)-(6)). Section 4 of S.B. 63 imposes two new restrictions on bail payments, along with criminal penalties for violations. *See* O.C.G.A. § 17-6-15(b)(4), (6). The first restriction (the "three-cash-bail limit") states that "[n]o more than three cash bonds may be posted per year by any individual, corporation, organization, charity, nonprofit corporation, or group in any jurisdiction." *Id.* § 17-6-15(b)(4). The second restriction (the "surety licensing requirement") states that "[e]very individual, corporation, organization, charity, nonprofit corporation, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons shall be required to submit to the same requirements as any professional surety company." *Id.* Those include the extensive licensing requirements set forth above, as well as mandatory training and a prohibition on providing attorney referrals. *Id.* (citing O.C.G.A. § 17-6-15(b)(1) and §§ 17-6-50, -50.1, -51).

## B.    Factual Background

Section 4 of S.B. 63 imposes what appear to be the nation's most severe restrictions on charitable bail funds. *See* Doc. 36-3 at 8-9. If allowed to go into effect, these restrictions would criminalize most charitable bail fund activity in Georgia, including the activities of Plaintiffs Barred Business, John Cole Vodicka, and Steven Williams.

### 1.    Tradition of Charitable Bail Activity

"From the founding through today, there have been both formal charitable organizations and informal groups of people who collectively post bail or bond for people who are incarcerated out of a broader sense of the injustice of the practice of money bail." Doc. 36-3 at 2. This work "evolved alongside the prohibition on excessive bail as an additional check on prosecutorial overreach and a means of ensuring that the poor were not deprived of the presumption of innocence." Doc. 38 at 29; *see also id.* at 30 (citing examples from the 18th and 19th centuries). Over 100 years ago, the ACLU created a national bail fund to advocate against sedition laws. *See id.* at 30; Doc. 36-3 at 5. "Today, there are nearly a hundred charitable bail funds operating across the United States," along with "countless groups" that pay bail for others as a means of advocacy and activism even if they "may not identify centrally as a 'bail fund.'" *See* Doc. 36-3 at 6. These charitable bail efforts are—and have always been—expressive acts communicating a broader message about pretrial detention and the bail system. *See id.* at 4, 6-7; *see also* Jocelyn Simonson, *Bail Nullification*, 115 Mich. L. Rev. 585, 600 (2017). Bail funds have paid bail, for example, to convey support for civil rights protesters, express opposition to the overincarceration of particular communities, and protest the unnecessary pretrial detention of criminal defendants who cannot afford bail. *See* Doc. 1 at 21-23; Doc. 36-3 at 4-7.

### 2. Plaintiffs' Charitable Bail Work

Plaintiffs' charitable bail work is part of this "long historical legacy of community support for people facing pretrial detention and community opposition to unnecessary detention." Doc. 36-3 at 8.

### a. Barred Business

Plaintiff Barred Business is a Georgia nonprofit organization that opposes mass incarceration and the money bail system and believes in building opportunity for people involved with the criminal legal system. Doc. 1 at 4; Doc. 5-1 at 1-2. As part of its mission, Barred Business raises and uses funds to pay cash bail for people stuck in pretrial detention because of poverty. Doc. 1 at 7; *see also* Doc. 36-1 at 15-16. It participates in bail-out campaigns—organized events during which it pays cash bail for multiple people in pretrial detention—with the goal of bringing attention to the more than half-million people in jail who have not been convicted of any crime but remain incarcerated because they lack money to post bail. Doc. 38 at 3 (citing Doc. 36-1 at 1). For example, through its Black Mamas Bail Out campaign, Barred Business works to "free as many Black mamas and caregivers as [the organization] can … so that they can spend Mother's Day with their families and in their communities." Doc. 36-1 at 1. "This campaign not only expresses [the organization's] opposition to unnecessary detention, but emphasizes that mothers belong with their families in their community." *Id.*

"When someone is bailed out, a group of Barred Business members and volunteers will wait (all day—or night—if needed) in the parking lot outside the detention centers, in full view of staff and visitors, in order to celebrate the person's release," "welcome them back into the community," and reunite them with their families. *Id.* at 1-2. Members "typically wear a Barred Business or Black Mamas Bail Out shirt so that people know who [they] are and why [they] are there," and they "often hold signs and posters or distribute flyers that further convey [the organization's] message that the love and support of your community will set you free—even from mass incarceration." *Id.* at 2; *see, e.g.*, Doc. 38 at 4-5 (photos from bailout events). When the mothers exit detention, the parking lot is "transformed into a magical place." Doc. 36-1 at 4. Barred Business members and volunteers "publicly welcome[]" the mothers at "the curb in front of the detention center" with a "loud[] and proud[]" celebration, symbols of affection such a bouquet of flowers or balloons, and gift bags with necessities. *See id.* at 4-6. As Barred Business Executive Director Bridgette Simpson explained, it is "clear to anyone passing by that [they] are there to support those being released and rejoice in the moment when families are reunited." *Id.* at 5.

In connection with its bailouts, Barred Business also hosts a "Homecoming Celebration and brunch" to celebrate the freedom of those they bail out. *Id.* at 7. These brunches have been hosted in churches and community parks, and usually include "colorful balloons," "flowers," "a big banner," "matching shirts," a cake

7

bearing the organization's logo and slogan, "tables full of wrapped gifts," and "warrior award[s]" celebrating how mothers have overcome barriers. *Id.* at 7, 9-10. As with the bailouts themselves, all members of the community are encouraged to participate. *See id.* at 14-17. Barred Business "invite[s] everyone in [the] community to come and celebrate the mothers because [it] believe[s] we are all impacted by mass incarceration." *Id.* at 8. Barred Business promotes its events on social media, distributes flyers, and encourages community partners to invite their members. *Id.* And as with the bailouts, which are streamed live, *id.* at 2, Barred Business posts videos and pictures of these celebrations on social media "to share them with the broader community and bring attention to the ongoing family separations happening because of pretrial detention," *id.* at 11.

"[E]ach person who is bailed out is welcomed into the Barred Business family." *Id.* at 12. Barred Business offers "social services and financial support," including "a year-long program that provides training, political education, leadership development, housing," and other wraparound services, in addition to "moral and emotional support." *Id.* It builds relationships with people who are bailed out and connects them to other justice-impacted individuals for support—including Simpson herself, who was previously convicted of a felony. *See id.*; Doc. 5-1 at 1. Barred Business members and volunteers also support people who have been bailed out by accompanying them to court, where they don "matching T-shirts" and "talk to the judges and demonstrate the community's support for the person." Doc. 36-1 at 13.

To support its bail work, including the payment of cash bail, Barred Business solicits donations from the public in a variety of ways, including on its website, via flyers distributed at rallies and events, and through social media. Doc. 1 at 7; Doc. 36-1 at 15-16. It purposefully solicits donations as small as $5 so that "more people in our community feel empowered to add their voices to [the] fight against unjust pretrial detention." Doc. 36-1 at 15-16.

Barred Business typically bails out more than three people each year in Fulton County alone. *Id.* at 18. And it coordinates with churches and other charitable groups to bail out countless more, including through a Freedom Day Bailout hosted by Ebenezer Baptist Church around Juneteenth. *Id.* at 11. Barred Business helps to "organize and promote" these coordinated bailouts and to "select who will be bailed out"; "camp[s] out" to "welcome people when they are released at the detention center"; and provides basic necessities and information about accessing its wraparound services. *Id.* at 11-12.

