# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

BARRED BUSINESS, et al.

*Plaintiffs/Appellees*,

v.

BRIAN KEMP, et al.,

*Defendants/Appellants.*

Appeal From the United States District Court
For the Northern District of Georgia
Case No. 1:24-cv-2744-VMC

**BRIEF OF AMICI CURIAE CURRENT AND FORMER ELECTED PROSECUTORS AND FORMER ATTORNEYS GENERAL AND UNITED STATES ATTORNEYS IN SUPPORT OF PLAINTIFFS AND AFFIRMANCE**

ZACK GREENAMYRE
Georgia Bar No. 293002
MITCHELL SHAPIRO GREENAMYRE & FUNT, LLP
881 Piedmont Avenue
Atlanta, Georgia 30309
404.812.4747
zack@michtellshapiro.com

November 15, 2024

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

1. ACLU Foundation of Georgia, Counsel for Plaintiff-Appellees

2. American Civil Liberties Union of Georgia, Counsel for Plaintiff-Appellees

3. Athens-Clarke County Attorney's Office, Counsel for Defendant Will Fleenor

4. Barred Business, Plaintiff-Appellees

5. Bhattacharyya, Rupa, Counsel for Plaintiff-Appellees

6. Burton, Beth, Deputy Attorney General, Counsel for Defendant-Appellants Governor Brian Kemp and Attorney General Christopher M. Carr

7. Calambokidis, Shelby, Counsel for Plaintiff-Appellees

8. Calvert, Victoria M., United States District Court Judge, Northern District of Georgia

9. Carr, Christopher M., Attorney General, Defendant-Appellant

10. Crowder, Elizabeth McRary, Senior Assistant Attorney General, Counsel for Defendant-Appellants Governor Brian Kemp and Attorney General Christopher M. Carr

11. Fleenor, Will, Solicitor General for Athens-Clarke County, Defendant

12. Freidlin, Akiva, Counsel for Plaintiff-Appellees

13. Gammage, Keith E., Solicitor General for Fulton County, Defendant

14. Greenamyre, Zack, counsel for Amici Curiae in support of Plaintiff-Appellees

15. Georgetown University Law Center

16. Hines, Sherrie Lynn Hines, Counsel for Defendant Will Fleenor

17. Hawkins, John Matthew, Counsel for Defendant Will Fleenor

18. Institute for Constitutional Advocacy and Protection, Counsel for Plaintiff-Appellees

19. Isaacson, Cory, Counsel for Plaintiff-Appellees

20. Kemp, Brian, Governor, Defendant-Appellant

21. Lichtenstein, Alexandra, Counsel for Plaintiff-Appellees

22. Lopez-Delgado, Andres Martin, Counsel for Plaintiff-Appellees

23. Mead, Joseph, Counsel for Plaintiff-Appellees

24. Mitchell Shapiro Greenamyre & Funt, LLP, counsel for Amici Curiae in support of Plaintiff-Appellees

25. Oconee Street United Methodist Church

26. Office of the Fulton County Attorney, Counsel for Defendant Keith E. Gammage

27. O'Kelley, Elijah J., Assistant Solicitor General, Counsel for Defendant-Appellants Governor Brian Kemp and Attorney General Christopher M. Carr

28. Petrany, Stephen J., Solicitor General, Counsel for Defendant-Appellants Governor Brian Kemp and Attorney General Christopher M. Carr

29. Piper, Tina M., Former Senior Assistant Attorney General, Former Counsel for Defendant-Appellants Governor Brian Kemp and Attorney General Christopher M. Carr

30. Plott, Mathew Eli, Counsel for Defendant Keith E. Gammage

31. Powell, William, Counsel for Plaintiff-Appellees

32. Simonson, Jocelyn, Professor of Law and Associate Dean for Research and Scholarship at Brooklyn Law School

33. Simpson, Bridgett, Executive Director of Barred Business

34. Vodicka, John Cole, Plaintiff-Appellee

35. Williams, Steven, Plaintiff-Appellee

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

This 15th day of November, 2024.

**Zack Greenamyre**
Zack Greenamyre
Georgia Bar No. 293002

# **TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE .......................................................................... 1

SUMMARY OF ARGUMENT.............................................................................. 2

ARGUMENT ....................................................................................................... 4

   I.    S.B. 63 Results in Unnecessary Pretrial Detention .................................... 4

  II.    Unnecessary Pretrial Detention Adversely Impacts Public Safety .......... 12

         A.    Unnecessary Pretrial Detention Negatively Affects Public Safety by
               Placing Already Vulnerable Individuals in Worse Circumstances
               and Raising Recidivism Rates......................................................... 13

         B.    Unnecessary Pretrial Detention May Contribute to Wrongful
               Convictions and Public Perceptions of Unfairness in the Criminal
               Legal System, Which Negatively Impacts Public Safety .............. 17

  III.    By Increasing the Number of People Unnecessarily Held Pretrial, S.B. 63
         is Detrimental to Public Safety ............................................................... 22

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES
## Federal Cases

*Daves v. Dallas County*,
 64 F.4th 616 (5th Cir. 2023) ............................................................................ 11

*ODonnell v. Harris Cnty.*,
 892 F.3d 147 (5th Cir. 2018) ............................................................................ 11

*ODonnell v. Harris County.*,
 251 F. Supp. 3d 1052 (S.D. Tex. 2017) ............................................................ 17

*Offut v. United States,*
 348 U.S. 11 (1954) ............................................................................................ 19

*Schultz v. State*,
 330 F. Supp. 3d 1344 (N.D. Ala. 2018) ............................................................ 10

*Williams-Yulee v. Fla. Bar,*
 575 U.S. 433 (2015). ......................................................................................... 19

## Statutes

O.C.G.A. § 17-6-1 ...................................................................................................... 9

O.C.G.A. § 17-6-15. ........................................................................................... 4, 5, 7

O.C.G.A. § 17-6-50.1. ............................................................................................ 5, 7

## Secondary Sources

ABA Standards for Criminal Justice: Pretrial Release 36 (2007) ............................ 6

Arthur Goldberg, *Equality and Governmental Action*, 39 N.Y.U. L. Rev. 205
 (1964) ............................................................................................................... 25

Brice Cooke, Binta Zahra Diop, Alissa Fishbane, Jonathan Hayes, Aurélie Ouss & Anuj Shah, *Text Message Reminders Decreased Failure to Appear in Court in New York City*, Jameel Poverty Action Lab (2018) ........................................... 16

Caitlin Delong & Jessica Reichert, *The Victim-Offender Overlap: Examining the Relationship Between Victimization and Offending*, Ill. Crim. Just. Info. Auth. Center for Justice Research & Evaluation 1 (Jan 15, 2019).............................. 14

Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, Laura & John Arnold Found., *The Hidden Costs of Pretrial Detention* (2013) ......... 14, 21

Conference of State Court Admins., *2012-2013 Policy Paper: Evidence-Based Pretrial Release* (2013) ...................................................................... 17

Cynthia Godsoe, *The Victim/Offender Overlap and Criminal System Reform,* 87(4) Bklyn L. Rev. 1319 (2022)........................................................................ 14, 19

Department of Justice, *Report and Recommendations Concerning Access to Counsel at the Federal Bureau of Prisons' Pretrial Facilities* (2023) .............. 17

Emily Widra, *Addicted to Punishment: Jails and Prisons Punish Drug Use Far More Than They Treat It*, Prison Policy Initiative (January 30, 2024) .............. 13

*In Pursuit of Peace: Building Police-Community Trust to Break the Cycle of Violence,* Giffords Law Center to Prevent Gun Violence, (September 9, 2021) 20

Jack Karp, *Do New Laws Seek To Regulate Charitable Bail, Or End It?* Law 360 (April 5, 2024) .................................................................................. 10

Laura & John Arnold Found., *The Hidden Costs of Pretrial Detention Revisited* (2022) ....................................................................................... 14, 21

Léon Digard & Elizabeth Swavola, *Justice Denied: The Harmful and Lasting Effects of Pretrial Detention*, Vera Inst. of Just. (2019)................................... 18

Marie VanNostrand & Gena Keebler, *Pretrial Risk Assessment in Federal Court*, Fed. Probation (2009) ...................................................................... 16

Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34(4) J.L. Econ. & Org. 511 (2018) ........................................ 19, 21

iv

Michael A. Ruderman, Deirdra F. Wilson & Savanna Reidadd, *Does Prison Crowding Predict Higher Rates of Substance Use Related Parole Violations? A Recurrent Events Multi-Level Survival Analysis*, 10(10) PLoS ONE (2015) .... 15

Michael Mueller-Smith, *The Criminal and Labor Market Impacts of Incarceration* (Working Paper, 2015) ...................................................................... 14

Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, Pretrial Justice Institute (2013) ................................................ 11

*Moving Beyond Incarceration for Women in Massachusetts: The Necessity of Bail/Pretrial Reform*, Wellesley Centers for Women (2015) ............................ 13

Natalia Ermasova, Erica Ceka, Aubrey Adams & Lisa Jackson, *Perceptions Toward Wrongful Convictions and Needed Reforms in the Criminal Justice System: Does Working Experience in Law Enforcement Matter?* Qualitative Criminology (2024) .......................................................................... 18

Paul Heaton, Sandra Mayson & Megan Stevenson, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69(3) Stan. L. Rev. 711 (2017) .......... 14, 21

Quentin King, *Overcrowded and Overburdened: West Virginia Counties Struggle to Pay Regional Jail Bills*, West Virginia Center on Budget and Policy (2021) ............................................................................................ 15

Rachel Leah Arco, *When Conditions of Confinement Lead to Violence: Eighth Amendment Implications of Inter-Prisoner Violence*, 20 Hous. J. Health L. & Pol'y 411 (2020-2021) .......................................................... 15

Stanley Dunlap, *Georgia Senate Panel Considers Solutions to Ease Overcrowding at Local Jails*, Georgia Recorder (April 29, 2024),............................................ 22

Stanley Dunlap, *State Lawmakers Dig into Violent Conditions in Georgia Prisons, Fulton Jail*, WABE (August 26, 2024) .......................................................... 22

Tiffany Bergin, René Ropac, Imani Randolph & Hannah Joseph, *The Initial Collateral Consequences of Pretrial Detention: Employment, Residential Stability, and Family Relationships,* Arnold Ventures & N.Y. Criminal Just. Agency, (2022) ................................................................................. 13

Tom R. Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 263 (2008) .......................................................................................................... 20

Tom R. Tyler & Jonathan Jackson, *Popular Legitimacy and the Exercise of Legal Authority: Motivating Compliance, Cooperation and Engagement*, 20 Psych., Pub. Pol'y & L. 78 (2014) ............................................................................... 20

U.S. Commission On Civil Rights, *The Civil Rights Implications of Cash Bail* (2022) ..................................................................................................... 10

UCLA School of Law Criminal Justice Program, *California Pretrial Release Considerations: A Bench Book for California Superior Court Judges* (2024) .. 10

United States Government Accountability Office, *Growing Inmate Crowding Negatively Affects Inmates, Staff, & Infrastructure* (2012) ............................... 15

Will Dobbie & Crystal S. Yang, *The US Pretrial System: Balancing Individual Rights and Public Interests*, 35(4) J. Econ. Persp. 49 (2021) .............................. 6

Will Dobbie, Jacob Goldin & Crystal S. Yang, *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) Am. Econ. Rev. 201 (2018) ...................................................... 17

# INTEREST OF AMICI CURIAE

Amici curiae are a group of 39 current and former elected prosecutors and former Attorneys General and United States Attorneys who are committed to protecting the integrity of our justice system and advancing public safety. A full list of Amici is attached as Appendix A.

As prosecutors and Attorneys General, past and present, Amici all are or have been tasked with ensuring the safety of everyone in their communities and are interested in the proper functioning of the criminal legal system. Amici all serve or have served in prosecutorial roles and acknowledge that pretrial detention, in the appropriate cases, can benefit public safety. However, when pretrial detention is based solely on a defendant's inability to post bail, it instead undermines public safety and the functioning of the criminal legal system.

Georgia's Senate Bill 63 ("S.B. 63") places significant limitations on the ability of charitable bail funds, groups, and other individuals to pay bail and thus secure the release of indigent defendants who have been deemed safe for pretrial release. Amici are deeply concerned that S.B. 63's arbitrary limitations will result in large numbers of people incarcerated pretrial for no reason other than their poverty. This unnecessary pretrial detention deepens the inequality of a cash-bail-based criminal legal system, undermines confidence and trust in the criminal legal system, fails to promote safe communities, and will have deleterious effects on public safety.

Amici are thus gravely concerned about the harm S.B. 63 would inflict on Georgians if allowed to go into effect, and Amici are further concerned about the national implications of allowing the State of Georgia to implement S.B. 63.