### b.    Vodicka and Williams

Plaintiffs Vodicka and Williams are members of the Oconee Street United Methodist Church in Athens, Georgia. Doc. 1 at 7, 12. Since 2021, Vodicka has spent hundreds of hours coordinating a charitable bail fund administered by the church with help from other volunteers like Williams. *Id.* at 7-9, 11; Doc. 36-2 at 1. Inspired by injustices that congregants witnessed during a church court-watching program and surrounding the death of George Floyd, the church started the fund as a means of

9

opposing overreaches of the criminal legal system. Doc. 36-2 at 1. The fund prioritizes people with misdemeanor charges whose bail is low but who cannot afford to pay even small amounts. Doc. 1 at 8; *see* Doc. 36-2 at 1-2, 4. Vodicka has posted cash bail "for many dozens of people held in the Athens-Clarke-County Jail," including more than three this year. Doc. 36-2 at 1. Other members of the congregation also pay cash bail. *Id.* Williams bails people out both with the church's money and his own money. *See* Doc. 1 at 12.

Paying bail to free impoverished individuals is an expression of Vodicka's and Williams's Christian faith, *id.* at 9-12, and those involved in the criminal legal system know that Vodicka's work with the charitable bail fund is an expression of his religion and opposition to poverty-based detention, Doc. 36-2 at 2. Indeed, every judge in the courthouse is familiar with Vodicka and the church's bail work, and public defenders, judges, and law enforcement have all asked him to bail people out. *Id.*

Paying cash bail is not a "short process." *Id.* When Vodicka pays bail, he must arrange the exact dollar amount needed; go down to the jail, sign in, and coordinate with various jail officials to arrange for a person's release; meet the person inside the jail, introduce himself, and explain why he is there; gauge the person's immediate needs and attempt to provide for them; and share his contact information to stay in touch. *See id.* When Vodicka signs in at the jail, he always notes his affiliation with the church, and jail staff know he is there because of his service with the church and the charitable bail fund. *Id.*; Doc. 1 at 8.

10

Volunteers of the church's bail fund, including Vodicka, believe it is important to "walk with" each person who is bailed out to demonstrate love and support for the person. Doc. 1 at 8; Doc. 36-2 at 2. That often means not only meeting any immediate needs after the person leaves the jail, such as providing a ride or a meal, but also providing reminders and transportation for court dates, accompanying the person to court, and developing a broader relationship with the person so they know that "there are people in the community who care about them." Doc. 36-2 at 2-3.

Vodicka shares information about the people the fund has bailed out with the congregation, and he frequently writes about his experience with the charitable bail fund, connecting it with the teachings of the Gospel. *See id.* at 3-5. In response to his writings, people donate money to be used for charitable bail. *Id.* at 5.

### C.     Procedural History

On June 21, 2024, Plaintiffs brought a pre-enforcement challenge to Section 4 of S.B. 63. Plaintiffs alleged that Section 4's restrictions unconstitutionally violate the First Amendment rights of speech and association, and, for Vodicka and Williams, the free exercise of religion. Doc. 1 at 34-43. Plaintiffs also alleged that these restrictions are unconstitutionally vague in violation of the Due Process Clause. *Id.* at 44-45. Plaintiffs sought a temporary restraining order ("TRO") and an expedited preliminary injunction. Doc. 2. Without injunctive relief against enforcement of Section 4, Plaintiffs argued that they would have to cease their constitutionally protected

11

activities by July 1 (the law's effective date) or face criminal penalties. *Id.*; *see also* Doc. 5-1 at 2; Doc. 5-2 at 2.

After the Governor and Attorney General ("Defendants")[1] filed a response, Doc. 26, the district court held a hearing on the motion and entered a TRO against enforcement of Section 4, Docs. 34 & 37. After accepting additional evidence from Plaintiffs, *see* Doc. 36, the court provided Defendants an extra week to file further briefing (which they declined to do) before converting the TRO into a preliminary injunction. Defendants neither submitted evidence nor challenged Plaintiffs' evidence. As it did at the TRO stage, the district court found that the three-cash-bail limit was likely unconstitutionally vague due to its use of the term "group," and that the surety licensing requirement likely violated Plaintiffs' free speech rights as a content-based speech restriction that failed strict scrutiny. *See* Doc. 38 at 12-24, 41-50. And, in light of Plaintiffs' supplemental evidence, the court also enjoined the three-cash-bail limit because it likely violated Plaintiffs' rights to free speech on an as-applied basis. *See id.* at 13, 24-41.

### D.    Standard of Review

This Court "review[s] the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact

---

[1] The Solicitors General of Fulton and Athens-Clarke Counties neither responded to Plaintiffs' motion nor appealed the injunction.

for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020). To

obtain a preliminary injunction, plaintiffs must show: (1) that they are likely to succeed

on the merits; (2) that they will suffer irreparable injury in the absence of an

injunction; (3) that the balance of equities tips in their favor because the harm from

the threatened injury outweighs the harm the injunction would cause the opposing

party; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 20, 24 (2008).

## SUMMARY OF ARGUMENT

1.      The district court correctly concluded that Plaintiffs are likely to succeed

on their argument that S.B. 63 is unconstitutionally vague because it fails to provide

proper notice of what constitutes a violation of the law. In particular, the law

prohibits any "group" from making more than three cash bail payments per year in

any jurisdiction, but it fails to explain what constitutes a "group" and whether, or to

what extent, collective action is needed to meet the definition. Without that direction,

Plaintiffs and others who pay cash bail have no way of knowing when they may be

unknowingly swept into a "group['s]" collective three-cash-bail limit, and which

payments might trigger criminal penalties. That violates the Due Process Clause.

2.      Plaintiffs are also likely to prevail on their First Amendment challenge to

the three-cash-bail limit as a restriction on their expressive conduct. The district court,

based on the evidence in the record about the context of Plaintiffs' bail payments,

properly found that Plaintiffs' charitable bail activity is expressive because a

reasonable observer would understand it to convey a message. As both the Supreme Court and this Circuit have emphasized, courts must look to just that sort of context when determining whether conduct is expressive. Defendants' argument that the court must consider only the act of paying bail is foreclosed by precedent.

Defendants also merge together disparate and inapposite doctrines addressing the speech of schoolchildren and government employees to suggest that there is a carveout from the First Amendment for "government benefits." It makes no sense to graft those context-specific rules onto Plaintiffs' expression.

Defendants' restrictions on Plaintiffs' expressive conduct must survive intermediate scrutiny, which they cannot. Defendants made no effort to carry their burden to identify evidence demonstrating that the law is narrowly tailored to further an important government interest. And the mismatch between the State's purported interest in having people attend court and the arbitrary three-cash-bail limit belies any argument that the law is narrowly tailored.

3.      Plaintiffs are also likely to prevail on their First Amendment challenge to the surety licensing requirement. That provision imposes a demanding licensing regime, specifically designed for the surety industry, on any entity that "purports to be a charitable bail fund with the purpose of soliciting donations" for charitable bail. By targeting the solicitation of donations for a particular purpose, S.B. 63 targets speech based on its content—and, indeed, based on its viewpoint. And the law fails any level of scrutiny because requiring charitable bail funds to maintain large bank accounts or

14

to obtain a license at a sheriff's discretion does nothing to advance the government's interests, and certainly is not narrowly tailored to any putative interests.

4.    Finally, the district court did not abuse its discretion by concluding that the equities favor Plaintiffs. Plaintiffs face irreparable harm in both the loss of their constitutional freedoms and in immediately having to cease the charitable activity they have conducted for years. Plaintiffs' efforts to obtain injunctive relief before the law went into effect also underscore the irreparable nature of the injury. In contrast, the law's restrictions are so ill-suited to the purported government interests, Defendants face no harm from the injunction. Indeed, those closest to the bail system—the defendant solicitors—declined to defend the law.

## ARGUMENT

## I.    The District Court Correctly Concluded That Plaintiffs Are Likely to Succeed on Their Vagueness and Free Speech Challenges.

### A.    The three-cash-bail limit is unconstitutionally vague.

A law is unconstitutionally vague when "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). The Constitution tolerates less vagueness in criminal statutes "because the consequences of imprecision" are more severe when criminal penalties are attached, especially in the absence of a *mens rea* requirement. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). And "standards of permissible statutory vagueness

are" also particularly "strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432 (1963). "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms" and therefore cannot be tolerated. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up).