Amici, who bring decades of experience as prosecutors and criminal justice leaders from around the country, have an interest in preserving and advancing public safety and fighting back against undue attacks on bail funds that serve an important public interest. Amici offer our views here respectfully as friends of the Court.[1]

## SUMMARY OF ARGUMENT

In 2024, the Georgia legislature enacted Georgia Senate Bill 63 ("S.B. 63"). Section 4 of S.B. 63 imposes two stringent restrictions on posting cash bail to secure people's release from pretrial detention and criminalizes any payment of bail not complying with those restrictions. First, S.B. 63 limits the number of times an organization or individual can post bail in a year to three. Second, it requires charitable bail entities to meet a variety of strict regulations that mimic the requirements for professional surety companies. By arbitrarily and severely limiting their work, S.B. 63 de-facto blocks all charitable bail actors—organizations and

---

[1] All parties have consented to the filing of this brief. Amici thus have authority to file it, based on Rule 29(a)(2) of the Federal Rules of Appellate Procedure. No party or counsel authored this brief in whole or in part, and no monetary contribution intended to fund the preparation or submission of this brief was made by such counsel or any party.

individuals—from securing the release of people incarcerated in Georgia pretrial regardless of the offense they have been charged with, the amount of bail set for their release, their risk to public safety, the likelihood they will fail to appear in court, or any other individual factor. S.B. 63 will therefore result in unnecessary pretrial detention. People who have been charged with minor offenses, pose no risk to public safety, and have bail set at as little as $1 will remain in custody for no reason other than their inability to pay their bail, at great cost to the person and the community.

Unnecessary pretrial detention—even briefly—has been linked to higher rates of mental and physical illness, homelessness, and the commission of future crimes. Unnecessary pretrial detention further costs taxpayers in the community precious resources. Rather than footing the enormous bill to detain people who are not a public safety risk, limited taxpayer dollars could be used to protect the public through enhanced investigations of serious offenses, increased victim assistance funds, and more robust social services to improve the well-being of community members and prevent crime. Unnecessary pretrial detention thus makes vulnerable populations even more vulnerable, communities less safe, and resources for assistance more scarce.

Pretrial incarceration that results solely from the poverty of the person incarcerated exacerbates the inequality in the criminal legal system and can lead to worse case outcomes for indigent defendants. This patent unfairness towards poor

people will inevitably lead to severe mistrust in the legal system, which makes it harder for prosecutors and police to gain community participation in the legal system, including reporting and solving serious crimes. The erosion of trust in the fairness of the criminal legal system and the rule of law therefore jeopardizes public safety.

The extreme restrictions that S.B. 63 imposes for bail payment would significantly increase the amount of people unnecessarily incarcerated pretrial with no public safety benefit, and will lead to worse public safety consequences. S.B. 63 does nothing, therefore, to improve public safety, and makes Georgians less safe in their homes and communities. Amici respectfully urge this court to affirm the District Court's order finding that S.B. 63 is unconstitutional and issuance of a preliminary injunction.

## ARGUMENT

### I. S.B. 63 Results in Unnecessary Pretrial Detention.

S.B. 63 imposes two severe restrictions on posting cash bail for people released from pretrial detention in Georgia. The first part of Section 4 of S.B. 63— the "Bond Limit"—limits "any individual, corporation, organization, charity, nonprofit corporation, or group" to pay bail three times per year. O.C.G.A. § 17-6-15(b)(4). The second part of Section 4—the "Surety Requirement"—requires every

"individual, corporation, organization, charity, nonprofit corporation, or group" that wishes to post bail on behalf of an accused person and "purports to be a charitable bail fund" to submit to the same requirements as professional surety companies. O.C.G.A. § 17-6-15(b)(4). These requirements include, among others, a valid business license, fingerprints and background check, establishment of a cash escrow account or other form of collateral, and completing specialized professional education. O.C.G.A. §§ 17-6-15(b)(1), 17-6-50.1. Even if these requirements are met, the sheriff still has discretion to decide whether the bail fund is acceptable. *Barred Business v. Kemp*, No. 1:24-cv-2744, slip op. at 46 (N.D. Ga. July 12, 2024) (hereinafter: District Court Order). Violating *either* the Bond Limit *or* the Surety Requirement is a misdemeanor offense that can be prosecuted by Georgia's local prosecutors or Attorney General. O.C.G.A. § 17-6-15(b)(5)-(6). Thus, in its entirety, S.B. 63 harshly restricts—and virtually halts—payment by charitable bail funds for people accused of crimes that a court determined can be released from pretrial detention.

Pretrial detention—keeping a person behind bars before they are convicted of a crime, despite the presumption of innocence—can be warranted from a public safety perspective when the person poses a danger or threat to other people in the community, or when their release would pose a risk to the administration of justice,

for example if they are likely to fail to appear in court.[2] However, S.B. 63, if allowed to go into effect, would lead to extensive *unnecessary* pretrial detention that is not related to any public safety purpose.

The specific restrictions and requirements that S.B. 63 sets for a third party to post bail will undoubtedly result in more people held pretrial for no reason other than their inability to pay their bail. First, S.B. 63 arbitrarily limits the amount of times per year that any individual, organization, or group can pay someone's bail to three. District Court Order, at 41 ("the three-cash-bond-per-jurisdiction limit is essentially arbitrary"). This limit restricts not only charitable bail funds but also individuals.[3] It's easy to imagine a situation in which someone has more than three family members or close friends arrested in a certain year, and thus would possibly be

---

[2] *See, e.g.*, ABA Standards for Criminal Justice: Pretrial Release 36 (2007); Will Dobbie & Crystal S. Yang, *The US Pretrial System: Balancing Individual Rights and Public Interests*, 35(4) J. Econ. Persp. 49, 54-55 (2021).

[3] At the District Court, the Defendants-Appellants offered a saving construction to S.B. 63 which would limit application of the Bond Limit to only charitable bail work, and thus the Bond Limit would not apply to all individuals and groups. The District Court found this interpretation "reasonable" but not rooted in the plain language of the statute. The Court further concluded that "the B[ond] Limit as written . . . fails to give a person of ordinary intelligence reasonable notice whether if they post three cash bonds for another person in any jurisdiction out of charity, they may be subject to prosecution for later posting a bond for themselves" and is thus "vague even as to individuals." District Court Order, at 20-23.

committing a crime if posting bail for the fourth arrested.[4] Moreover, if the person posting the bail was later arrested, they would not be able to secure their own release by paying the required cash bail without subjecting themselves to the possibility of prosecution. District Court Order, at 22.

Second, S.B. 63's use of the term "group," with no interpretation or mens rea element, potentially criminalizes actions of several individuals posting bail more than three times per year if they are considered to be acting together in some manner. District Court Order, at 17-19, 23. These restrictions and attached criminal penalties will dissuade people from posting bail for others, resulting in more people being detained pretrial for no reason other than their inability to pay.