### 1. By criminalizing more than three cash bail payments made by any "group," S.B. 63 fails to provide notice on how to comply with the law.

The three-cash-bail limit bars "any individual, corporation, organization, charity, nonprofit corporation, or group" from paying more than three cash bonds per year "in any jurisdiction." O.C.G.A. § 17-6-15(b)(4). But it fails to define what qualifies as a "group" or set any criteria for making that determination, making it impossible to discern when or if Plaintiffs and others similarly situated might be acting as part of a group when paying bail, *see* Doc. 38 at 23. As a result, the task of determining which bail payments count toward the cap is impossible, and people are left guessing about how to comply—rendering the law unconstitutionally vague.

No doubt Plaintiffs are "'individuals' and a 'nonprofit corporation' covered by the law," Opening Br. 17, but they also could be part of any number of "groups," with other individuals' or organizations' cash bail payments counting toward Plaintiffs' own three-cash-bail limit. Without clarity about what "group" means, Plaintiffs cannot know when they exceed the three-payment cap.

Consider the dilemmas Plaintiffs and others face, with the threat of prosecution if they guess wrong. All Plaintiffs engage in activities that might bring them within broader "groups," depending on how that term is defined. For example, Barred Business is made up of individual members, each of whom might pay cash bail themselves—but Barred Business has no way of knowing when or if those payments would count toward its organizational total or toward the totals of other individual members. *See* Doc. 38 at 8. Barred Business also partners with other organizations to participate in bailouts. Doc. 36-1 at 11. In some circumstances, these partner organizations fund the payment of cash bail, while Barred Business "organize[s] and promote[s] the event, help[s] to select who will be bailed out, camp[s] out and welcome[s] people when they are released at the detention center," and provides other help and ongoing services. *Id.* at 11-12. Barred Business is left to guess whether these partnerships make it part of a "group," and whether bail payments made by partner organizations count against Barred Business's limit. *Id.* at 18.

Vodicka and Williams face similar uncertainty. If they make three cash bail payments using the church's bail fund, are they prohibited from making further payments using their own funds? And if updates about the bail fund or Vodicka's presentations about the inequities of cash bail inspire other members of the congregation who are driven by a common religious purpose to post bail, are they acting as individuals or as part of the "group" of the bail fund or the church? Do their payments count against Vodicka, Williams, or the bail fund as a separate entity? These

17

are not "hypothetical" or "imaginary" concerns, Opening Br. 27-28, but real-world illustrations of the indeterminacy baked into S.B. 63 that prevents Plaintiffs and others from having the fair notice necessary to avoid potential criminal liability.

Finally, although the district court focused on the word "group," the law is also vague in other ways. The three-cash-bail limit applies to payments made in "any jurisdiction." The word "any" can mean "one," but it can also mean "every." *Any*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/any (last visited Nov. 7, 2024). Thus, the provision could be reasonably read to bar more than three bail payments across *all* jurisdictions or to bar more than three bail payments in *a single* jurisdiction. The word "jurisdiction" is equally unclear. The statute's text offers no insight into whether a "jurisdiction" should be defined as the jail holding individuals, a county, the state, or something else. If the legislature meant "county," for example, it could have said so. And although Defendants proffer a narrowing construction of the term, *see* Opening Br. 10, that construction is not binding on future enforcement of the provision, *Stenberg v. Carhart*, 530 U.S. 914, 940-41 (2000). These additional vagueness problems offer yet another basis to affirm the district court.

### 2.    The court cannot cure the law's vagueness.

Defendants complain that the district court should have interpreted the vagueness out of the law, but the text offers no way to discern what the legislature intended it to mean. There is no single plain meaning of "group." *See* Doc. 38 at 17.

The word can encompass a wide variety of situations in which individuals have "some unifying relationship," *Group*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/group (last visited Nov. 7, 2024), but no common standard or set of criteria determines which unifying relationships count. "Group" can, in its ordinary meaning, refer to individuals (or, as applicable, organizations) that are merely "assembled or standing together," that are "regarded as a unit because of their comparative segregation from others," that are "bound together by a community of interest, purpose, or function," or that have "interlocking interests or a single owner or management." Doc. 38 at 17. The undefined statutory language makes it impossible for those paying bail to understand what they can and cannot do. The law provides no "statutory definition[]" or "narrowing context" to help define the term, nor does it offer any examples of what might qualify as a group. *United States v. Williams*, 553 U.S. 285, 306 (2008). And because there is no *mens rea* requirement, those paying bail lack any protection from the law's criminal prohibition "by the necessity of having a specific intent to commit an unlawful act," rendering the vagueness even more harmful. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972).

Despite asserting that the meaning of the term "group" is clear, Defendants themselves seem uncertain about what the term means in context. At the TRO hearing, they explained that "group" was a "catchall term" and then seemed to suggest that it would capture "several individuals who have similar interests and …

19

also happen to be at the same place at the same time." Doc. 37 at 17:5-14.[2] They later

posited that being members of a group meant "acting in concert." *Id.* at 17:18-22; *see*

*also id.* at 18:10-13 ("If they talk to each other and … plan[] to meet and go as a unit

into the jail for the purpose, then, yes, I would say that would constitute a group."). In

their appellate brief, Defendants mention the need for "coordinat[ion]" between

members of a group (without offering any examples of the extent of coordination

necessary). Opening Br. 10. Elsewhere, they note that "a group is 'a number of

individuals *bound together by a community* of … *purpose, or function.*'" *Id.* at 29 (alteration in

original) (quoting Doc. 38 at 17). Defendants' inability to settle on a clear definition of

"group" is further evidence that the term does not offer fair notice to regulated

parties or sufficient guidance to those who will enforce the law. *See Johnson*, 576 U.S. at

601 (noting that "pervasive disagreement about the nature of the inquiry one is

supposed to conduct and the kinds of factors one is supposed to consider" suggests a

law is vague).

Defendants argue (at 29) that the Court could cure the statute's vagueness by

imposing one of several "competing interpretations" on S.B. 63. For example,

Defendants asserted below that the three-cash-bail limit could be interpreted to apply

only to charitable bail funds, and thus would not prohibit a mother from bailing out

her four children if she "us[ed] her own money." Doc. 37 at 19:10-18; *see* Doc. 38 at

---

[2] References to page numbers in the TRO hearing transcript are to those
assigned by the court reporter.

19. But that limit has no textual basis, and a federal court has no power to reinterpret state law by imposing constraints missing from the text. *See Grayned*, 408 U.S. at 110. Indeed, a key problem with vague laws is that they "allow[] … courts to make it up," reflecting an abdication of *legislative* responsibility to define the contours of law precisely. *Sessions v. Dimaya*, 584 U.S. 148, 175, 181 (2018) (Gorsuch, J., concurring in part and concurring in the judgment).

At bottom, what renders the three-cash-bail limit unconstitutionally vague is that Plaintiffs are left to guess "precisely what … fact" is relevant to determining whether they have paid bail as part of a group and therefore whether they have complied with the law. *Williams*, 553 U.S. at 306. Because there is no single standard for determining whether someone is acting as part of a group, neither those subject to the law nor those enforcing it have any direction to follow but their own "untethered, subjective judgments." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010). S.B. 63's text thus denies *all* Georgians, including Plaintiffs, fair notice of what conduct is and is not criminalized, and subjects them all to a risk of arbitrary and discriminatory enforcement. *See Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 613 (1976) (finding a law vague where "it [was] not clear what groups f[ell] into the class" of those covered). That renders the law not merely ambiguous, as Defendants argue, but unconstitutionally vague on its face.

21

**B.    The three-cash-bail limit violates the First Amendment.**

The three-cash-bail limit violates Plaintiffs' freedom of speech by preventing them from paying cash bail as an expression of their religious beliefs and their belief in the injustice of poverty-based pretrial detention. The fact that spending money for charitable purposes is protected by the First Amendment only further underscores the expressive nature of Plaintiffs' work here. *See Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254-55 (11th Cir. 2021) ("[W]e have no problem finding that Amazon engages in expressive conduct when it decides which charities to support.").