Third, with regards to charitable bail funds, or any entity that "purports to be" one, S.B. 63 poses a wide array of burdensome requirements in order to post bail, forcing charitable bail organizations to adhere to the same strict set of rules that for-profit bonding companies must follow.[5] This unnecessary restriction will negatively impact charitable bail funds' ability to function. Unlike for-profit bonding

---

[4] The District Court's example of a mother seeking to post bail for her four children illustrates this point. District Court Order, at 17.

[5] As noted *supra*, these requirements include, among others, a valid business license, fingerprints and background check, establishment of a cash escrow account or other form of collateral, and completing specialized professional education (O.C.G.A. §§ 17-6-15(b)(1), 17-6-50.1); even if these are all met, the sheriff still has discretion to decide whether the bail fund is acceptable. District Court Order, at 46; *see also* District Court Order at 43-46 (explaining requirements).

companies, charitable bail funds post bail in its entirety and do not post a surety.[6] Charitable bail actors also have community ties to the people they pay bail for—further distinguishing them from professional bond companies and making them closer to friends, family, or neighbors of the bailees. As the District Court Order demonstrates, the Plaintiff-Appellees are all but distant from the people for whom they post bail. They work together with the bailees' families; wait for them in person as they walk out of jail to welcome them back into the community; provide them with necessities, services, and support; and stay in touch with them. District Court Order, at 3-4, 6-7, 9-10. Requiring charitable bail actors to conform to the requirements of for-profit bonding companies is unnecessary, illogical, and will only serve to limit the ability of charitable bail actors to pay bail for poor people, thus resulting in more unnecessary pretrial detention.

Increasing the amount of people that are incarcerated pretrial solely due to their inability to pay bail does nothing to improve public safety. As the District Court

---

[6] In a commercial bonding scenario, the individual detained or a family or friend pays a usually nonrefundable percentage of the bond to the bonding company, and in exchange the bonding company posts a surety to the Court. The legislature has created certain requirements of that company in order for the Court to be satisfied that if the individual fails to appear, the bonding company will pay the entire amount of the bond set by the Court. Charitable bail organizations, however, do not ask the Court to trust that the entirety of the bond will be paid in the event the individual fails to appear—the entire bond is already posted to the Court, and the Court can forfeit that bond in the event of absconsion.

noted, when a person is set for release on cash bail in Georgia, a court has already determined that he or she "(A) [p]oses no significant risk of fleeing… or failing to appear in court when required; (B) [p]oses no significant threat or danger to any person, to the community, or to any property in the community; (C) [p]oses no significant risk of committing any felony pending trial; and (D) [p]oses no significant risk of intimidating witnesses or otherwise obstructing the administration of justice." District Court Order, at 38; O.C.G.A. § 17-6-1(e)(1). For most misdemeanor offenses, the court is legally required to release arrestees on bail. O.C.G.A. § 17-6-1(b)(1). And as the District Court found, many people who had their bail posted by the Plaintiffs were charged with misdemeanors. District Court Order, at 9, 40. Therefore, the people who benefit from charitable bail funds and are released from pretrial detention in accordance with courts' decisions pose no threat to their community, and there is no public safety benefit—or other community interest—in keeping them in jail while they await their trials.[7]

Moreover, from a public safety perspective, there is no particular risk or concern when the bail is paid by charitable bail funds rather than other payers such as family members. The fact that a bond is posted by an individual or entity not

---

[7] In the District Court's words, "it bears stating that the persons being bailed out by Plaintiffs are not inherently flight risks or dangerous to the community. This context is important when considering the State's interest in enforcing the Bond Limit." District Court Order, at 39.

known to the person it benefits does not make that person suddenly more dangerous to the community. Notably, the State has not argued otherwise. Additionally, contrary to the State's argument, it does not adversely affect the person's likelihood of appearance in court. Extensive data—in research and court analyses—has consistently pointed to the significantly high court appearance rates of people whose bail was paid by charitable organizations. For example, the District Court for the Northern District of Alabama estimated this appearance rate to be 95%.[8] Data has also established that surety bonds—the only form of bond S.B. 63 allows—do not

---

[8] *See Schultz v. State*, 330 F. Supp. 3d 1344, 1363 (N.D. Ala. 2018) ("95% of nearly 2,300 criminal defendants whose bail was paid by charitable organizations, i.e. who had no 'skin in the game,' made all court appearances."); *see also* Jack Karp, *Do New Laws Seek To Regulate Charitable Bail, Or End It?* Law 360 (April 5, 2024) https://www.law360.com/articles/1820106 ("91% of the nearly 30,000 people The Bail Project has helped have returned for their court dates."); UCLA School of Law Criminal Justice Program, *California Pretrial Release Considerations: A Bench Book for California Superior Court Judges* 18 (2024), https://docs.google.com/document/d/1XjIdSne2B4X4CZ__89mY8sn3XGkufz5RC X3wB6dsO-M/edit ("Bail funds have shown that people return to court, even when a bail fund pays for their release and the individual has no financial ties to their bail payment. Charitable bail funds in California and around the country have demonstrated promising results, showing that people return to court when barriers to return are removed."). Studies have also shown that "failure to appear rates can be reduced by providing people with better and more explicit information on when and where to appear, as well as reminders of their court dates." U.S. Commission On Civil Rights, *The Civil Rights Implications of Cash Bail* 69 (2022) https://www.usccr.gov/files/2022-01/USCCR-Bail-Reform-Report-01-20-22.pdf.

achieve better results, in terms of court appearances or public safety, compared to unsecured bonds.[9]

Since the release of a person aided by the Plaintiffs-Appellees paying bail does not pose any threat to public safety or increase the likelihood that the bailees will fail to appear in court, no benefit to the state could be derived from curtailing charitable bail funds' ability to post bail. And as the District Court detailed, the people who have had their bail paid by the Plaintiffs-Appellees had no other way to be released, even though the amount of bond the court set for their release was often as little as $1 to $10. District Court Order, at 39-40. In requiring such a small monetary amount for the release, such as a single dollar, judges in those cases sent a clear message that they intended that these people would return to their communities. Keeping people in pretrial detention in these circumstances serves no

---

[9] *ODonnell v. Harris Cnty.*, 892 F.3d 147, 154 (5th Cir. 2018) (*overruled on other grounds by Daves v. Dallas County*, 64 F.4th 616 (5th Cir. 2023)) ("The court's review of reams of empirical data suggested… that 'release on secured financial conditions does not assure better rates of appearance or of law-abiding conduct before trial compared to release on unsecured bonds or nonfinancial conditions of supervision.'"); *see also* Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, Pretrial Justice Institute 11 (2013), https://www.ncsc.org/__data/assets/pdf_file/0017/1655/unsecured-bonds-the-as-effective-and-most-efficient-pretrial-release-option.ashx.pdf (showing higher court appearance rates for defendants who were released pretrial with unsecured bonds compared to secured bonds, especially for low-risk defendants).

public safety benefit and inflicts enormous human costs on the persons trapped in jail due to their poverty, their families, and the community.