The three-cash-bail limit is subject to intermediate scrutiny as a restriction on expressive conduct. *See United States v. O'Brien*, 391 U.S. 367, 376-77 (1968). And it fails intermediate scrutiny because Defendants have not met their burden to show that it furthers a substantial government interest in a narrowly tailored way.

**1.    The three-cash-bail limit severely restricts Plaintiffs' expressive conduct.**

The Free Speech Clause "affords protection to symbolic or expressive conduct as well as to actual speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003); *see, e.g.*, *Texas v. Johnson*, 491 U.S. 397 (1989) (flag burning); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (wearing a black armband); *Coral Ridge Ministries Media*, 6 F.4th 1247 (donating money). Conduct can be expressive even without "a narrow,

succinctly articulable message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).

To determine whether conduct is expressive, a court asks: (1) "whether '[a]n intent to convey a particularized message was present,'" and (2) "whether 'in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'" *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (*FNB I*) (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)). The relevant question is "whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Id.* (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (per curiam)). And importantly, because "context matters" in "understanding what is going on around us," *id.* at 1237, contextual factors are used to assess whether a reasonable observer would view the events at issue "as conveying some sort of message," thus placing them "on the expressive side of the ledger," *id.* at 1242; *see also Burns v. Town of Palm Beach*, 999 F.3d 1317, 1346 (11th Cir. 2021) (explaining that "[t]he [*FNB I*] factors are contextual guidelines that we weigh together to decide whether or not certain conduct is protected expression").[3]

---

[3] Defendants' argument (at 43) that the district court erred by "[a]ttempting to broaden [*FNB I*] into a generally applicable test" ignores circuit precedent. *See Burns*, 999 F.3d at 1346 ("[W]e and the Supreme Court have used the [*FNB I*] factors in cases as different as flag burning, armband wearing, parading, and meal sharing. There's no reason … why the same factors cannot be used to evaluate the expressiveness of residential architecture.").

23

Defendants do not contest that the first prong of the expressive-conduct test is met, and rightfully so: "Plaintiffs submitted evidence that they intended to convey a particularized message," namely, "opposition to unnecessary, poverty-based detention." Doc. 38 at 31 (citing Doc. 36-1 at 1; Doc. 36-2 at 2). Defendants therefore focus on the second prong, arguing that "a reasonable person witnessing [Plaintiffs] paying cash bail would not detect any message from the act itself." Opening Br. 18 (quoting *The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 577 (7th Cir. 2023)). The district court properly rejected that argument, and this Court should do the same.

First, nothing about *FNB I* or other relevant precedent suggests that courts may look only to the activity being regulated—the "bare act" of "transferring … money to a bail clerk," Opening Br. 31, 33—to determine whether that activity is expressive. Indeed, *FNB I* held exactly to the contrary: "context matters." 901 F.3d at 1237. "[T]he circumstances surrounding an event often help set the dividing line between activity that is sufficiently expressive and similar activity that is not." *Id.* at 1241. Thus, "[c]ontext … differentiates the act of sitting down—ordinarily not expressive—from [a] sit-in … understood as a protest against segregation," and simple jaywalking from a constitutionally protected "parade." *See id.* (first citing *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966); then citing *Hurley*, 515 U.S. at 568).

The act of paying bail here is accompanied by context that underscores the expressive quality of Plaintiffs' conduct. Paying cash bail to secure someone's release

24

from pretrial detention is not a discrete financial transaction or even "a short process." Doc. 36-2 at 2. It involves going to the jail, waiting for and filling out paperwork, explaining who you are and your affiliation, identifying whom you are bailing out, paying the required amount, and waiting for the person to be released. That waiting occurs "in full view of staff and visitors," and when it stretches on for hours, it may include time spent outside the jail, visible to other members of the public. *See* Doc. 36-1 at 1-2. As the district court explained, "all the circumstances surrounding the payment of bail, including waiting outside in the parking lot all hours of the day and night as well as in the jail's bail clerk's office provide important context to be considered in the analysis."[4] Doc. 38 at 37.

Second, the "surrounding circumstances" and "factual context and environment in which [Plaintiffs' payment of cash bail is] undertaken" would lead a reasonable observer to view the conduct as expressing some sort of message. *FNB I*, 901 F.3d at 1240, 1245 (quoting *Spence*, 418 U.S. at 410-11).

Like in *FNB I*, where the presence of tables, banners, and literature made clear that the plaintiffs' food-sharing event was more than a group of acquaintances eating together in a park, *id.* at 1242, the evidence here distinguishes Plaintiffs' activities from

---

[4] For similar reasons, Defendants' conclusory assertion (at 43) that the communal meal in *FNB I* "was at least arguably a symbolic event," while "paying cash bail itself symbolizes nothing," lacks merit. The *reason* the communal meal was symbolic in *FNB I* was the surrounding context, and it is that same context that renders Plaintiffs' payment of cash bail expressive.

a non-expressive payment of bail, *see* Doc. 38 at 31. Barred Business organizes

members, volunteers, and family members to "wait (all day—or night—if needed) in

the parking lot outside the detention centers, in full view of staff and visitors, in order

to celebrate the person's release and welcome them back into the community." Doc.

36-1 at 1-2. They livestream releases on social media, and staff and volunteers typically

wear Barred Business or other shirts in support of their broader cause while holding

signs and posters or distributing flyers. *See id.* at 2-3. They publicly welcome each

person at the curb with a "loud[] and proud[]" celebration that includes hugs, cheers,

and gifts. *Id.* at 4-6. And they "perform a needs assessment … right there in the

parking lot, often on the hood of a car." *Id.* at 4; *see also id.* (noting that they are

"always accompanied by [their] big van" to provide rides).[5] Similarly, that Vodicka's

charitable bail work is an expression of his religious and other beliefs is widely known

to the people who see it—most consistently, public defenders, judges, and court and

jail employees.[6] *See* Doc. 36-2 at 2. When he pays bail, he notes his affiliation, and jail

staff know he is there on behalf of the church's charitable bail fund. *See id.*; *see also*

---

[5] To the extent Defendants try to resist this comparison by observing that the banners in *FNB I* "were located where the regulated conduct was—in the park and at the meal," Opening Br. 44, they offer no persuasive reason for distinguishing signs that are held outside the jail here. The only reason to draw such a distinction would be if the distance impacted what a reasonable observer might perceive. That is simply not the case on this record. *See supra* pp. 24-26. And to the extent Defendants are raising a forum-analysis argument, that is addressed *infra* at pp. 28-29.

[6] Of course, as underscored by the Petition Clause, speech does not lose its protected quality because it is made to a government official. *E.g.*, *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018).

Doc. 38 at 31. Plaintiffs' payment of bail occurs within a context, and people observing those payments understand that their actions are an expression of their mission and beliefs. Doc. 36-2 at 2; *see* Doc. 36-1 at 5.

Like in *FNB I*, Plaintiffs also express a message on "an issue of concern in the community," 901 F.3d at 1242—namely, "the debate over affordable cash bail," Doc. 38 at 33. Defendants' insistence that this cannot "transform the non-expressive into the inherently expressive," Opening Br. 40, ignores its relevance under the "context matters" standard of *FNB I*. The fact that the treatment of homeless people was an issue of public concern did not *itself* render the plaintiffs' food-sharing events expressive in that case, but it did contribute to the Court's conclusion that a reasonable observer would understand those events to convey some message. 901 F.3d at 1242-43. So, too, here. The ongoing debate over poverty-based detention in Georgia means that members of the public are primed to understand the message conveyed by Plaintiffs' actions.