## II.   Unnecessary Pretrial Detention Adversely Impacts Public Safety.

Unnecessary pretrial detention leads to a myriad of negative outcomes for public safety. Placing already vulnerable persons in the worst circumstances puts them at greater risk for losing their homes, their livelihoods, their jobs, and their children; exacerbates the symptoms of physical or mental health ailments, including substance abuse; and can trap them in a cycle of poverty and failure, which may lead to further criminal behavior. Additionally, people who are detained before trial are more likely to commit future crimes due to the criminogenic effects of incarceration, especially in facilities that are overcrowded and offer no treatment to address mental health issues, substance abuse, or other root causes of crime. Extensive pretrial detention is also extremely costly, and requires vast resources that could be better used to offer crime-preventing treatment or community services. Moreover, unnecessary pretrial detention can lead to worse case outcomes for defendants— including wrongful convictions or disproportionate sentences—and may also erode public trust in the legal system. When community members observe that their friends and loved ones remain incarcerated solely due to their lack of financial means to pay bail, admit to crimes they hadn't committed, and receive unfairly excessive sentences, they are more likely to view the criminal legal system as unjust. They are

also less likely to participate as witnesses, jurors, and to report crime as victims—which are all indispensable for ensuring public safety.

> **A.  Unnecessary Pretrial Detention Negatively Affects Public Safety by Placing Already Vulnerable People in Worse Circumstances and Raising Recidivism Rates.**

There is extensive data and research demonstrating the negative consequences of pretrial detention on the person detained. Detention before trial, even briefly, can result in the loss of employment, housing, government assistance, education, and child custody.[10] A person detained in jail—even though still presumed innocent—may be unable to access necessary mental-health and medical treatment, including

---

[10] *See Moving Beyond Incarceration for Women in Massachusetts: The Necessity of Bail/Pretrial Reform*, Wellesley Centers for Women (2015), https://www.wcwonline.org/images/PolicyBrief3.15.Bail.Pretrial_Reform.pdf (showing that in a study of women incarcerated pretrial in Massachusetts, although half owned or rented their own home prior to their incarceration they were at risk of being evicted as a result of their incarceration); Tiffany Bergin, René Ropac, Imani Randolph, Hannah Joseph, *The Initial Collateral Consequences of Pretrial Detention: Employment, Residential Stability, and Family Relationships,* Arnold Ventures & N.Y. Criminal Just. Agency, (2022), https://www.nycja.org/assets/downloads/Collateral-Consequences-Results-Summary-Brief.pdf (showing that participants who were detained pretrial were 74% more likely to become unemployed than counterparts who are not detained; that pretrial detention is associated with a 420% increased likelihood of becoming homeless; and that detained individuals had a 57% likelihood of being inhibited in their ability to provide for their children due to their justice involvement compared to a 41% likelihood for people who are not detained pretrial).

drug therapy.[11] Opportunities for pretrial supervision or diversion programs, which address underlying factors that contribute to criminal behavior, may be unavailable.

If people are not able to get the help they need to address the factors that lead to the commission of crimes, such as severe poverty, addiction, and mental and physical health concerns, they are more likely to reoffend or become victims of crimes themselves.[12] Rather than keeping communities safer, pretrial detention— even for just 24 or 48 hours—can actually increase future criminal behavior and likelihood of arrest, particularly for defendants who are deemed to pose a lower risk. Studies have found that the duration of pretrial detention is associated with significant increases in both new pretrial criminal activity (after release) and future recidivism,[13] and data shows that pretrial detention of misdemeanor defendants is

---

[11] Emily Widra, *Addicted to Punishment: Jails and Prisons Punish Drug Use Far More Than They Treat It*, Prison Policy Initiative (January 30, 2024) https://www.prisonpolicy.org/blog/2024/01/30/punishing-drug-use/.

[12] *See* Caitlin Delong & Jessica Reichert, *The Victim-Offender Overlap: Examining the Relationship Between Victimization and Offending*, Ill. Crim. Just. Info. Auth. Center for Justice Research & Evaluation 1 (Jan 15, 2019) (calling the phenomenon of victim-offender overlap "one of the strongest empirical associations in criminological literature."); *see also* Cynthia Godsoe, *The Victim/Offender Overlap and Criminal System Reform,* 87(4) Bklyn L. Rev. 1319 (2022), https://brooklynworks.brooklaw.edu/blr/vol87/iss4/10/ (hereinafter: Godsoe).

[13] *See* Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, Laura & John Arnold Found., *The Hidden Costs of Pretrial Detention* 4 (2013), https://craftmediabucket.s3.amazonaws.com/uploads/PDFs/LJAF_Report_hidden-costs_FNL.pdf (Hereinafter: Lowenkamp et al.).

associated with increased future crime and re-incarceration.[14] Research has particularly shown adverse effects that overcrowded detention facilities have on public safety.[15] Therefore, by increasing the likelihood of future criminal conduct,

---

[14] Paul Heaton, Sandra Mayson & Megan Stevenson, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69(3) Stan. L. Rev. 711, 718 (2017), https://perma.cc/B7MF-9RLV (hereinafter: Heaton et al.) (examining misdemeanor defendants in Harris County and finding that "detention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges" in 18-month period after a bail hearing); *see also* Michael Mueller-Smith, *The Criminal and Labor Market Impacts of Incarceration* 3 (Working Paper, 2015), https://sites.lsa.umich.edu/mgms/wp-content/uploads/sites/283/2015/09/incar.pdf.

(examining effects of post-sentencing incarceration in Harris County and finding that "short-run gains" of incapacitation while a person is jailed "are more than offset by long-term increases in post-release criminal behavior").