Like in *FNB I*, Plaintiffs' expression draws on a historical tradition of expressive conduct. *See id.* at 1243. "[P]osting bail for others as an act of faith and an expression of the need for reform has an important history in this country since its founding." Doc. 38 at 33-34; *see also id.* at 29-31 (discussing history). Defendants suggest that the history of charitable bail funds proves "the opposite conclusion" about the expressiveness of Plaintiffs' conduct than the one drawn by the district court, *see* Opening Br. 39, because "that history means nothing unless paired with

explanatory speech," *id.* at 41; *see also infra* pp. 29-30. But by this logic, history will never carry any significance, a position belied by *FNB I*. *See* 901 F.3d at 1243 (relying on, among other things, the Biblical recounting of meals that Jesus shared with sinners and tax collectors to conclude that reasonable observers would interpret food sharing as expressive). History matters here, too.

And like in *FNB I*, Plaintiffs' efforts are shared with the public, *see id.* at 1242, further underscoring their expressive nature. "Plaintiffs encourage the public to join them in welcoming the former detainees to the community." Doc. 38 at 32. For example, Barred Business invites volunteers to participate in bailouts and hosts community gatherings and discussions in connection with those events. *See* Doc. 36-1 at 2, 7-11, 14-15, 17. It also livestreams bail-out events from the jail parking lot so that the public is included in welcoming people back into the community. *See id.* at 2, 17. And it shares photos, videos, and stories from events on social media and in media appearances to explain its mission and solicit donations. *See id.* at 15-18. The district court correctly concluded that these factors, weighed together, show that a reasonable observer would conclude that Plaintiffs' conduct was expressive.

To be sure, in reaching this conclusion, the district court found that one of the five factors considered in *FNB I*—location—did not "cut in either direction." Doc. 38 at 33. Although the court acknowledged that jails are not traditional public forums like the parks in *FNB I*—a distinction also relied upon by Defendants on appeal (at 43-44)—the court reasoned that Plaintiffs have "no real option but to engage in their

28

alleged expressive conduct at the jails where the detainees are housed." Doc. 38 at 32-33. Moreover, the court emphasized that Plaintiffs' activities take place in areas "open to the public (the parking lot and the bail clerk's office)" and not in areas reserved for other jail uses. *Id.* at 32; *cf. Spence*, 418 U.S. at 409-10 (finding the display of a flag to be expressive by emphasizing "the context in which [it] is used," even though it was flown from the plaintiff's apartment "on private property"). For these reasons, location is, at worst, neutral here. *See FNB I*, 901 F.3d at 1242 (choice of location is important but "not dispositive"); *Burns*, 999 F.3d at 1346 ("[W]e've never said that every contextual factor has to weigh in favor of the conduct being expressive."). But on these facts, Plaintiffs submit that the location factor tips in their favor. In *FNB I*, the location informed whether the food-sharing events were expressive in part because of the tight nexus between the forum (a public park) and the message (community and care for all citizens, including the homeless). *See* 901 F.3d at 1242-44. An even stronger nexus exists here: Plaintiffs' message about pretrial detention happens at the very place where pretrial detention occurs, making the expressive intent even clearer to an onlooker.

Third, Defendants are wrong to suggest that Plaintiffs' "explanatory speech" necessarily renders their associated conduct not itself expressive. *E.g.*, Opening Br. 5 (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006)). It does not matter whether Plaintiffs engage in other First Amendment activity as well; "the critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a

message from the conduct." *FNB I*, 901 F.3d at 1244; *see also id.* at 1243-44 (explaining that although the Supreme Court has stated that "'the fact that explanatory speech is necessary is strong evidence that the conduct at issue … is not so inherently expressive that it warrants protection,'" that language "does not mean that conduct loses its expressive nature just because it is also accompanied by other speech" (cleaned up) (quoting *FAIR*, 547 U.S. at 66)). Surrounding speech cannot *create* expressive conduct, but "context still matters." *Id.* at 1244. And in this case, context alone would allow a reasonable observer to "infer some sort of message." *Id.* "[A] reasonable observer seeing a group of people assembled outside of a jail, wearing matching graphic t-shirts, with or without signs, would naturally assume that some sort of message about incarceration was intended, *even if* he or she could not actually read the text on the shirts or signs." Doc. 38 at 34 (emphasis added); *see also FNB I*, 901 F.3d at 1244 (explanatory speech such as text and logo on banners may have been necessary to understand the plaintiff's *specific* message, but context such as banners, a table, and a gathered crowd was sufficient for a reasonable observer to infer *some sort of message*).[7]

---

[7] Defendants cite to Vodicka's declaration as a specific example of Plaintiffs "engag[ing] in expression to explain why they are posting bail." Opening Br. 18-19 (citing Doc. 36-2 at 2). In addition to noting that every judge in the courthouse is familiar with Vodicka and his charitable bail work and that various officials have asked him to bail out individuals, the portion of the declaration cited by Defendants states that Vodicka "not[es] [his] affiliation with [the] Church" when he signs into the jail, and that "jail staff know that [he is] there because of [his] service with the Church and

Finally, contrary to Defendants' assertion (at 45), the district court correctly distinguished the Seventh Circuit's decision in *The Bail Project*. In that case, the Seventh Circuit held that The Bail Project's payment of cash bail did not constitute expressive conduct because "without awareness of The Bail Project and its mission—presumably gleaned from the organization's website or other speech explaining its efforts—a reasonable person witnessing an employee from The Bail Project paying cash bail would not detect any message from the act itself." 76 F.4th at 577. That case differs from this one on both the facts and the law.

On the facts, there are a number of expressive elements present in Plaintiffs' charitable bail work that were missing from the record in *The Bail Project. Compare id.* at 573-74, 577, *with supra* pp. 6-11. And as the district court pointed out, the audience here extended beyond "'county clerk's office employees and by-standers who happen to be in the office'" to "the general public and members of the criminal justice system." Doc. 38 at 35 (quoting *The Bail Project*, 76 F.4th at 574).

On the law, the Seventh Circuit adopted an unduly narrow understanding of when conduct is expressive. The Seventh Circuit required The Bail Project's conduct to be "inherently expressive"—that is, capable of "'comprehensively communicat[ing] its own message without additional speech.'" *The Bail Project*, 76 F.4th at 575 (quoting

---

the charitable bail fund." Doc. 36-2 at 2. Vodicka flags his affiliation with the church and its charitable bail fund as part of the process of paying bail, but the record indicates that a reasonable observer would understand his expression absent that speech. *See* Doc. 38 at 34.

*Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017)). Its analysis "d[id] not properly consider context," *id.* at 581 (Jackson-Akiwumi, J., dissenting), which both the Supreme Court and this Court have long considered key, *see, e.g.*, *Spence*, 418 U.S. at 410 ("[T]he context in which a symbol is used for purposes of expression is important."); *FNB I*, 901 F.3d at 1242-44; *see also* Doc. 38 at 37 ("One might wonder if the majority in *The Bail Project* was faced with the facts of [*FNB I*] whether it would look only to the moment a bite is taken from food to discern expressiveness.").[8] Applying both the Supreme Court's and this Circuit's precedent to the evidence in the record compels the conclusion that Plaintiffs' charitable bail activity is expressive conduct. The three-cash-bail limit places a severe restriction on their First Amendment-protected activity.

### 2.    The three-cash-bail limit is not subject to lesser First Amendment scrutiny as a "government benefit."

In the alternative, Defendants argue that even if Plaintiffs' payment of cash bail is expressive, Plaintiffs "cannot impose their expression onto a government program." Opening Br. 36. According to Defendants, the bail system is "a government benefit" in which Plaintiffs "voluntarily choose to participate," and the

---

[8] The Seventh Circuit further seemed to require that the conduct communicate a specific message understood by the audience, *see The Bail Project*, 76 F.4th at 577 ("[T]he point is that nothing about the act itself inherently expresses any view on the merits of the bail system."), which strays from the Supreme Court's teachings that do not require a specific articulable message, *see Hurley*, 515 U.S. at 569.