[15] *See*, *e.g.*, Rachel Leah Arco, *When Conditions of Confinement Lead to Violence: Eighth Amendment Implications of Inter-Prisoner Violence*, 20 Hous. J. Health L. & Pol'y 411, 433 (2020-2021), https://www.law.uh.edu/hjhlp/volumes/Vol_20-2/3_Arco.pdf (finding that "crowded spaces, coupled with overwhelmed resources and disorder, increase opportunities and instances of violence whether due to idleness or lack of meaningful opportunities. The threat is even greater when the state places violent offenders in extremely close confines."); Michael A. Ruderman, Deirdra F. Wilson & Savanna Reidadd, *Does Prison Crowding Predict Higher Rates of Substance Use Related Parole Violations? A Recurrent Events Multi-Level Survival Analysis*, 10(10) PLoS ONE (2015), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0141328 (finding that prison crowding predicts higher rates of parole violations after release from prison); United States Government Accountability Office, *Growing Inmate Crowding Negatively Affects Inmates, Staff, & Infrastructure* (2012), https://www.gao.gov/assets/gao-12-743.pdf (finding that growth in the prison population has negatively affected inmates, staff, and infrastructure; it specifically increased waiting lists for education and drug treatment programs, limited meaningful work opportunities, and increased inmate-to-staff ratios, leading to increased inmate misconduct, negatively affecting the safety and security of inmates and staff); Quentin King, *Overcrowded and Overburdened: West Virginia Counties Struggle to Pay Regional Jail Bills*, West Virginia Center on Budget and Policy

rather than providing services that can help address its underlying causes and prevent it, pretrial incarceration has a significant detrimental effect on public safety. And more unnecessary pretrial detention increases the jail population, creating overcrowded and under-resourced detention facilities, and exacerbating the negative public safety effects.

In addition, pretrial detention is very costly and diverts resources that could be better used for more effective public safety interventions. Once released, defendants can still be monitored pending trial through pretrial supervision or diversion programs. Although these programs require resources, their financial cost is far less than that of pretrial detention. In the Federal Judiciary, for example, pretrial supervision cost only about $11 per defendant per day in 2022.[16] Compared to the $92 per-day estimate for pretrial detention, pretrial supervision is far more cost-effective.[17] Even limited and low-cost steps to encourage appearances, such as

---

(2021) https://wvpolicy.org/wp-content/uploads/2021/01/WVCBP-Jail-Cost-Brief.pdf (finding that West Virginia counties are entirely unable to pay for the high cost of unnecessary pretrial detention, leading to less investment in local service programs such as law enforcement, emergency services, youth programs, and paid family leave).

[16] Pretrial Release and Detention in the Federal Judiciary, https://www.uscourts.gov/services-forms/probation-and-pretrial-services/pretrial-services/pretrial-release-and-detention.

[17] *Id*.; *see also* Marie VanNostrand & Gena Keebler, *Pretrial Risk Assessment in Federal Court*, Fed. Probation 17-18 (2009) (finding annual cost of pretrial detention

phone calls or text-message reminders about court dates, effectively reduce failure-to-appear rates.[18] By using limited resources to incarcerate people for often non-violent misdemeanor offenses, unnecessary pretrial incarceration wastes valuable resources that could be better utilized to solve and prevent more serious crimes.

### B. Unnecessary Pretrial Detention May Contribute to Wrongful Convictions and Public Perceptions of Unfairness in the Criminal Legal System, Which Negatively Impacts Public Safety.

Pretrial detention also negatively impacts a person's ability to mount a successful or effective defense to the charges against them, which can result in wrongful convictions, disproportionate sentences, decreased public trust in the criminal legal system, and ultimately, increased public safety risks. Access to counsel while in detention may be severely hampered, undermining preparation of a defense, enlistment of witnesses, and accumulation of evidence.[19] These factors

---

until case resolution to vary between $18,768 and $19,912, while pretrial release and supervision averaged $3,860).

[18] Brice Cooke, Binta Zahra Diop, Alissa Fishbane, Jonathan Hayes, Aurélie Ouss & Anuj Shah *Text Message Reminders Decreased Failure to Appear in Court in New York City*, Jameel Poverty Action Lab (2018), https://www.povertyactionlab.org/evaluation/text-message-reminders-decreased-failure-appear-court-new-york-city.

[19] Department of Justice, *Report and Recommendations Concerning Access to Counsel at the Federal Bureau of Prisons' Pretrial Facilities* (2023), https://www.justice.gov/d9/2023-07/2023.07.20_atj_bop_access_to_counsel_report.pdf.

contribute to worse outcomes for detained indigent defendants, including a greater likelihood of conviction and a greater likelihood of longer sentences compared to those released.[20]

To avoid these negative consequences, accused persons may seek quick guilty pleas, particularly if they are eligible for probation, as the most expedient way to obtain release.[21] As a District Court in Texas explained, "credible, reliable, and well-supported" evidence and studies "overwhelmingly prove that thousands of misdemeanor defendants each year are voluntarily pleading guilty knowing that they are choosing a conviction with fast release over exercising their right to trial at the cost of prolonged detention."[22] This desperate decision made by defendants in pretrial detention may result in the conviction of innocent people, caught in the Hobson's choice between (1) pleading guilty and being immediately (or more

---

[20] Conference of State Court Admins., *2012-2013 Policy Paper: Evidence-Based Pretrial Release* 5 (2013), https://cosca.ncsc.org/__data/assets/pdf_file/0019/1639/evidence-based-pre-trial-release-final.ashx.pdf.

[21] *See* Will Dobbie, Jacob Goldin & Crystal S. Yang, *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges* 108(2) Am. Econ. Rev. 201, 203 (2018), https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20161503 (finding decrease in conviction rates for people released pretrial, "largely driven by a reduction in the probability of pleading guilty," with data suggesting the decrease occurs "primarily through a strengthening of defendants' bargaining positions before trial").

[22] *ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1107 (S.D. Tex. 2017).

quickly) released, or (2) contesting their charges and continuing to be detained even while retaining, at least formally, the presumption of innocence. In the District Court's words, that predicament is "the predictable effect of imposing secured money bail on indigent misdemeanor defendants."[23] By increasing the likelihood that people will plead guilty to a crime they did not commit or accept a sentence they would be unlikely to receive if they were able to spend time litigating or negotiating their case without the pressure of incarceration, unnecessary pretrial detention leads to increased wrongful convictions and excessive sentences.[24] This is detrimental for public trust and confidence in the fairness of the criminal legal system.[25]

The fact that a person's pretrial incarceration can be caused solely due to their acute poverty further destroys confidence in the fairness of the criminal legal system. As Amici are well aware, the people most adversely impacted by wealth-based bail

---

[23] *Id.*

[24] Léon Digard & Elizabeth Swavola, *Justice Denied: The Harmful and Lasting Effects of Pretrial Detention*, Vera Inst. of Just. (2019), https://www.vera.org/downloads/publications/Justice-Denied-Evidence-Brief.pdf.