First Amendment does not "empower" Plaintiffs to "dictate" the terms of that program. *Id.* at 37-38 (internal quotation marks omitted). That argument also fails.

First, it is forfeited. Defendants did not raise this "government benefit" issue below, *see* Doc. 26 at 5-10, and cannot rely on a theory not considered by the district court for the first time on appeal, *see Flowers v. Comm'r, Soc. Sec. Admin.*, 97 F.4th 1300, 1305 (11th Cir. 2024).

Even if the Court considers it, Defendants' contention that the payment of cash bail is a "government benefit" subject to diminished First Amendment scrutiny is wrong. There is no categorical rule permitting the government to suppress speech so long as it occurs in the context of a government program. The Supreme Court has rejected proposals to create "a new doctrine that would" weaken First Amendment protections in all "'government-program' cases." *Matal v. Tam*, 582 U.S. 218, 241 (2017) (plurality opinion). To the contrary, the Constitution protects expression in a wide variety of government-sponsored programs. *See, e.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 393-94 (2019) (trademark registration); *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 893 (2018) (public-sector union agency fees); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 221 (2013) (government funding for nongovernmental organizations); *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 191 (2021) (high school cheerleading).

Defendants are also wrong to suggest (at 38) that "voluntary participation in a government program" carries with it a forfeiture of First Amendment freedoms

across the board.[9] Many of the cases cited above involved government programs in which participation is voluntary. And it is irrelevant whether the government provides a program as a matter of grace: the government still must respect speech rights in the context of that program, even if it would be free to offer no program at all. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

Defendants' cases apply lesser First Amendment scrutiny to particular government programs for context-specific reasons inapplicable here. Indeed, Defendants' "government program" argument incoherently combines disparate lines of cases arising in discrete areas of First Amendment law that bear no relation to the issues in this case. Cases involving the speech rights of schoolchildren, *see* Opening Br. 36, 39 (quoting *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007))—which turn on the principle that students in public schools have fewer rights than adults—are inapposite. Defendants rely heavily on *Lowery*, a case about high school football players who were kicked off the team in retaliation for speech criticizing the coach, where the court applied the lesser First Amendment protections applicable to schoolchildren under *Tinker*. And *Lowery* appears to have been abrogated by *Mahanoy*,

---

[9] Defendants say that "federal courts should give States wide latitude to fashion procedures for setting bail." Opening Br. 37 (quoting *Walker v. City of Calhoun*, 901 F.3d 1245, 1268 (11th Cir. 2018)). But this case is about payment of bail, not procedures for setting bail. And none of the cases on which Defendants rely involved First Amendment claims or offer any support for Defendants' arguments for a new First Amendment exception.

which recognized that being suspended from high school cheerleading can constitute a First Amendment injury.

Government-speech cases are even further afield. *See* Opening Br. 38 (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)). The State is not "speaking" through Plaintiffs' payment of cash bail to express opposition to unnecessary pretrial detention, much less "speaking on its own behalf," *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009), rendering these cases inapplicable.

Defendants' reliance on government-subsidy cases is equally flawed. *See* Opening Br. 38 (citing *Rust v. Sullivan*, 500 U.S. 173 (1991)). Plaintiffs' payment of cash bail is funded by constitutionally protected private charitable donations, not by the government. *See also Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 436 (5th Cir. 2014) (en banc) (*Rust* does not apply when "no public monies or 'spending' by the state are involved").

Finally, nonpublic forum cases, which Defendants invoke only by way of "example," are also inapposite. *See* Opening Br. 36-37. The expression at issue here is the payment of cash bail, and, although the process varies across counties, Plaintiffs make payments on government property specifically designated for that purpose. Thus, the expressive conduct is better understood as occurring in "a designated public forum" that has been "intentionally opened up" for the "purpose" of receiving bail payments. *Pleasant Grove City*, 555 U.S. at 469 (internal quotation marks omitted).

35

### 3.  Defendants fail to carry their burden of showing that the law survives intermediate scrutiny.

The three-cash-bail limit's restriction on expressive conduct fails intermediate scrutiny. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291 (11th Cir. 2021) (*FNB II*). Defendants bear the burden of demonstrating that the law passes scrutiny. *See, e.g.*, *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1299 (11th Cir. 2017). Under intermediate scrutiny, Defendants must demonstrate that the restrictions are "narrowly drawn to further a substantial governmental interest unrelated to the suppression of free speech." *FNB II*, 11 F.4th at 1291 (cleaned up).

Defendants contend that they have "a compelling interest in assuring the presence at trial of persons charged with crime," Opening Br. 47 (internal quotation marks omitted), but they do not demonstrate that the three-cash-bail limit advances that interest, much less in a narrowly tailored way, *see id.* at 47-48. As an initial matter, Defendants have not provided evidence to substantiate the idea that limiting the ability of third parties to pay cash bail will increase appearance rates. *See Buehrle v. City of Key West*, 813 F.3d 973, 980 (11th Cir. 2015) ("The government bears the burden of showing that the articulated concern has more than merely speculative factual grounds." (cleaned up)). And that premise is undermined by Plaintiffs' evidence that

bail funds are invested in the success of the people they help and work to ensure that those people appear for court.[10]

Moreover, even if the law advanced Defendants' stated interest, the three-cash-bail limit is poorly tailored in several respects. For one, the three-cash-bail limit focuses on the wrong actor. Rather than imposing restrictions on criminal defendants, who are directly responsible for whether they appear in court, the law restricts the expressive conduct of third parties. In addition, the choice to limit the number of permissible payments to three is arbitrary, as Defendants offer no reason to believe that a fourth individual bailed out by a bail fund is any less likely to appear than the first three. *See* Doc. 38 at 41 ("There does not appear to have been any congressional findings or details about why an individual or entity posting four cash bonds rather than three suddenly undermines the State's interest in ensuring attendance of formerly detained individuals at trial."). And because the three-cash-bail limit applies to anyone, not just bail funds, it prevents any private individual from bailing out four family members—or the same family member four times—even though there is no reason to

---

[10] *See* Doc. 36-1 at 12-13 (noting that "each person who is bailed out is welcomed into the Barred Business family," which provides a number of wraparound services to ensure people succeed, and which attends court with people who are bailed out); Doc. 36-2 at 2-3 ("It is an important part of our bail out process to 'walk with' each person" who is bailed out, which means "not only physically accompanying them to their court dates, but also developing a relationship with [them]."); *see also* Doc. 1 at 5-6 ("Barred Business identifies potential recipients of bail through community engagement," "undertak[es] a careful intake assessment," and "will only bail someone out if it has the resources to support that person [during] reentry."); *id.* at 24 ("Charitable bail funds regularly report perfect or near-perfect appearance rates ….").

think there would be any difference in appearance rates after the first three payments. At the same time, the law does nothing to restrict the payment of cash bail for those criminal defendants who the State believes are less likely to appear, for example because they have weaker community ties or have committed more serious offenses. *See* Doc. 38 at 40. Defendants' failure to show that the law is tailored to advance its interests means the law fails intermediate scrutiny. *See FNB II*, 11 F.4th at 1291; *see also, e.g.*, *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1238 (10th Cir. 2021) (holding that a law failed intermediate scrutiny based on "the paucity of evidence proffered by the City showing that the harms or the remedial effects of the Ordinance [were] supported by more than speculation and conjecture" (cleaned up)).