[25] *See* Natalia Ermasova, Erica Ceka, Aubrey Adams & Lisa Jackson, *Perceptions Toward Wrongful Convictions and Needed Reforms in the Criminal Justice System: Does Working Experience in Law Enforcement Matter?* Qualitative Criminology (2024), https://www.qualitativecriminology.com/pub/7tlj85ll/release/1 ("wrongful convictions have been recognized as a failure of the justice system that poses a significant challenge to the integrity and legitimacy of the criminal justice system").

systems are often those from communities where crime is more prevalent.[26] Victims and witnesses whom prosecutors rely on for evidence and testimony often are or have been defendants in criminal cases, especially misdemeanor cases.[27] When people witness or experience pretrial detention based solely on the inability to post bail while other similarly-situated defendants are released because they have money, they will question the legitimacy of the criminal legal system and its actors. Additionally, the link between wealth-based pretrial detention and worse case outcomes for defendants undoubtedly harms the community's faith in the fairness of the criminal legal system.

The destruction of confidence in the legal system significantly harms public safety. The United States Supreme Court recognized this in the relationship between the public and the Courts, writing that "[J]ustice must satisfy the appearance of justice." *Offut v. United States*, 348 U.S. 11, 14 (1954). Our legal system "depends in large measure on the public's willingness to respect and follow its decisions." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445-46 (2015). It is quite common for a

---

[26] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34(4) J.L. Econ. & Org. 511, 542 (2018) (hereinafter: Stevenson).

[27] Godsoe, *supra* note 12, at 1324 (noting that there is a significant racial component to this phenomenon, "youth of color are more likely than their peers to report experiencing or witnessing community violence" although they are the least likely to be recognized as victims due to racial and gender stereotypes, despite men of color committing the majority of offenses.)

family member or close friend of a victim or witness to have been charged with a crime at some point. The willingness of these victims and witnesses to report crimes to law enforcement, cooperate with prosecutors, show up for court proceedings, and testify truthfully depends in part on their belief that the judicial system will treat them and their loved ones fairly. Indeed, research supports that when people have trust in legal authorities and view the police, the courts, and the law as legitimate, they are more likely to report crimes, cooperate as witnesses, and accept police and judicial system authority.[28] In contrast, when the public does not trust the criminal legal system, community members may be less willing to participate in the criminal legal system. This reluctance hampers the ability of the courts, police, and

---

[28] *See* Tom R. Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 263 (2008), https://kb.osu.edu/server/api/core/bitstreams/9f207de7-8f1e-550b-bae1-be261bd741f7/content ("[Findings] demonstrate that people are more willing to cooperate with the police when they view the police as legitimate social authorities. If people view the police as more legitimate, they are more likely to report crimes in their neighborhood. In addition, minority group members are more likely to work with neighborhood groups."); Tom R. Tyler & Jonathan Jackson, *Popular Legitimacy and the Exercise of Legal Authority: Motivating Compliance, Cooperation and Engagement*, 20 Psych., Pub. Pol'y & L. 78, 78-79 (2014), https://law.yale.edu/sites/default/files/area/center/justice/document/ssrnpopularlegitimacy.pdf ("The most important finding of this study is that legitimacy plays a significant role in motivating law related behavior. The prior role of legitimacy in shaping compliance is replicated, as is the role of legitimacy in encouraging cooperation, including ceding power to the state and helping to address problems of crime and social order. In addition, legitimacy is shown to have a role in motivating empowerment, e.g. in building social capital and facilitating social, political and economic development.").

prosecutors to fulfill their public safety obligations.[29] Without cooperating victims and witnesses, police are unable to investigate, prosecutors are unable to bring charges, and juries are unable to convict the guilty or free the innocent. Thus, by eroding trust in the criminal legal system, unnecessary pretrial incarceration makes communities less safe.

## III.    By Increasing the Number of People Unnecessarily Held Pretrial, S.B. 63 is Detrimental to Public Safety.

S.B. 63's provisions that prevent the release of people who have no access to funds for bail other than through third party charitable means will have a negative effect on public safety. As explained above, studies demonstrate that pretrial detention—even of short duration—increases the likelihood of future crime, arrest, and sentencing severity, especially for people who are classified as low risk, held on the smallest amounts of bail, and charged with misdemeanors rather than felonies.[30]

---

[29] *See In Pursuit of Peace: Building Police-Community Trust to Break the Cycle of Violence,* Giffords Law Center to Prevent Gun Violence, (September 9, 2021), https://giffords.org/report/in-pursuit-of-peace-building-police-community-trust-to-break-the-cycle-of-violence/ (violent crime rates increase in areas with a lack of public trust in law enforcement).

[30] *See* Lowenkamp et al., *supra* note 13 (which found the impact of pretrial detention to be greatest for people assessed to be low risk); *See also* Laura & John Arnold Found., *The Hidden Costs of Pretrial Detention Revisited* (2022), https://craftmediabucket.s3.amazonaws.com/uploads/HiddenCosts.pdf; Heaton et al., *supra* note 14, at 6 (which found the greatest impact on people held on lower bail amounts); and Stevenson, *supra* note 26, at 536 (which found the strongest effect for people facing misdemeanor charges).

These are the very persons that charitable bail organizations like the Plaintiffs-Appellees seek to help[31] and therefore mitigate the causal relationship between pretrial incarceration and its various adverse public safety outcomes. The Plaintiffs-Appellees often release people who are not able to pay even small amounts of cash bail and would otherwise remain incarcerated before being convicted.[32] Even if those people would eventually be able to secure the amount of bail needed for their release, the increased time they would spend in pretrial detention could itself have a damaging effect on their future conduct and well-being. This is especially true in Georgia's overcrowded detention facilities.[33]

While charitable bail funds or other third party payment of bail can mitigate economic inequality in the criminal legal system, S.B. 63's restrictions will exacerbate that inequality with devastating effects on public faith and trust in institutions. S.B. 63's arbitrary restrictions, such as the provision permitting a party to pay bail no more than three times per year, has a discriminatory impact on

_____

[31] *See* District Court Order, at 9, 40.

[32] *Id*.

[33] *See, e.g.*, Stanley Dunlap, *Georgia Senate Panel Considers Solutions to Ease Overcrowding at Local Jails*, Georgia Recorder (April 29, 2024), https://georgiarecorder.com/2024/04/29/georgia-senate-panel-considers-solutions-to-ease-overcrowding-at-local-jails/; Stanley Dunlap, *State Lawmakers Dig into Violent Conditions in Georgia Prisons, Fulton Jail*, WABE (August 26, 2024), https://www.wabe.org/state-lawmakers-dig-into-violent-conditions-in-georgia-prisons-fulton-jail/.

individuals and communities in which poverty is the main roadblock to release and criminal legal system contacts are more prevalent. Moreover, requiring charitable bail funds to abide by the requirements of for-profit bonding agencies is an attempt to burden these bail funds out of existence so that they cannot help anyone who remains incarcerated pretrial for no reason other than their poverty. Community members, especially in low-income communities such as the ones directly affected by S.B. 63, will have less faith in the fairness of the law and lose trust in the criminal legal system as a whole. And as Amici all know firsthand, public safety cannot be achieved without the community's trust in the criminal legal system and the cooperation of victims and witnesses with law enforcement.