Defendants also argue (at 48) that the three-cash-bail limit imposes a "minimal" burden on speech that should "easily satisfy intermediate scrutiny" because it targets only the "literal payment of bail" and not "all the [other] things that [Plaintiffs] purport to do now." But allowing people to engage in other forms of speech does not excuse an otherwise unconstitutional restriction on speech. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543-44 (2022) (finding free speech violation when coach was prohibited from praying on field after football games, even though he could engage in same speech at other locations and times). To the extent that Defendants seek to invoke the "ample alternative channels of communication" framework, *see generally McCullen v. Coakley*, 573 U.S. 464, 477 (2014), it is unclear whether this framework applies at all when the government regulates expressive conduct (as opposed to

enforcing a content-neutral regulation of the time, place, and manner of speech in a public forum). In any event, the availability of alternative channels comes up only *after* the government demonstrates narrow tailoring, *see id.* at 496 n.9; *FNB II*, 11 F.4th at 1297, which Defendants have failed to do here. The question is whether Defendants have met the burden required to restrict Plaintiffs' expressive conduct, not whether Plaintiffs might be able to express their message through other means.

### C. The surety licensing requirement violates the First Amendment.

The district court correctly held that the surety licensing requirement is an unconstitutional content-based restriction on speech. The provision requires every individual, organization, or group that "purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons" to meet onerous surety licensing requirements. O.C.G.A. § 17-6-15(b)(4). It thus singles out parties for restrictions based on the content of their speech: the *purpose for which they "solicit[] donations"* while "purporting" to be a bail fund. Because soliciting donations unquestionably constitutes protected speech, and because Defendants fail to establish that the surety licensing requirements further any alleged government interest at all (much less in a narrowly tailored way), the requirement cannot survive First Amendment scrutiny.

39

### 1. The surety licensing requirement is a content-based restriction on protected speech.

Laws that target speech based on content are presumptively unconstitutional. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The surety licensing requirement is just such a law. It imposes onerous licensing restrictions based entirely on the content of an entity's expression—namely, whether the entity solicits donations for a particular purpose.

Soliciting donations for charitable causes is entitled to the highest level of First Amendment protection. "[S]olicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes," and "without solicitation the flow of such information and advocacy would likely cease." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). Because soliciting for charitable causes "does more than inform private economic decisions," it is subject to greater protection than "purely commercial speech." *Id.*; *accord, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). The surety licensing requirement singles out one protected form of expression—soliciting donations for one charitable cause—for onerous restrictions that do not apply to other types of speech. This is precisely what content-based scrutiny is designed to prevent. *See Reed*, 576 U.S. at 163-64; *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125-26 (11th Cir. 2022).

The Supreme Court's decision in *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), underscores that the surety licensing requirement is content-based. In *Austin*, the Court noted that a broad restriction on *all* forms of solicitation would be content-neutral if it "applied evenhandedly to all who wished to solicit funds, whether for commercial or charitable reasons." *Id.* at 73 (cleaned up). S.B. 63 does not apply to all solicitation regardless of the reason; it singles out solicitation for one particular charitable cause.

Indeed, by singling out solicitation for one specific cause—"securing the release of accused persons"—the surety licensing requirement is not just content-based, but an example of *viewpoint* discrimination. Viewpoint discrimination is a particularly "egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), that is "even more anathematic to the First Amendment" than content-based restrictions alone, *Cartwright*, 32 F.4th at 1126. In any event, because the restrictions are at a minimum content-based, Defendants must satisfy strict scrutiny. They cannot do so.

### 2. Defendants' defense of the surety licensing requirement ignores the plain language of the statute.

Defendants argue (at 48-54) that the surety licensing requirement should be given a pass because it regulates "conduct, not speech." This argument misunderstands both S.B. 63 and the First Amendment.

To begin, Defendants' argument flies in the face of the law's plain language. The surety registration requirements are triggered by pure expression—the solicitation of donations for a particular use. Whether an entity actually pays cash bail is irrelevant: the licensing requirements would apply to an entity that solicited donations for bail but never received enough money to pay bail, but they would not apply to an entity with an independent source of revenue that pays bail but does not solicit donations for the cause.[11] *See* Doc. 38 at 47 (noting that "if Church A and Church B both use funds to bail out members of the community, but only Church A posts a public appeal to congregants to raise money for the purpose," then "only Church A would be required to comply with the Surety Requirement"). And an organization that purports to be a charitable bail fund and solicits donations in one county to be used as bail in *another* county or any other jurisdiction would have to register as a surety only in the county in which it engaged in solicitation. As these scenarios make clear, the law targets the constitutionally protected expression of soliciting charitable donations, not the act of paying bail.

Similarly, Defendants misapply the First Amendment by leaning heavily into caselaw upholding regulations that apply to professions that a regulated party "holds

---

[11] Defendants' argument (at 53) that if the surety licensing provision violates the First Amendment, "the proper remedy would be to enjoin the State from enforcing the law based on what someone has purported," is therefore misplaced. By its plain language, the surety licensing requirement applies *only* based on speech, not based on actual payment of bail.

herself out" to practice. *See* Opening Br. 50-51. Those cases simply uphold the application of an otherwise valid licensing regime to those who hold themselves out to perform a profession. But that does not fix the constitutional problem with the surety licensing regime, because there is a First Amendment right to solicit donations, and the surety licensing requirement restricts that constitutionally protected expression. The requirement is akin to a law imposing restrictions on any "person who purports to be a Baptist missionary with the purpose of sharing the Baptist faith," which undoubtedly would be struck down.

In any event, "[t]he dangers associated with content-based regulations of speech are also present in the context of professional speech," *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018), and "governments' characterization of their [laws] as professional regulations cannot lower" the level of scrutiny that accompanies content-based restrictions, *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020).[12] This Court has cautioned against tolerating intrusions on the freedom of speech as "merely incidental to the regulation of professional conduct." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc). And in *Riley*, the Supreme Court struck down a set of licensing requirements that applied to

---

[12] As the Supreme Court has made clear, a licensing requirement triggered by speech rather than business conduct raises significant constitutional concerns. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try.").

professional fundraisers who solicited charitable donations, rejecting an argument that the regime should be scrutinized under a more lenient standard. 487 U.S. at 796 ("[E]ven assuming, without deciding, that such speech in the abstract is indeed merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech."). Instead, the Court "appl[ied] [its] test for fully protected expression." *Id.*; *accord, e.g.*, *Thompson*, 535 U.S. at 360 (regulation of drug safety did not justify restrictions on "advertising and solicitation"). The same should happen here.

### 3.    The surety licensing requirement fails any level of scrutiny.

As a content-based (and viewpoint-based) restriction on speech, the surety licensing requirement is subject to strict scrutiny. This means the law is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Indeed, "[f]ew categories of regulation have been as disfavored as content-based speech restrictions," which "almost never survive" strict scrutiny. *Otto*, 981 F.3d at 862. Defendants fail this test at every turn; indeed, the surety licensing requirement could not survive even less rigorous scrutiny. *See Wollschlaeger*, 848 F.3d at 1308 (declining to decide whether strict scrutiny applied when regulation failed less stringent scrutiny). Defendants chose not to submit any evidence to meet their burden in the district court, *see* Doc. 26 at 19-20; Doc. 37 at 24:15-21; Doc. 38 at 2, a failure

which itself is fatal, *see Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (plaintiffs seeking a preliminary injunction "must be deemed likely to prevail unless the Government has shown" that the law burdening protected expression satisfies the applicable tier of scrutiny). But even ignoring this evidentiary deficit, Defendants fail to offer a logical explanation of how the surety licensing requirement furthers any government interest, let alone a compelling one in a narrowly tailored way.

Defendants invoke an "interest in assuring the presence at trial of persons charged with crime," and in ensuring "the fair and proper administration of the criminal laws." Opening Br. 56-57 (internal quotation marks omitted). But the government may not simply state an interest; it must "specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up); *see also id.* at 799-800 ("ambiguous proof will not suffice" to show "direct causal link" between interest and regulation). Defendants do not try to explain how applying the surety registration requirement to charitable bail funds furthers their purported interest in ensuring that people show up to court or in protecting the administration of the criminal justice system; they make only a conclusory assertion. Opening Br. 56.