Further, S.B. 63 not only curtails bail funds' and other groups and individuals' ability to post bail on behalf of others to secure their release from pretrial detention—it also *criminalizes* this action. It puts people in an absurd position where they must make an impossible choice between helping family or community members and risking involvement in the criminal legal system themselves. Thus, S.B. 63 not only increases unnecessary pretrial detention, but also risks ensnaring even more people in the criminal legal system, merely for trying to be good parents, friends, or community members. Widening the net of the criminal legal system in this way—especially by creating vague, capricious, and over-inclusive crimes, leading to

arbitrary and problematic enforcement—does not create safe communities or achieve public safety goals.

Where bail has been imposed, and a court has determined that there is no public safety reason to hold someone behind bars before their trial, S.B. 63's creation of unnecessary and arbitrary roadblocks to achieving release serves no public interest. It only hampers a fair criminal justice system, harms public safety, prevents social services from addressing the underlying causes of criminal activity and recidivism, and wastes public funds that can be better invested in preventing and fighting crime. As Supreme Court Justice Arthur Goldberg cautioned more than 50 years ago, "[t]hink of the needless waste—to the individual, the family, and the community—every time a responsible person presumed by a law to be innocent is kept in jail awaiting trial solely because he is unable to raise bail money."[34] Blocking the Plaintiffs-Appellees from serving people in need lies in stark contradiction with any public safety rationale. Amici are gravely concerned for the well-being and safety of Georgians if S.B. 63 goes into effect.

## CONCLUSION

Amici are deeply concerned with the arbitrary, severe, and undue restrictions that S.B. 63 places upon charitable bail actors, whether organizations or individuals.

---

[34] Arthur Goldberg, *Equality and Governmental Action*, 39 N.Y.U. L. Rev. 205, 222 (1964).

Charitable bail can serve an important public interest by decreasing the number of people held in unnecessary pretrial detention despite a court determining that they pose no risk for flight or danger to others and should be released to the community. Unnecessary pretrial detention adversely affects the economic, emotional, mental, and physical well-being of those incarcerated, leading to increases in homelessness and deepening cycles of poverty. This in turn harms public safety, as people are more likely to recidivate when they are held for no reason other than their inability to pay bail. Creating roadblocks for their release does nothing to improve public safety or increase the likelihood of court appearances. S.B. 63 therefore provides no benefit to the state and makes everyone in Georgia less safe. Amici urge the Court to affirm.

Respectfully submitted, this 15th day of November, 2024.

**Zack Greenamyre**
Zack Greenamyre
Georgia Bar No. 293002

MITCHELL SHAPIRO GREENAMYRE & FUNT, LLP
881 Piedmont Avenue
Atlanta, GA 30309
Phone: 404-812-4747
Fax: 404-812-4740
zack@mitchellshapiro.com

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this document complies with the 6,500-word limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,496 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman font. The brief was prepared using Microsoft Word.

This 15th day of November, 2024.

**Zack Greenamyre**
Zack Greenamyre
Georgia Bar No. 293002

## CERTIFICATE OF SERVICE

I certify that on this date I served the foregoing by electronically filing with the CM/ECF system, which constitutes service upon attorneys of record under 11th Cir. Doc. 25-3(a).

This 15th day of November, 2024.

**Zack Greenamyre**
Zack Greenamyre
Georgia Bar No. 293002

# APPENDIX A: LIST OF AMICI

**Diana Becton**
District Attorney, Contra Costa County, California

**Buta Biberaj**
Former Commonwealth's Attorney, Loudoun County, Virginia

**Sherry Boston**
District Attorney, DeKalb County, Georgia

**Chesa Boudin**
Former District Attorney, City and County of San Francisco, California

**John Choi**
County Attorney, Ramsey County (St. Paul), Minnesota

**Dave Clegg**
Former District Attorney, Ulster County, New York

**John Creuzot**
District Attorney, Dallas County, Texas

**Parisa Dehghani-Tafti**
Commonwealth's Attorney, Arlington County and the City of Falls Church, Virginia

**Steve Descano**
Commonwealth's Attorney, Fairfax County, Virginia

**Michael Dougherty**
District Attorney, Twentieth Judicial District (Boulder), Colorado

**Matt Ellis**
District Attorney, Wasco County, Oregon

**Ramin Fatehi**
Commonwealth's Attorney, City of Norfolk, Virginia

**Gil Garcetti**
Former District Attorney, Los Angeles County, California

**Stan Garnett**
Former District Attorney, Twentieth Judicial District (Boulder), Colorado

**Sarah F. George**
State's Attorney, Chittenden County (Burlington), Vermont

**Sim Gill**
District Attorney, Salt Lake County, Utah

**Deborah Gonzalez**
District Attorney, Western Judicial Circuit (Athens), Georgia

**Kimberly Graham**
County Attorney, Polk County, Iowa

**Natasha C. Irving**
District Attorney, Sixth Prosecutorial District, Maine

**Justin F. Kollar**
Former Prosecuting Attorney, County of Kaua'i, Hawaii

**Lawrence S. Krasner**
District Attorney, Philadelphia, Pennsylvania

**Beth McCann**
District Attorney, Second Judicial District (Denver), Colorado

**Mary Moriarty**
County Attorney, Hennepin County (Minneapolis), Minnesota

**Steve Mulroy**
District Attorney, Shelby County (Memphis), Tennessee

**Channing Phillips**
Former United States Attorney, District of Columbia

**Richard J. Pocker**
Former United States Attorney, District of Nevada

**Dalia Racine**
District Attorney, Douglas County, Georgia

**Ira Reiner**
Former District Attorney & Former City Attorney, Los Angeles, California

**Stephen D. Rosenthal**
Former Attorney General, Virginia

**Jacqueline A. Sartoris**
District Attorney, Cumberland County (Portland), Maine

**Eli Savit**
Prosecuting Attorney, Washtenaw County (Ann Arbor), Michigan

**Mike Schmidt**
District Attorney, Multnomah County (Portland), Oregon

**Carol Siemon**
Former Prosecuting Attorney, Ingham County (Lansing), Michigan

**Carter Stewart**
Former United States Attorney, Southern District of Ohio

**David Sullivan**
District Attorney, Northwestern District, Massachusetts

**Shannon Taylor**
Commonwealth's Attorney, Henrico County, Virginia

**Anthony F. Troy**
Former Attorney General, Virginia

**Matthew Van Houten**
District Attorney, Tompkins County, New York

**William D. Wilmoth**
Former United States Attorney, Northern District of West Virginia