Nor have they shown narrow tailoring. There is a fundamental mismatch between the State's purported interest in assuring that people show up for court and the law's reliance on solicitation as a trigger for regulation, rendering the law both

over- and under-inclusive. Further, the requirement imposes surety-specific statutory rules designed for bonding companies onto charitable bail funds, with no consideration of how those requirements would or should work for those who pay cash bail in full. Sureties are required to maintain a cash escrow account as collateral in case a defendant fails to appear in court and the company is required to pay the full bond amount. O.C.G.A. § 17-6-15(b)(1)(E). But because cash bail is paid in full up front, it makes no sense to require bail funds to maintain collateral, let alone up to a million dollars' worth. *See id.* Nor has the State shown that the law's requirements about who can act as a surety make any sense transplanted onto charitable bail funds. For example, the law requires that bondsmen meet a "good moral character" requirement and have no felony convictions. O.C.G.A. § 17-6-50(b)(3); *see also id.* § 17-6-15(b)(1)(D) (requiring fingerprinting and background checks). But, if anything, the wraparound services provided by organizations like Barred Business to ensure their clients show up for court are *more* effective when designed and provided by justice-impacted individuals who understand the needs of the community. *See* Doc. 5-1 at 1.

Charitable bail funds deter jumping bail in ways sureties do not, including by providing community support and services that encourage individuals to appear in court. And they have a financial incentive to ensure that their clients appear because a client who jumps bail forfeits funds that could be used to help more people. *See* Doc. 1 at 25. It is unsurprising, then, that "[c]haritable bail funds regularly report perfect or

46

near-perfect appearance rates, higher than those provided by surety bond companies." *Id.* at 24. Defendants do not—and cannot—explain how subjecting charitable bail funds to burdensome requirements, designed for a different sort of organization, would improve this already sterling record.

In any event, importing regulations unaltered from the surety context to the charitable bail context is not tailored to the State's interest. "[I]f the State is concerned about the risk of bail jumping or other pretrial misconduct by a particular class of detainees whose bail is paid by charitable bail funds, there are more straightforward ways to deter that conduct" that do not unnecessarily burden speech. Doc. 38 at 49-50. Judges can impose additional conditions or constraints for particular defendants shown to be a flight risk. Or the State could have required charitable bail funds to provide regular reports about the status of the people they bail out, *see* Doc. 37 at 22:13-21, or to provide ongoing support and services, *see* Opening Br. 56. Any number of options that do not infringe First Amendment rights were open to the State. *See FNB II*, 11 F.4th at 1296 ("[A]n abundance of targeted alternatives may indicate that a regulation is broader than necessary." (citing *McCullen*, 573 U.S. at 490-94)). The fact that it instead adopted a nonsensical scheme that does nothing to ensure that individuals show up to court or to protect the administration of justice makes clear that the surety licensing requirement fails any level of scrutiny.

Finally, S.B. 63 constitutes a prior restraint by providing unfettered discretion to sheriffs to decide whether to approve applications for surety registration. "[A]

47

licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (collecting cases). Here, a sheriff has discretion to deny a charitable bail fund authorization to operate *even if* it meets all of the enumerated statutory requirements. O.C.G.A. § 17-6-15(b)(2); *see Bondsman, Inc. v. Taylor*, 367 Ga. App. 213, 218, 885 S.E.2d 249, 254 (2023); *A.A.A. Always Open Bail Bonds, Inc.*, 129 F. App'x at 524. And the requirements to become a surety bonding company are themselves highly discretionary, allowing the sheriff to decide, for example, whether "a person [is] of good moral character." O.C.G.A. § 17-6-50(b)(3); *cf. Schneider v. Town of Irvington*, 308 U.S. 147, 158 (1939) (striking down law allowing permits to be denied if Chief of Police determined that the applicant was "not of good character"). Leaving an entity unable to solicit donations until it satisfies the whims of a government decisionmaker is clearly unconstitutional. *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958) (striking down prior restraint on soliciting dues-paying union membership). This discretionary regime therefore constitutes an independent basis for striking down the surety licensing requirement. *See City of Lakewood*, 486 U.S. at 755-56 ("[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." (collecting cases)).

48

**II.    The District Court Did Not Abuse Its Discretion in Weighing the Remaining Preliminary Injunction Factors.**

This Court's review of the district court's assessment of the equitable factors is "exceedingly narrow" and highly deferential. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Defendants point to no abuse of discretion in the district court's weighing of these factors in Plaintiffs' favor.

First, "an ongoing violation of the First Amendment constitutes an irreparable injury." *Cartwright*, 32 F.4th at 1128 (internal quotation marks omitted). And the harm to Plaintiffs is more than an abstract infringement of that right. Instead, it is a near-total curtailment of the charitable activity and religious exercise that they have conducted for years.

Defendants argue that Plaintiffs' purported "delay" in bringing the suit undercuts their claim of harm. This is wrong. S.B. 63 was signed into law in May, and Plaintiffs filed their case in June—with enough time before the law went into effect for Defendants to respond, the court to hold a hearing, and Plaintiffs to obtain a TRO and then a preliminary injunction. Moreover, Defendants' only citation is to a case finding that a delay of five months *while* a party is experiencing the purported irreparable harm undercuts the claim of urgency. Opening Br. 59 (citing *Wreal, LLC*, 840 F.3d at 1248). Here, Plaintiffs' efforts ensured they would not experience S.B. 63's restrictions for even a single day—underscoring, rather than belying, their claim of irreparable injury.

49

Defendants "ha[ve] no interest in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). And as noted above, the new law's restrictions are disconnected from any government interest. Tellingly, those closest to the bail system—the defendant solicitors—declined to offer any defense of the law. *See supra* note 1. Indeed, Georgia's law is an outlier, imposing more severe restrictions on charitable bail activity than any other state does. The injunction preserves the status quo for both Plaintiffs and Defendants while the serious constitutional problems with the law are fully litigated. *See Robinson v. Att'y Gen.*, 957 F.3d 1171, 1178-79 (11th Cir. 2020) (emphasizing key function of injunction is to preserve the status quo). As the district court correctly concluded, these equities favor the injunction.

## CONCLUSION

For the foregoing reasons, the district court properly issued a preliminary injunction against enforcement of Section 4 of S.B. 63. Its order should be affirmed.

Dated: November 8, 2024

Respectfully submitted,

*s/ Alexandra Lichtenstein*

Cory Isaacson
Andrés López-Delgado
Akiva Freidlin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA
P.O. Box 570738
Atlanta, GA 30357
(770) 415-5490
cisaacson@acluga.org

Alexandra Lichtenstein
Rupa Bhattacharyya
Shelby Calambokidis
Joseph Mead
William Powell
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 662-9042
alex.lichtenstein@georgetown.edu

*Attorneys for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it contains 12,934 words, excluding those exempted by Rule 32(f) and 11th Cir. R. 32-4, and has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*s/ Alexandra Lichtenstein*
Alexandra Lichtenstein

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2024, I electronically filed the foregoing brief using this Court's CM/ECF system, which will serve all counsel of record.

*s/ Alexandra Lichtenstein*
Alexandra Lichtenstein

# ADDENDUM

O.C.G.A. § 17-6-15

**§ 17-6-15. Bail**

. . . .

(b) . . . .

(4) No more than three cash bonds may be posted per year by any individual, corporation, organization, charity, nonprofit corporation, or group in any jurisdiction. Every individual, corporation, organization, charity, nonprofit corporation, or group that purports to be a charitable bail fund with the purpose of soliciting donations to use for securing the release of accused persons shall be required to submit to the same requirements as any professional surety company, including, without limitation, the requirements set forth in paragraph (1) of this subsection and Code Sections 17-6-50, 17-6-50.1, and 17-6-51.

(5) Prosecuting attorneys and the Attorney General shall have concurrent authority to prosecute any violation of paragraph (4) of this subsection.

(6) Any person or entity who violates any part of paragraph (4) of this subsection shall be guilty of a misdemeanor.

. . . .